**ELECTRONICALLY FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

| | |
|---|---|
| CHARLES W. ADAMS, JR., et al. | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| v. | ) CASE NO. 5:03-CV-476-JBC |
| | ) |
| COOPER INDUSTRIES, INC. | ) |
| and MCGRAW EDISON CO. | ) |
| | ) |
| Defendants | ) |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO
EXCLUDE PLAINTIFFS' EXPERTS MILLER, BACON, AND DEAN,
IDENTIFIED IN VIOLATION OF THE COURT'S SCHEDULING ORDERS**

Defendants, Cooper Industries, Inc. and McGraw Edison Company,
respectfully submit this Memorandum in support of their Motion to Exclude
Plaintiffs' Experts Miller, Bacon and Dean.

**I.  PLAINTIFFS' "SUPPLEMENTAL" EXPERT REPORTS ARE
IMPROPER**

This matter is set for trial in January 2007.  Since spring, the parties have
worked hard to accommodate each other's schedules and to work through
discovery issues with minimal court assistance.  Due to a wholly improper and
strategic proliferation of no less than ten so-called "supplemental" reports by
plaintiffs' newly- or previously- disclosed experts, the situation has gotten out of
hand, working wholesale changes to plaintiffs' expert disclosures, creating a

quintessential moving target, and wreaking havoc with orderly expert discovery to defendants' substantial detriment.

When the Court set the January 2007 trial date, it also set deadlines for Rule 26 expert disclosures.[1]  Plaintiffs' expert disclosures were due on April 17, 2006. Defendants' expert disclosures were due on May 29, 2006.  After various accommodations, all initial expert disclosures were made by July – or so it appeared.

In addition to those initial disclosure deadlines, the Court included a provision for "supplemental" disclosures – initially September 1 and later changed to October 1.[2]  The parties discussed the scope of those supplemental disclosures in May 2006.  Any such supplemental reports were to be narrowly confined as rebuttal to the opposing party's expert reports:

> I also want to confirm our agreement that if the [initial] reports, when received, suggest to the opposing party that he/she may need an additional expert to testify *in rebuttal to the subject matter contained in the opposing party's expert witness report*, the opposing attorney will have a reasonable period of time, I suggest 21 days, in which to retain the expert and advise the opposing party of the expert information which we are now agreeing to submit by the original deadlines, i.e., name, CV and subject matter. The retaining party will then have 30 days to complete and file the Rule 26 report.

---

[1] See Order of February 12, 2006, a copy of which is attached as Exhibit A.

[2] See August 31, 2006 Order Amending Scheduling Order of February 13, 2006, attached as Exhibit B.

> **I want to confirm that if new experts are retained under the above agreement, they will be retained as *rebuttal* witnesses to the information supplied in the reports.  In other words, we will not find people who will address a new subject matter for the first time.**[3]

Several months later, plaintiffs filed their "Plaintiffs' Supplemental Rule 26 Disclosure of August 31, 2006."   This document does not provide supplemental Rule 26 information regarding any of the 17 previously-identified plaintiffs' experts.   Instead, it identifies four new experts[4] who purport to be offering rebuttal testimony – but who in fact are not offering rebuttal testimony at all.   These new experts offer opinions that fall squarely within plaintiffs' original and obvious burden of proof in this case.

First, Dr. Miller, a hematologist, now offers the fundamental causation opinion that plaintiff Mary Jessie's non-Hodgkin's lymphoma was caused by the alleged chemical exposure.[5]  Second, Dr. Bacon, a liver specialist, now offers the fundamental causation opinion that Mr. Roper's liver disease was caused by the alleged chemical exposure.[6]  Third, Dr. Dean, a pathologist who examined the 2002 and 2003 liver biopsy slides of plaintiff Curtis Roper, now offers opinions

---

[3] See letter from Harry K. Herren, counsel for defendants, to Donna Holt, counsel for plaintiffs, dated May 12, 2006 (emphasis supplied), a copy of which is attached as Exhibit C.

[4] Plaintiffs' August 31, 2006 disclosure designated four new experts – Drs. Miller, Bacon, Dean, and Rich.  However, Defendants do not move to exclude Dr. Rich in this motion.

[5] Dr. Miller's expert report is attached as Exhibit D.

[6] Dr. Bacon's expert report is attached as Exhibit E.

about his review of those slides.[7] None of these opinions could by any stretch be considered "rebuttal" opinions. The Court accordingly should exclude these three experts.

Even more recently – in late September and in October, plaintiffs filed additional, so-called "supplemental" reports from another new expert, Dr. Sawyer, and from the previously-retained experts Drs. Carpenter, Sawyer, Orris, Rodgers, and Kramer, and Mr. Peake. Two of these "supplemental" reports – from Drs. Sawyer and Carpenter – relate to analytical blood data, which Dr. Carpenter recommended that plaintiffs' counsel obtain approximately *one year ago* but which were not obtained by plaintiffs at that time, purportedly due to the modest cost involved. The "supplemental" report by Mr. Peake addresses air-dispersion modeling, which he discussed in his initial Rule 26 report, but chose not to perform at that time. None of these reports is proper "rebuttal" either and defendants will file motions regarding those more recent "supplements" separately, as noted below. Rather, they are part and parcel of a massive strategic attempt to work wholesale changes to plaintiffs' vast array of expert disclosures after defendants spent considerable time and resources addressing the opinions that plaintiffs' experts initially put forth.

---

[7] Dr. Dean's expert report is attached as Exhibit F.

## II. REBUTTAL OPINIONS MUST ADDRESS "NEW, UNFORESEEN" FACTS -- NOT ESSENTIAL ELEMENTS OF PLAINTIFFS' PROOF.

BLACK'S LAW DICTIONARY defines "rebut" as meaning "to refute, oppose or counteract by evidence, argument, or contrary proof."[8]  As the First Circuit has put it, "the principal objective of rebuttal is to permit a litigant to counter new, unforeseen facts brought out in the other side's case."[9]

Rebuttal evidence is that "which has become relevant or important only as an effect of some evidence introduced by the other side."[10]  Thus, the "scope of rebuttal testimony is limited by the evidence adduced by the opposing party."[11]  Rebuttal evidence may also be permitted to "counter new facts presented in the defendant's case in chief.  New facts might include surprise evidence that the defendant presents, or evidence that, through no fault of his own, the plaintiff was unable to present earlier."[12]

In *Marmo v. Tyson Fresh Meats, Inc.*,[13] the parties were under a progression order relating to the designation of witnesses.  Plaintiff had designated a Dr. Kilburn as her primary expert, and then not long before trial identified a Dr. Meggs as a rebuttal expert.  The district court excluded Dr. Kilburn in response to a *Daubert* challenge and plaintiff then sought to redesignate Dr. Meggs as her primary witness.  The trial court refused to allow plaintiff to do so, noting that it

---

[8] BLACK'S LAW DICTIONARY 1295 (8th Ed. 2004).

[9] *Faigin v. Kelly,* 184 F.3d 67, 85 (1st Cir. 1999).

[10] *Nickey v. Brown,* 454 N.E. 2d 177 (Ohio Ct. App. 1982).

[11] *Id.*

[12] *Miller v. Akron General Medical Center,* No. 14368, 1990 WL 106215, at *2 (Ohio Ct. App. July 25, 1990).

[13] 457 F.3d 748 (8th Cir. 2006).

would be highly prejudicial to defendants who had developed their trial strategy and named their own experts based on the plaintiff's selection of her primary expert.[14]

In this case, the agreement that the parties could file supplemental expert reports was *not* designed to help plaintiffs get "better" experts once they saw the reports of the experts identified by the defendants. Nor was it designed to allow plaintiffs to perform work that should have been done at the time their expert disclosures were initially due. In *Gilette Foods, Inc. v. Bayernwald-Fruchterverwertung, GMBH,*[15] the Court considered such an effort. There, plaintiff had designated two certified public accountants to testify on the issue of damages. Defendants selected as their expert a CPA who was also a professor. His analysis of damages was much more sophisticated than that done by the plaintiff's experts. Plaintiff attempted to get around this problem by designating an economics professor as a rebuttal witness. The trial court refused to permit the expert to testify in response to the defendant's better-qualified expert because it would be unfair to the defendant. This same situation exists in this case and this Court should reach the same result.

The parties agreed to supplemental reports to allow them to respond to unanticipated evidence or unanticipated theories raised by the opposing side. But defendants did not agree that plaintiffs could avoid the expert disclosure

---

[14] *Id.* at 760.

[15] No. 87-1509, 1990 WL 238620 (D. N.J. January 8, 1991).

6

deadline simply by adding more experts or more expert reports to address what

"was or should have been raised in plaintiff's case in chief."[16]   As the Sixth

Circuit has explained in discussing rebuttal testimony:

> Rebuttal testimony is not merely a restatement or repeat of the
> expert opinion first given by the plaintiff's expert in the plaintiff's
> case in chief; its presentation is not warranted merely because a
> defense expert gave an opinion contrary to the Plaintiff's expert.
>
> * * *
>
> Thus, when plaintiff's expert and treating physicians opined that
> her injuries were caused by lithium toxicity, and a defense expert
> opined that they were psychogenic, plaintiff cannot rebut by
> reiterating that her injuries were caused by lithium. . . . This is not
> true rebuttal testimony. True rebuttal specifically rebuts issues first
> raised in the defendants' case and concerning matters that should
> not have been raised in the plaintiff's case in chief, as she need not
> preemptively counter defense arguments.   Dr. Spring's desired
> testimony, as described in plaintiff's brief, is merely reiteration of
> her expert's opinion and the opinions of her treating physicians.[17]

The Sixth Circuit has consistently defined "rebuttal testimony" as that

which "is responsive to new information by the other party."[18]  As that Court has

colorfully put it, a plaintiff is not allowed to present expert testimony "merely by

sticking the label 'rebuttal' on a neglected part of its affirmative case."[19]

The Sixth Circuit has also noted that if the substance of the testimony

proposed to be offered as rebuttal has already been presented to the jury through

---

[16] *Mitchell v. Columbiana County Mental Health Center,* No. 00-CO-46, 2001 WL
1647180 (Ohio Ct. App. Dec. 20, 2001).

[17] *Id.*

[18] *In Re Air Crash Disaster*, 86 F.3d 498, 528 (6th Cir. 1996).

[19] *Id.* at 528.

direct and cross examination of other witnesses, it is completely proper to exclude that proposed testimony.[20]

### III. PLAINTIFFS' INITIAL EXPERTS ALREADY OPINED THAT MS. JESSIE'S NON-HODGKINS LYMPHOMA WAS CAUSED BY EXPOSURES FROM THE SITE.

Here, plaintiffs have always had the burden of proving the cause of plaintiffs' medical conditions.  Plaintiff Mary Ann Jessie asserts claims for non-Hodgkin's lymphoma (NHL), for which she was diagnosed in 2002 and successfully treated.  In their April 17, 2006 Plaintiffs' Rule 26 Designation of Expert Witnesses, plaintiffs designated three medical doctors to offer opinions concerning Ms. Jessie's NHL – Drs. Orris, Rodgers, and Carpenter – each of whose opinions concerning Ms. Jessie are addressed below.[21]  By May 2006, plaintiffs had complete causation opinions regarding Ms. Jessie's NHL and their effort to offer new expert opinions under the guise of "rebuttal" must fail.

Dr. Peter Orris is an Illinois licensed practicing physician who examined Ms. Jessie (and Mr. Roper, as discussed below), and who testified for plaintiffs in the *Robinett* case.  Dr. Orris graduated from Harvard University, received a Masters in Public Health from Yale, and then received his M.D. from Chicago Medical College in 1975.  He is the past President of the Medical Staff of Cook County Hospital and is an adjunct professor at Northwestern University Medical

---

[20] *Varga v. Rockwell Int'l Corp.,* 242 F.3d 693, 701 (6th Cir. 2001).

[21] Copies of the expert reports of Drs. Orris and Rodgers with regard to Ms. Jessie and Mr. Roper as well as the pertinent conclusion from the report of Dr. Carpenter are attached as Exhibit G and are organized by plaintiff within Exhibit G.

School and at the University of Illinois at Chicago School of Public Health. He works for the Division of Occupational Medicine of Cook County Hospital as well as for the Occupational Health Services Institute at the Great Lakes Center for Occupational and Environmental Safety and Health. He has had contracts with the U.S. Environmental Protection Agency as well as a number of other professional appointments as reflected on his c.v. On April 22, 2006, Dr. Orris provided his expert report on Ms. Jessie in which he concluded:

> In light of this, the history of exposure to the chemicals emited (sic) from the NEC plant in Dayhoit, and her medical history, *it is my opinion, on a more likely than not basis that these exposures were a substantial factor in causing Ms. Mary Ann Jessie's Non-Hodgkins Lymphoma in 2002.*[22]

Not content with just a single medical doctor's opinion on Ms. Jessie's NHL, on April 17, 2006 plaintiffs also designated Dr. George Rodgers, who is a practicing physician with Board Certification in Medical Toxicology and who is a Professor at the University of Louisville School of Medicine. Dr. Rodgers served in 2004 on the U.S. Environmental Protection Agency National Advisory Committee to Develop Acute Exposure Guideline Levels for Hazardous Substances. His c.v. lists dozens of publications and research contracts. On May 16, 2006, Dr. Rodgers provided his expert report concerning Ms. Jessie in which he opined that:

---

[22] Exhibit G, April 22, 2006 Report by Dr. Orris at 4. (Emphasis added.)

As documented in my previous report, several of these substances are either known or presumed human carcinogens. Non-Hodgkin's lymphoma (NHL), the malignancy with which Mrs. Jessie suffers, is associated with four of the toxins found in Dayhoit from the NEC plant – dioxins and dibenzofurans, TCE, vinyl chloride (VC), and PCBs.

There is no toxicological test that can be done to demonstrate definitively that Mrs. Jessie's malignancy arose because of her exposure to these chemicals. However, in considering the magnitude of the exposure that she has had over many years to the above chemicals, I feel that *it is more likely than not that this exposure was a substantial factor in the development of this cancer.*[23]

Plaintiffs also designated Dr. David Carpenter in April 2006 to testify about causation for Ms. Jessie and her NHL. Dr. Carpenter received both his undergraduate and medical degrees from Harvard University. He is a Professor of Environmental Health Sciences and the Director of the Institute for Health and the Environment at the School of Public Health at the University of Albany. In 1995-2001, he received a $12 million grant to study PCBs from a multi-disciplinary approach. In his expert report, Dr. Carpenter states that he is a "public health physician" and that "the health effect of persistent toxic substances is [my] public health specialty."[24] He offered causation opinions for all four plaintiffs in his expert report,, including Ms. Jessie's NHL:

Health Effects of the Plaintiffs in this Case: I have reviewed the reports of Peter Orris, MD, MPH, who has examined the four lead plaintiffs in this case, Janice Simpson Burkhart, Curtis Lynn Roper, Doris Colinger and Mary Ann Jessie. I have also reviewed their medical records and the exposure information on each of them.

---

[23] Exhibit G, May 16, 2006 Report by Dr. Rodgers at 2. (Emphasis added.)
[24] Exhibit G, May 12, 2006 Report by Dr. Carpenter at 1.

> Their exposures are substantial and I concur with the conclusion of Dr. Orris that the exposures to PCBs, dioxins, vinyl chloride and other volatile organic substances has increased the risk for development of the diseases found in each of these patients.  The diseases of concern include . . . . abnormal liver function, ... and cancer.  For each of these diseases, as discussed above, there is clear evidence that exposure to PCBs and the other compounds increases risk.  While for each of these diseases other factors, ranging from genes to diet, exercise, other exposures and many behavioral factors, will also increase risk, *it is clear to a reasonable degree of medical certainty that the exposures from defendant's plant suffered by these plaintiffs has either caused directly or have substantially contributed to the development of these diseases.*[25]

In addition to his individual causation opinions, Dr. Carpenter also included in his expert report the opinion that *"Some use the Hill criteria as the gold standard for cause-effect relationships.  These criteria are clearly met for cancer....."* [26] Thus, plaintiffs' April and May 2006 expert disclosure recognized the Hill criteria as an issue in this case and they offered expert opinions on them.

When making their April 17, 2006 expert designations, plaintiffs made the strategic decision to stick with many of their original medical causation experts from the *Robinett* case and to add only a few selected more specialized medical causation experts.  For example, in April 2006, plaintiffs chose to designate an endocrinologist (Dr. Steven Dorfman from Dallas), in addition to relying on Drs. Orris, Rodgers, and Carpenter with regard to Ms. Abston's endometriosis and hypothyroidism claims, Ms. Colinger's diabetes claim and Mr. Roper's hypothyroidism claim.  In contrast, in April 2006, plaintiffs decided not to

---

[25] *Id.* at 21-22.  (Emphasis added.)

[26] *Id.*  (Emphasis added.)

designate hematology/oncology specialists on Ms. Jessie's NHL or a hepatology specialist on Mr. Roper's liver disease. Having made that decision, they should not be allowed to adopt an entirely new strategy over four months later. *Plaintiffs' changing their mind about strategy does not transform medical causation opinions into rebuttal.*

IV. **DR. MILLER'S OPINIONS ON MS. JESSIE'S NON-HODGKIN'S LYMPHOMA AND ON THE HILL CRITERIA ARE NOT REBUTTAL OPINIONS BUT ARE MERELY AN END-RUN AROUND THE APRIL 2006 DISCLOSURE DEADLINE**

On August 31, 2006, plaintiffs filed a Supplemental Rule 26 Disclosure of Expert Witnesses in which for the first time they designated Dr. Kenneth Miller, the director of Clinical Hematology at Beth Israel Deaconess Medical Center in Boston. Dr. Miller's report offers the following opinion regarding Ms. Jessie's NHL:

> In summary Ms. Jessie was exposed to a number of known and suspected carcinogens over many years. The agents reported from the NEC site have been associated individually and in combination with the development of NHL and other cancers. In my medical opinion and in my review of the literature *Ms. Jessie's exposure to these agents more likely than not was a substantial factor in causing the development of her large B cell lymphoma.*[27]

As the basis for his opinions about Ms. Jessie, Dr. Miller cites to various summary documents issued by EPA and IARC.[28] The section of his report in which he addresses Ms. Jessie has nothing to do with rebuttal. His medical causation opinion regarding Ms. Jessie and her NHL is a blatant and belated

---

[27] Exhibit D Report by Dr. Miller at 12.

[28] *Id.* at 13-14.

effort by plaintiffs to "find a better witness" and disguise Dr. Miller in rebuttal

rubric. [29]

## V.    PLAINTIFFS' INITIAL EXPERTS, DRS. ORRIS, RODGERS, AND CARPENTER, SIMILARLY ALREADY PROVIDED CAUSATION OPINIONS REGARDING PLAINTIFF CURTIS ROPER'S LIVER DISEASE

Just as on April 17, 2006 plaintiffs provided triple-coverage on medical

causation for Ms. Jessie, so did they provide triple-coverage then for Mr. Roper's

liver disease.  First, Dr. Orris concluded in his April 22, 2006 expert report on Mr.

Roper:

> *It is my opinion, to a reasonable degree of medical certainty, that it is more likely than not that Mr. Roper's exposures to these materials released by the NEC plant was a substantial factor in his development of ...cryptogenic cirrhosis.* His family history indicates a probable genetic predisposition to liver disease and his weight is

---

[29] Dr. Miller also discusses at length his opinions about the "Hill criteria."  This portion of his report is not rebuttal.  On April 17, 2006, plaintiffs designated a number of experts whose expert reports addressed the Hill criteria.  For example, in his expert report, Dr. Carpenter stated that "Some use the Hill criteria as the gold standard for cause-effect relationships."  In her report, plaintiffs' expert, Dr. Shira Kramer similarly discussed the Hill criteria – in great detail on pages 7-9 – arguing that they are not the proper methods for the "assessment of causality."  Dr. Parent's advertisements for his work include the statement "His in-depth reports are based on the most current scientific research and frequently include formal causation analyses using the Hill Criteria."  A copy of the Consultox advertisement is included as Exhibit H.  In the *Robinett* trial ten years ago, Plaintiffs' experts Drs. Orris, Rodgers, and Kramer – all of whom are again listed as experts in this case, and all of whom issued reports in April and May – were all questioned about their views on Hill's postulates for causation analysis.  It was a recurring theme of plaintiffs' case that the defense experts applied these criteria too rigidly, raising the bar too high to ever conclude that the chemicals at issue cause cancer and other illnesses.  Dr. Miller's discussion of whether Hill's postulates are really "viewpoints," and whether defendants' application of those "viewpoints" is a "perversion," is simply more of the same.  It responds to nothing new, raises nothing new, and is not in the nature of true "rebuttal."

also a risk factor. ***The Toxic exposures added to these risks and was a substantial factor in causing his cirrhosis***.[30]

Second, Dr. Rodgers concluded in his May 16, 2006 expert report that:

> After considering all of these factors, it is my opinion, to a reasonable degree of medical probability, that his exposure to chemicals emanating from the NEC plant is a significant contributing factor to the development of both his cryptogenic cirrhosis and his hypothyroidism.[31]

Third, Dr. Carpenter included Dr. Rodgers in his May 12, 2006 medical causation opinion (also quoted above):

> <u>Health Effects of the Plaintiffs in this Case</u>:  I have reviewed the reports of Peter Orris, MD, MPH, who has examined the four lead plaintiffs in this case, Janice Simpson Burkhart, Curtis Lynn Roper, Doris Colinger and Mary Ann Jessie.  I have also reviewed their medical records and the exposure information on each of them. Their exposures are substantial and I concur with the conclusion of Dr. Orris that the exposures to PCBs, dioxins, vinyl chloride and other volatile organic substances has increased the risk for development of the diseases found in each of these patients. The diseases of concern include . . . . abnormal liver function, ... and cancer.  For each of these diseases, as discussed above, there is clear evidence that exposure to PCBs and the other compounds increases risk.  While for each of these diseases other factors, ranging from genes to diet, exercise, other exposures and many behavioral factors, will also increase risk, ***it is clear to a reasonable degree of medical certainty that the exposures from defendant's plant suffered by these plaintiffs has either caused directly or have substantially contributed to the development of these diseases.***[32]

Just as with Ms. Jessie, plaintiffs made the strategic decision in April and May 2006 not to designate a pathologist or other specialist on Mr. Roper's liver disease.  However, over four months later, plaintiffs suddenly designated Dr.

---

[30] Exhibit G, April 22, 2006 Report by Dr. Orris at 5. (Emphasis added.)

[31] Exhibit G, May 16, 2006 Report by Dr. Rodgers at 2-3.

[32] Exhibit G, May 12, 2006 Report by Dr. Carpenter at 21-22.  (Emphasis added.)

Bruce Bacon and Dr. Patrick Dean to offer new opinions regarding Mr. Roper and his liver disease – not based on any new facts or information, not based on any new studies -- solely to buttress their case and relying only on medical records that had been available for several years.

VI.    **PLAINTIFFS' TWO NEW LIVER DISEASE EXPERTS, DRS. BACON AND DEAN, SHOULD BE EXCLUDED AS UNTIMELY, NON-REBUTTAL DESIGNATIONS**

As stated above, on August 31, 2006, plaintiffs first designated Dr. Bruce Bacon, Professor of Internal Medicine and Director of the Division of Gastroenterology and Hepatology at Saint Louis University School of Medicine. Dr. Bacon's August 31, 2006 expert report concludes: *[i]t appears that Mr. Roper most likely developed endstage liver disease necessitating liver transplantation from his exposure to various hepatoxins."*[33]

Dr. Bacon based his opinion on Mr. Roper's historical medical records, including specifically blood analysis done in 2002 and biopsies done in 2002, 2003, and 2005. Plaintiffs offer no explanation of why they failed to disclose Dr. Bacon by the April 17, 2006 deadline. As this Court is aware, one of the key reasons that Mr. Roper was selected as a bellwether plaintiff was to determine the relationship between his obesity and his disease. Indeed, the chart of bellwether plaintiffs which was filed with the Court specifically identified obesity as an issue to be addressed in this plaintiff's case. Thus, any suggestion that plaintiffs did not need to offer expert opinions concerning whether Mr.

_____

[33] Exhibit E, August 31, 2006 Report by Dr. Bacon at 4. (Emphasis added.)

15

Roper's liver disease was obesity-related defy credibility and is not a basis for permitting Dr. Bacon to testify.

Dr. Bacon also discusses the 2002 levels of coproporphyrin in Mr. Roper's blood as a key basis for his "rebuttal" opinion – even though none of defendants' May and June 2006 expert reports mention prophyrins at all.  Dr. Bacon is not offering rebuttal opinions, he is offering medical causation opinions that have been plaintiffs' burden from the start.  Plaintiffs should not be allowed repeated opportunities to add ever more experts with different credentials and ever more expert opinions with different bases.

Also on August 31, 2006, plaintiffs first disclosed Dr. Patrick Dean, a pathologist from Memphis, who now offers his review of the 2002-2005 biopsy slides of Mr. Roper.  Nothing could be more fundamentally plaintiffs' original burden than reviewing biopsy slides that have been accessible to them and in Mr. Roper's control for years.  Long past time for doing so, plaintiffs hired Dr. Dean to re-evaluate the biopsy slides and to opine that:

> I can say to a reasonable degree of medical certainty based on the objective scientific evidence known to us, that *the finding on Mr. Roper are more consistent with a chemical injury to his liver than for any other causes*. . . .  My review of his biopsy slides from his original diagnosis in 2002 and his explant liver in 2003 confirm that absence of any evidence of these known causes of cirrhosis, including fatty changes of steatohepatitis.[34]

---

[34] Exhibit F, August 30, 2006 Report by Dr. Dean at 1.  (Emphasis added.)

Dr. Dean also references the 2002 blood levels of prophyrins in Mr. Roper's blood. None of this makes Dr. Dean's opinions rebuttal and they too should be stricken.

## VII. PLAINTIFFS' CONDUCT VIOLATING THE COURT'S SCHEDULING ORDERS IS CAUSING UNFAIR PREJUDICE TO DEFENDANTS IN THEIR TRIAL PREPARATION

Plaintiffs' end run around the Court's expert designation deadlines is neither harmless nor trivial. The trial in this case is set for January 29, 2007. Leading up to the trial date, this Court set various deadlines including deadlines for motions in limine, motions for summary judgment, and a discovery cutoff. When defendants received Plaintiffs' April 17, 2006 expert disclosures, defendants made certain strategic decisions relying on the roster of experts designated by plaintiffs and relying on the content of those experts' reports. Defendants did not contemplate that plaintiffs would attempt to re-make their case at the last minute. The parties and this Court planned the disclosures in a staged manner – plaintiffs first, then defendants. Now, for key aspects of the case – the two most serious diseases claimed in this case – plaintiffs have circumvented this order and process to defendants' detriment. Plaintiffs' roster of experts is now quite different from the one timely designated and the one to which defendants responded with their own roster.

Plaintiffs' designation of Drs. Bacon and Dean required defendants to search for and retain an expert in porphyrins as well as a pathologist with expertise in specific aspects of Mr. Roper's liver disease in order to respond to

plaintiffs' new expert opinions.[35] Since receiving Plaintiffs' August 31, 2006 designation of Drs. Bacon and Dean, defendants have over and over demanded that plaintiffs provide the liver biopsy slides on which those doctors rely. Only recently did plaintiffs' counsel provide those biopsies, and they are now being reviewed by defendants' newly-retained pathologist as well as by other existing defense experts. In addition, defendants have had to provide these additional expert reports to their existing experts – including Drs. Caldwell, Rozman, and Borak – for their views on these newly-raised issues. Defendants have also been forced to spend time and effort obtaining supplemental reports from Drs. Rozman and Borak -- efforts that would have been acceptable in April, May, or June but which now place an unfair burden and disadvantage on defendants as they take and defend expert depositions on an intense schedule. Squeezing four more depositions into the tight schedule is placing unplanned and unfair burdens on defendants.[36] This prejudice to defendants provides ample grounds on which to exclude these new, late-designated experts.[37]

Plaintiffs' late addition of four new experts on August 31, 2006 did not end their "supplementation." Rather, plaintiffs' expert team continues to be a

---

[35] Defendants designated these two experts (Drs. Joel Greeson and Karl Anderson) on September 29, 2006.

[36] The earliest possible dates on which these three new experts could be deposed are October 24 (Dean), October 25 (Miller), and November 1 (Bacon). In addition, Defendants have also had to shoe-horn in the deposition of Dr. Rich on October 31.

[37] *Trustmark Ins. Co. v. General Cologne Life Re of America*, No. 00-1926, 2003 WL 21673934 (N.D. Ill. July 16, 2003); *Domke v. McNeil-P.P.C., Inc.*, No. 95-382-T-CIV-17A, 1996 WL 567165 (M.D. Fla. Sept. 26, 1996).

moving target. Indeed, just as defendants completed their Motion to Exclude and this supporting Memorandum, plaintiffs suddenly served yet another expert disclosure – now attempting to designate yet another expert, William Sawyer – apparently to testify about his analysis of the sampling of plaintiffs' blood for PCBs and dioxins. Plaintiffs also served supplemental disclosures with new opinions from five of plaintiffs' previously designated experts.[38] Defendants have not had adequate time to decide on an appropriate response to this latest "Supplemental Disclosure," but it furthers the prejudice to defendants from plaintiffs' untimely expert designations.

## VIII. CONCLUSION

Defendants respectfully request that this Court exclude the proposed expert testimony of Drs. Miller, Dean, and Bacon. Nothing these witnesses propose to testify about was unknown to plaintiffs in April and May when it was time to identify their experts in this case. Plaintiffs should not be able to introduce these additional experts whose opinions could have been developed earlier and who are not offering rebuttal opinions. Plaintiffs failed to comply with the Court's Scheduling Orders. Their tardy designations and disclosures should be stricken and Drs. Miller, Dean, and Bacon should be excluded.

---

[38] Given plaintiffs' additional new, non-rebuttal designation of William Sawyer who apparently plans to testify about the results of dioxin and PCB analysis of plaintiffs' blood, defendants may need to designate their own new expert to offer a response to Dr. Sawyer's blood opinions. In addition, once defendants have had an opportunity to review the five new, non-rebuttal expert reports plaintiffs provided on October 2, 2006, defendants may need additional experts or additional expert opinions or may also need to seek relief from the Court.

Respectfully submitted,

s/ Elizabeth Ullmer Mendel
Harry K. Herren
Elizabeth Ullmer Mendel
WOODWARD, HOBSON & FULTON, L.L.P.
2500 National City Tower
101 South Fifth Street
Louisville, Kentucky 40202
Telephone: (502) 581-8000
Email: emendel@whf-law.com

Clifford J. Zatz
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2595
Telephone: (202) 624-2500

Linnea Brown
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
Telephone: (303) 861-7000

*Counsel for Defendants Cooper Industries, Inc.
and McGraw Edison Company*

## CERTIFICATE OF SERVICE

It is hereby certified that a copy of the foregoing was filed electronically on this the 4th day of October, 2006. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Donna Keene Holt
P.O. Box 10307
Knoxville, TN 37939

Charles L. Cunningham, Jr.
Suite G
6010 Brownsboro Park Boulevard
Louisville, KY 40207

Nancy Seidler Eichler
Masry & Vititoe
Second Floor
5707 Corsa Avenue
Westlake Village, CA 91362

Ellen Presby
Laura Baughman
Jory Lange
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219

s/ Elizabeth Ullmer Mendel