# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### LEXINGTON DIVISION

CIVIL ACTION NO. 03-476-JBC

CHARLES W. ADAMS, JR., et al.,                                    PLAINTIFFS,

V.                        **MEMORANDUM OPINION AND ORDER**

COOPER INDUSTRIES, INC. and
MCGRAW EDISON COMPANY,                                    DEFENDANTS.

* * * * * * * * * * *

This matter is before the court on the defendants' motion for summary judgment as to the personal injury claims of Anissa Alred and Ada Clem and for partial summary judgment as to the personal injury claims of Gail Gooden Daniels (DE 365); the plaintiffs' motion for Rule 41(a) dismissal of claims by Anissa Alred (DE 375); the plaintiffs' motion to permit supplementation of the evidentiary record as to Gail Gooden Daniels at a later date if necessary (DE 377); the plaintiffs' motion for reconsideration of the court's grant of summary judgment as to Bettye Moody, Debra Harris, and Virginia Sharp (DE 378); and the plaintiffs' motion to strike two expert witnesses named by the defendants and to strike or otherwise limit repetitive expert testimony (DE 394).

## I. Factual Background

This matter is one of several cases arising out of contamination caused by chemical emissions from the National Electric Coil ("NEC") plant in Harlan County, Kentucky.

In February 1989, Kentucky officials discovered that the groundwater wells adjacent to the NEC plant were contaminated. According to the defendants, after discovery of the contamination, Cooper Industries paid for and installed city water lines near the plant so that residents would no longer need to rely on the contaminated wells for their water. Between 1990 and 1992, over 500 plaintiffs filed actions in this court seeking damages relating to the contamination. Several actions were consolidated into what has been referred to as the "*Robinett* litigation," which went to trial in April of 1996. The *Robinett* litigation was settled in October of 1996, with payments being made to the plaintiffs in November of that same year. The Environmental Protection Agency established for the NEC plant a clean-up plan which has been in place since 1992.

*Blanton v. Cooper Indus., Inc.*, 99 F. Supp. 2d 797, 799 (E.D. Ky. 2000). A class action was filed in the Harlan Circuit Court on October 6, 1997. *Lankford, et. al. v. Cooper Indus., et. al.*, No. 97-CI-00670 (Harlan Cir. Ct. 1997). The class was later decertified, and many of the plaintiffs in that case settled. Pursuant to the settlement agreement reached in that case, the statute of limitations for actions by plaintiffs who fit the class description was tolled from the date the action was filed through April 1, 2004. This lawsuit was filed on September 19, 2003, and the complaint alleges various claims for wrongful death and personal injury. A related lawsuit, *Moody, et. al. v. Cooper Indus., et. al.*, No. 03-158-JBC, was filed on February 13, 2003, and was later consolidated with the present case.

**II. Legal Analysis**

*A. The Defendants' Motion for Summary Judgment*

The statute of limitations for filing a personal injury claim in Kentucky is one

year after the cause of action accrues.  K.R.S. 413.140(1).  The defendants

contend that they are entitled to summary judgment on the claims by Ada Clem and

Anissa Alred and on Gail Gooden Daniels's claims based on her 1980 miscarriage

and alleged infertility, because those plaintiffs either knew or should have known

that their ailments may have been caused by the toxic emissions from the NEC

plant more than one year before they filed suit.

Summary judgment is appropriate only when there are no genuine issues of

material fact and the moving party is entitled to a judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The moving party's burden can be

satisfied by demonstrating that there is an absence of evidence to support the non-

moving party's case.  *Id*. at 324-25.  To survive summary judgment, the non-

moving party must come forward with evidence on which the jury could reasonably

find in its favor.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986).  The non-

moving party must present more than a mere scintilla of evidence to defeat a

motion for summary judgment.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472,

1479 (6th Cir. 1989); Fed. R. Civ. Pro. 56 (e).  The court must view all of the

evidence in the light most favorable to the party opposing summary judgment.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In cases involving latent diseases, Kentucky has adopted the "discovery rule"

to determine when a statute of limitations begins to run.  Under the discovery rule,

a cause of action does not accrue "until the plaintiff discovers or in the exercise of

3

reasonable diligence should have discovered not only that he has been injured but also that his injury may have been caused by the defendant's conduct." *Louisville Trust Co. v. Johns-Manville Products Corp.*, 580 S.W.2d 497, 501 (Ky. 1979); *see also Perkins v. Northeastern Log Homes*, 808 S.W.2d 809, 819 (Ky. 1991). Reasonable diligence is "a degree between absolute inaction and an extreme effort undertaken against apparent futility." *Gray v. Sawyer*, 247 S.W.2d 496, 498 (Ky. 1952). If the plaintiff knows of any fact that should raise his suspicion, that is the equivalent of actual knowledge of the entire claim. *Hazel v. General Motors Corp.*, 863 F. Supp. 435, 440 (W.D. Ky. 1994). "[T]he means of knowledge are the same thing as knowledge itself." *Id.* The date upon which the party discovers that there is a cause of action is irrelevant to the application of the discovery rule. *Conway v. Huff*, 644 S.W.2d 333, 334 (Ky. 1982).

In *Blanton*, this court granted summary judgment to the defendants on the basis that certain plaintiffs, Kaye Blanton and Terry Farley, should have known of the cause of their injuries and did not exercise due diligence to discover that cause prior to the running of the statute of limitations. *Blanton*, 99 F. Supp. 2d 797. Those plaintiffs lived in Harlan, Kentucky, but never in Dayhoit, which is where media attention relating to the contamination was concentrated. In that opinion, the court described in detail the degree to which the contamination was made public:

> According to the defendants, the contamination of
> the NEC plant, the *Robinett* litigation, and allegations that

4

exposure to chemicals from the NEC plant caused cancer and other health concerns were the subject of widespread reports by local, regional, and national media.  From 1989 through 1994, the controversy surrounding the NEC plant was the subject of over 80 articles in the local newspaper, the *Harlan Daily Enterprise*, and 44 articles in three other regional newspapers.  Many of these articles referred to cancer as a potential health hazard of the contamination.

> . . . .

After the contamination came to light, Joan Robinett and others formed a local community group called Concerned Citizens Against Toxic Waste ("CCATW").  According to the defendants, CCATW held at least one demonstration warning of contamination by the NEC plant and was also responsible for addressing health hazards caused by the plant's operations, holding regular public meetings to discuss these issues.  The U.S. Department of Health and Human Services' Agency for Toxic Substances and Disease Registry held a "public availability meeting" in Harlan in April of 1992.  A subsequent report by the Department dated November 1994 addressed the community health concerns resulting from the contamination.

Joan Robinett and CCATW also conducted a survey of Harlan County residents titled the "Dayhoit Listening Project."  The purpose of this survey was to gather information from people in Harlan County and to inform them that they could get assistance with medical problems related to the NEC plant contamination.  Teams were trained to go door-to-door to community homes and personally interview residents by asking the questions on the survey, which related to the sources of residential water, contamination of the water, health problems related to the contamination, the community's desire for medical monitoring, etc.  According to the plaintiffs, this survey was conducted in January of 1991 and did not extend into the Watts Creek community but was limited to the Dayhoit community.

*Id.* at 799-800.  Many Harlan County residents were also part of the *Lankford* class

action in the Harlan Circuit Court.

The court rejected the plaintiffs' argument in *Blanton* that the media blitz covering the NEC plant contamination centered solely around the Dayhoit community, *see id.* at 800, finding that "a person exercising reasonable diligence would have discovered the cause of the injuries" more than one year prior to the filing of the lawsuit.  *Id.* at 802.  Mr. Farley was essentially illiterate, and he claimed not to have had any knowledge relevant to the NEC plant contamination. *Id.* at 800.  The court found that, even if his assertions of ignorance were true, he had "failed to exhibit the qualities of 'attention, knowledge, intelligence and judgment' that society requires of its members for their own protection."  *Id.* at 802-803 (quoting *Cappelli v. York Operating Co.*, 711 A.2d 481, 488 (Pa. Super. Ct. 1998)).

With these principles in mind, the court will consider the individual circumstances of each of the plaintiffs at issue in this motion.

i. Anissa Alred

Ms. Alred was born in Loyall, Kentucky, and lived there until 1994.  At that time, she moved to Baxter, Kentucky, where she still resides.  Loyall is about three miles northeast of Dayhoit, and Baxter is about four miles northeast of Dayhoit. Ms. Alred has both a Bachelor of Arts degree and a Master of Arts degree and currently works as a reading teacher at Cawood High School.

In 1989, Ms. Alred was diagnosed with alopecia, an auto-immune disease

6

that results in the loss of body hair.  In her deposition, Ms. Alred testified that she remembered reading the *Harlan Daily Enterprise,* and being aware of the NEC plant contamination and that the contamination could cause health problems.  Finally, Ms. Alred stated that she did consider the possibility that the contamination was the cause of her alopecia when she learned of the contamination in 1990.

Based on the evidence presented, Anissa Alred's claim is barred by Kentucky's one-year statute of limitations.  Ms. Alred's deposition testimony indicates that she was diagnosed with alopecia in 1989 and thought about the possibility that the NEC plant contamination, with which she was also familiar, had caused her condition in 1990.  Thus, by 1990, she had "discovered not only that [she had] been injured but also that [her] injury may have been caused by the defendant's conduct." *Louisville Trust*, 580 S.W.2d at 501.  Even if she does meet the qualifications for the *Lankford* class action, Ms. Alred's cause of action is untimely if it accrued before October 6, 1996.  Because the facts indicate that it accrued pursuant to the discovery rule in 1990, the court holds that Ms. Alred's claim against the defendants must be dismissed pursuant to K.R.S. § 413.140(1).

ii. Ada Clem

Ms. Clem has been a resident of Harlan County her entire life and currently lives in Lenarue, which is about eleven miles from Dayhoit.  Ms. Clem meets the class definition in the *Lankford* case because she often attended churches located in Dayhoit, Keith, and Tremont, where her husband worked as a minister.

Therefore, her claim is barred by the statute of limitations if it accrued prior to October 6, 1996.

Ms. Clem testified in her deposition that she recalls reading newspaper articles about the contamination at the NEC plant and that she remembers the CCATW group creating a "ruckus" over the situation at the plant from 1989 to 1991. She also stated that she knew at least ten people involved in the *Robinett* litigation well enough that she would stop and talk to them if she saw them on the street. As noted above, her husband often worked as a preacher in the Dayhoit area and she would travel with him when he did so; her husband also worked at the Test Oil Company plant in Fresh Meadows.

Ms. Clem underwent surgery to remove her left ovary and fallopian tube in addition to three tumors that an ultrasound had revealed in May of 1995. In September of the same year, she underwent a complete hysterectomy following a diagnosis of endometriosis and fibroid tumors; it is these ailments for which Ms. Clem is suing to recover. She has subsequently suffered from seizures, but she has not based her allegations in this case on that condition.

Ms. Clem clearly knew that she had been injured in September of 1995. The question for the court is thus whether she knew or should have known her injury may have been caused by the NEC plant emissions before October 6, 1996. The plaintiffs claim that Ms. Clem had no reason to know that her medical condition was linked to the NEC plant because she did not live or work in Dayhoit herself;

8

most of the media and community attention was focused solely on the Dayhoit area; and a reasonable person in Ms. Clem's position could conclude from the coverage that the contamination was limited to Dayhoit.  The plaintiffs also argue that Ms. Clem's medical problems (endometriosis and fibroid tumors) were sufficiently dissimilar from most of the reported ailments that were allegedly caused by the contamination (skin rashes and cancer) that she was not put on notice that the NEC plant emissions may have made her ill.

Based on the evidence presented as to Ms. Clem, the court cannot say as a matter of law that she knew or should have known that her injury may have resulted from the NEC plant contamination before October 6, 1996.  As noted, Ms. Clem did not discover her complained-of injury until September of 1995.  While the extent of the media blitz in Harlan County during 1989 and the early 1990's was substantial, Ms. Clem has put forth sufficient evidence to create a genuine issue of fact as to whether she should have "put two and two together," *Blanton*, 99 F. Supp. 2d at 803, in the one-year period between her hysterectomy and the cut-off date for the Lankford litigation.  The court will therefore deny the defendants' motion for summary judgment as to Ms. Clem.

### iii. Gail Gooden Daniels

Ms. Daniels resides in Loyall, Kentucky.  She is a high school graduate and has completed two years of college at Eastern Kentucky University.  Ms. Daniels suffered a miscarriage in 1980 and has not been pregnant since that time.  The

defendants move for summary judgment as to her claims based on these two facts.

Ms. Daniels works at the Harlan Circuit Court as a bookkeeper and was employed in that position during the media coverage concerning the NEC plant contamination in Dayhoit.  In her deposition, Ms. Daniels testified that she remembered reading articles about the contamination in the *Harlan Daily Enterprise* in 1989 and the early part of the 1990's; she also stated that, as a court employee, she kept abreast of current events in the community, often by reading the *Enterprise*.  In particular, she testified that she was aware that the people in her community were concerned that the contamination was leading to health problems and that this concern was felt not only by those who lived in Dayhoit, but by others in Harlan County who spent time in Dayhoit.  Finally, she claims she was aware of the *Robinett* litigation that occurred in the early 1990s.

Ms. Daniels's miscarriage occurred in 1980, and, since she has not been pregnant nor used birth control since that time, she presumably had sufficient reason to suspect that she may be infertile by the time the media blitz occurred. Thus, she knew she suffered the physical ailments of which she complains at the time of the uproar over the NEC plant in 1989, and she has admitted that she followed the news of the contamination, the risk of health hazards it presented, and the litigation following it.  Even assuming that Ms. Daniels qualified for the *Lankford* class action, she should have known that the defendants' actions may have caused her injuries well before October 6, 1996.  Thus, the court will grant the defendants'

10

motion for partial summary judgment as against Gail Gooden Daniels's claims based on her miscarriage and alleged infertility.

*B. Anissa Alred's Alternative Motion for Rule 41(a) Dismissal*

Ms. Alred has moved to dismiss her claim against the defendants based on the fact that her alopecia cannot be linked causally to her exposure to the defendants' chemicals. The defendants object to Ms. Alred's motion with the argument that allowing the plaintiff to dismiss her claim would violate Kentucky's rule against splitting causes of action. That is, they claim that it is improper for a plaintiff to sue for one disease, then withdraw and retain the right to sue for a second disease at a later time.

Kentucky law requires personal injury plaintiffs to sue for all injuries arising out of a single transaction in the same action. *Carroll v. Owens-Corning Fiberglass Corp.*, 37 S.W.3d 699, 700 (Ky. 2000); *Capital Holding Corp. v. Bailey*, 873 S.W.2d 187, 194 (Ky. 1994). In a recent decision, the Kentucky Court of Appeals summarized the options available to a plaintiff in a latent disease case:

> After *Carroll*, a plaintiff who has been injured by asbestos exposure must make an election of how to proceed. He may follow the *Capital Holding Corp.* path: *filing suit within one year of diagnosis* of his first asbestos-related disease or injury, in which case he must include any and all present and future damages from asbestos exposure or risk losing the right to pursue these damages due to the statute of limitations. Alternatively, if his first asbestos-related injury is non-disabling and he has no reason to believe that he is likely to develop a more serious disease or injury, he may follow the *Carroll* path: waiting to sue until he develops a more serious asbestos related disease and then filing within a year of being diagnosed with this more serious disease. But if he follows the latter path, he may risk losing any right

11

to recover for the initial disease or injury.

*Combs v. Albert Kahn Assoc., Inc.*, 183 S.W.3d 190, 198 (Ky. Ct. App. 2006)

(emphasis added).[1]  Ms. Alred clearly chose to file suit based upon her diagnosis for

alopecia.  Therefore, she was required to sue for "all present and future damages"

in this suit.  As previously noted, *see supra* Part II.A.i, Ms. Alred did not file her

claim within the one-year limitations period for personal injury actions found in

K.R.S. § 413.140(1), and her suit must be dismissed on that ground.  Allowing Ms.

Alred to dismiss her untimely claim with the right to refile at a later date if she

suffers a later ailment would impermissibly allow her to split her causes of action in

violation of Kentucky law.  Having chosen to take the *Capital Holding* path, Ms.

Alred cannot now refuse to accept the consequences of her choice in favor of the

benefits of the *Carroll* path.

Ms. Alred presents the alternative argument that, because her disease is not

causally connected to her exposure to the NEC plant chemicals, she does not have

a linkable illness and her cause of action has not yet accrued.  She relies on *Capital

Holding*, in which the Kentucky Supreme Court held that the trial court properly

disallowed the plaintiff's claims for increased risk of future harm and emotional

distress from fear of contracting a disease in the future.  *Id.* at 192, 195.  The

Court reasoned that, because the plaintiff had not yet shown that he suffered a

---

[1]Although the Court of Appeals referred to asbestos exposure in its opinion,
it did not limit its consideration solely to asbestos, and this court finds the Court of
Appeals' detailed analysis to be equally applicable to other hazardous substances
which may result in latent diseases.

12

physical injury from his exposure, "his cause of action ha[d] yet to accrue." *Id.* at 195. Ms. Alred asserts that, like the plaintiff in *Capital Holding*, any claim she may have has yet to accrue because she has no injury that can be causally linked to her exposure. As a result, she claims that she should be permitted to dismiss her suit and refile when her cause of action does accrue.

In *Capital Holding*, the Court based its opinion on the fact that "the plaintiff failed to prove that the asbestos exposure had as yet caused any harmful change of any nature." *Id.* at 193. Indeed, it stated that "[m]ere ingestion of a toxic substance does not constitute sufficient physical harm upon which to base a claim for damages." In this case, however, Ms. Alred *did* allege a physical harm (her alopecia) as a result of exposure to the NEC plant contamination. Her situation is therefore distinguishable from the circumstances that the Kentucky Supreme Court faced in *Capital Holding*. There is language in the opinion, however, which seems to support the plaintiffs' argument that her cause of action will not accrue until she has a disease that can be causally linked to the NEC plant contamination. *See, e.g., id.* at 192 ("[N]o cause of action accrues until the potentially harmful exposure *actually causes* injury that produces loss or damage.") (emphasis added); *id.* at 195 ("Until such time as the plaintiff *can prove* some harmful result from the exposure . . . , his cause of action has yet to accrue.") (emphasis added). The question presented by Ms. Alred's reasoning is readily apparent: Does *Capital Holding* extend to a case where a plaintiff has sustained an injury she erroneously believes is a

13

result of exposure to a hazardous substance?

The court is convinced that it does not.  First, subsequent cases have cited *Capital Holding* for the proposition that "a plaintiff must have sustained some physical injury before a cause of action can accrue."  *Wood v. Wyeth-Ayerst Lab., Div. Of Home Prod.*, 82 S.W.3d 849, 854 (Ky. 2002); *see also Rainier v. Union Carbide Corp.*, 402 F.3d 608, 618-22 (6th Cir. 2005).  In light of these opinions, *Capital Holding* is most reasonably construed as an expression of Kentucky's policy decision to limit recovery to toxic-tort plaintiffs who have actually suffered a physical injury.  It was not intended to state a rule that a cause of action accrues only when a plaintiff demonstrates the element of causation.  Further, a plaintiff's cause of action accrues when she knows or should know that she "has been injured but also that [her] injury *may have been caused* by the defendant's conduct."  *Louisville Trust*, 580 S.W.2d at 501 (emphasis added).  Pursuant to this principle, Ms. Alred's cause of action accrued when she knew or should have known that her alopecia *may have been linked* to the contamination at Dayhoit.  As a result, Ms. Alred's argument that her claim will accrue only when she contracts a disease causally linked to the contamination is at odds with the discovery rule. Finally, under Ms. Alred's reasoning, she could presumably continue filing unsuccessful claims for any number of diseases and withdraw those claims when she saw they were flawed, without ever having a cause of action accrue, until she finally achieved success.  In Kentucky, a one-disease state where a jury is

14

permitted to "assess damages for the enhanced risk of contracting [a future disease]," *Capital Holding*, 873 S.W.2d at 195, such a result is impermissible.

In sum, the court is of the opinion that the courts of the State of Kentucky would find that a plaintiff who mistakenly believes that a defendant's conduct is responsible for her existing illness nonetheless has an accrued cause of action, so long as the requirements of the discovery rule are satisfied. Since Ms. Alred's cause of action accrued more than one year before she entered this lawsuit and she has presented no legitimate ground for dismissal without prejudice, the court will deny Ms. Alred's motion for Rule 41(a) dismissal.

### C. Gail Gooden Daniels's Motion to Permit Supplementation

Ms. Daniels has also moved the court for permission to supplement the evidentiary record at a later date, if it becomes necessary to do so. Ms. Daniels claims such supplementation may be needed, if the court makes a finding that she should have known she was exposed to the defendant's chemicals more than one year before she filed this suit, because she has not yet established that exposure to the defendants' chemicals caused her miscarriage and alleged inferility. The plaintiff reasons that, if she were permitted to supplement the record and ultimately discovered that the defendants did not cause her ailments, she would have no need for an appeal and her claim would not be prejudiced by this court's finding that her claim was time-barred. Ms. Daniels further claims that she is not prepared to address causation at this phase of the litigation and that she needs additional time

15

to develop that issue.

As stated in Part II.A.iii, the court has found that Ms. Daniels's claim is barred by the statute of limitations.  The defendants' motion for summary judgment on that ground did not require Ms. Daniels to prove that the defendants' chemicals caused her miscarriage and infertility, and the court did not rely on any causal connection between the defendants' chemicals and her injuries in granting it.  The question before the court on the motion was when Ms. Daniels knew or should have known that her injury may have been caused by the defendants' chemicals; it was not whether the defendants' chemicals caused her health problems.  No proof on the merits was needed to decide the defendants' motion for summary judgment as to her claims.  The fact that Ms. Daniels has been unable to establish causation is therefore irrelevant because her claim is time-barred as a matter of law.  It follows that any supplementation of the record as to causation for her claims based on her miscarriage and alleged infertility will be an exercise in futility.

The court also sees no need to allow supplementation of the record for Ms. Daniels's appeal purposes.  If Ms. Daniels wishes to appeal the court's statute-of-limitations ruling on her miscarriage and infertility claims, she may do so regardless of whether causation can be established for her claim.  The court does not see the need to permit her to supplement the record merely to facilitate her decision.  Ms. Daniels's motion to supplement the record at a later date will be denied.

*D. Plaintiffs' Motion for Reconsideration*

16

The plaintiffs request that the court reconsider that part of its May 3, 2006, order in *Moody* that granted the defendants' motion for summary judgment against Bettye Moody, Debra Harris, and Virginia Sharp.  In support of this motion, the plaintiffs rely on the affidavit of Paul Kaufman, M.D., J.D., which states that, if Moody, Harris, and Sharp had inquired with him about their claims, he would have informed them that they had not been exposed to the NEC plant chemicals, or, if they had been exposed, their disease was not causally linked to their exposure. The plaintiffs also rely on the information they supplied with their response (DE 376) to the defendants' motion for summary judgment to the effect that the media coverage and community outcry was centered around Dayhoit and these plaintiffs therefore reasonably did not conclude that they were exposed to the contamination.

The court interprets a motion for reconsideration as a motion to alter or amend a judgment under Fed. R. Civ. P. 59(e).  *Trident Int'l Corp. v. Kentucky*, 395 F. Supp. 2d 521, 523 (E.D. Ky. 2005).  In order to succeed on such a motion, the movant must establish a clear error of law; present newly discovered evidence; show that there has been an intervening change in controlling law; or show that, absent relief, a manifest injustice will result.  *Gencorp, Inc. v. American Int'l Underwriters,* 178 F.3d 804,  (6th Cir. 1999); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).

Virginia Sharp was diagnosed with ovarian cancer in 1981, and she was familiar with the plant contamination and its potential effects from reading the

newspaper and from interaction with people in the community.  She never visited Dayhoit and believed that the contamination was not applicable to her.  Bettye Moody lived in Rio Vista and was not a regular visitor to Dayhoit.  She had a hysterectomy in 1985 because of an ovarian cyst; she was diagnosed with fibrocystic breast disease with accompanying calcifications in the 1980s; she was diagnosed with and treated for a precursory form of breast cancer in 1994; and in 1999 she was diagnosed with thrombocytopenia.  Ms. Moody read articles and heard gossip about the possible contamination in Dayhoit no later than 1994, and she was aware of the *Robinett* litigation.  She claims she did not think she was affected by the contamination until other Rio Vista residents suggested she consult an attorney after her daughter's death.  Neither Ms. Sharp nor Ms. Moody fits the *Lankford* class description; Ms. Sharp joined this suit on November 4, 2003, and Ms. Moody filed her suit on February 13, 2003.

Even if the plaintiffs' proffered affidavits constitute "newly discovered evidence," they would not save the claims of Ms. Moody and Ms. Sharp.  These affidavits show that the media outcry in the early 1990s was not centered around where these plaintiffs lived; that the air plume theory was not developed until 1994; that breast cancer was not causally linked to the contamination until 1996; and that if they had inquired as to the feasibility of their claims in the early 1990s, they would have received an unfavorable evaluation.  None of this evidence, however, explains these plaintiffs' failure to begin their suits until 2003, after much

litigation in these cases had already been pursued.  Indeed, the plaintiffs' affidavits imply that, by the end of 1994, the air plume theory *had* been established, and, by the end of 1996, breast cancer *had* been causally linked to the contamination. Many other plaintiffs "who did not live in the Dayhoit community" had "put two and two together," *see Blanton*, 99 F. Supp. 2d at 803, well before the time Ms. Moody and Ms. Sharp filed suit and without the benefit of the evidence to which they were privy.  Thus, summary judgment was properly entered against Ms. Moody and Ms. Sharp on statute-of-limitations grounds.

Ms. Harris lived in Fresh Meadows, in such close proximity to Dayhoit that she referred to her home as being in Dayhoit.  She claims to have been familiar with the activities of Joan Robinett and CCATW and remembers people discussing the groundwater contamination as early as May of 1992.  Ms. Harris was diagnosed with breast cancer in 1990 and underwent a mastectomy in 1991.  She claims that, because breast cancer was not causally connected to the contamination until 1996, she would have been informed that her disease had no relation to the NEC plant chemicals and she thus had no reason to know she could file a claim against the defendants.

This reasoning is flawed, however, because the statute of limitations begins to run "with the discovery that a wrong has been committed and not that the party may sue for the wrong."  *Conway*, 644 S.W.2d at 334.  In *Drake v. B.F. Goodrich Co.*, 782 F.2d 638 (6th Cir. 1986), the plaintiffs filed wrongful death and personal

injury claims against the defendants based on injuries suffered from exposure to vinyl chloride. *Id.* at 639-40. At the time of the plaintiffs' injuries, they were advised that an award of worker's compensation was their only legal remedy. *Id.* As a result, the plaintiffs did not file their tort claims until years after they suffered harm from their exposure. The trial court granted summary judgment in favor of the defendants on statute-of-limitations grounds and the Court of Appeals affirmed, stating that "[t]o hold otherwise could vitiate the statute of limitations by allowing a plaintiff to plead a stale case because he did not see 'the right lawyer' . . ., or by allowing a plaintiff to endlessly shop for a lawyer until he found one willing to take his case." *Id.* at 641.

Ms. Harris was diagnosed for breast cancer during the height of the media blitz and shortly before she acknowledges she heard people discussing the contamination in 1992. As a previous resident of Dayhoit, she knew or should have known around that time that her cancer may have been connected to that contamination. This is all the statute of limitations requires. Like the plaintiffs in *Drake*, Ms. Harris cannot evade the statute by claiming that she would have been told her claim was invalid at the time it arose. Thus, even if she did qualify for the *Lankford* class action, her claim is time-barred as a matter of law.

For the reasons stated above, the plaintiffs' motion for reconsideration will be denied.

*E. The Plaintiffs' Motion to Strike and Limit Expert Testimony*

20

The plaintiffs have moved to strike Patricia A. Buffler and Karl K. Rozman as Rule 26 expert witnesses for the defense.  The plaintiffs base their motion to strike Buffler and Rozman on the ground that the defendants had not provided counsel for plaintiffs with their reports pursuant to Fed. R. Civ. P. 26(a) at the time this motion was filed on July 31, 2006.  In an order entered by the court on July 26, 2006, however, the defendants were given until July 31, 2006, to file Buffler's report, and the defendants claim in their response that they did so.  Moreover, the defendants contend that the parties agreed that no specific deadline was set for the submission of Rozman's report, but they state that this report was provided to the plaintiffs' counsel on August 1, 2006.  As the plaintiffs have not contested either of these claims by the defendants, the court will presume that the plaintiffs have received these experts' reports and will therefore deny the plaintiffs' motion to strike them as Rule 26 expert witnesses.

The plaintiffs also request the court strike or otherwise limit the defendants' expert testimony pursuant to Fed. R. Evid. 403 because the testimony of these experts is unnecessarily repetitive.  Specifically, the plaintiffs allege that these experts will give testimony regarding the same scientific studies and evidence and that their testimony will essentially cover the same causation-related issues.

The defendants argue in response that, regardless of the merits of the plaintiffs' motion, the court should decline to limit the expert testimony at this juncture of the proceedings.  As noted by both parties, "[i]t is well within the

21

discretion of a district court to limit the number of expert witnesses who testify at trial." *Coal Resources, Inc. v. Gulf & Western Indus., Inc.*, 865 F.2d 761, 770 (6th Cir. 1989) (quoting *Aetna Casualty & Sur. Co. v. Guynes*, 713 F.2d 1187, 1193 (5th Cir. 1983)).  The court agrees that exclusion of any allegedly cumulative expert testimony would be premature at this time.  The pre-trial conference scheduled for December 21, 2006, is two months away; the trial, set for January 29, 2007, is three months from now.  In the meantime, the defendants may decide not to present certain experts, as they refine their trial strategy; their experts' testimony may be limited or excluded by other evidentiary rulings; or some of the experts' testimony may be rendered unnecessary by future substantive orders of this court or by compromises between the parties.  Further, with nothing on which to rely besides the experts' preliminary Rule 26 reports, any order entered by the court limiting the number of expert witnesses the defendants may utilize will, at least, be arbitrary; at worst, it may be prejudicial to their defense.

The plaintiffs cite *Chapman v. United States*, 169 F.2d 641, 643 (10th Cir. 1948), for the proposition that it is "properly left to the trial court's discretion to determine when in the litigation it [is] feasible to limit the number of expert witnesses."  Plaintiff's Reply, at 7.  In that case, however, the court also noted that "[i]t has . . . been held that the trial court should not undertake to limit the number of witnesses introduced by either party until it becomes obvious that further testimony would be merely cumulative, hence of no probative value."

*Chapman*, 169 F.2d at 643.  In affirming the decision of the trial court to limit the number of experts the parties could call at trial, the appellate court found it relevant that "[t]he limitation was imposed *only after a pre-trial conference had developed the issues* and . . . counsel had outlined the nature of his proof . . . ." *Id.* (emphasis added).  When read in its entirety, *Chapman* actually lends support for the notion that a court should delay the exclusion of cumulative expert witnesses until the parties have had a sufficient opportunity to sharpen the issues and evidence to be presented at trial.[2]

In short, an order excluding any of the defendants' experts at this point would not only run the risk of undue prejudice or arbitrariness but is also likely to be mooted by later developments.  The plaintiffs claim that the defendants' expert witness list should be shortened as soon as possible so that they can avoid unnecessary and burdensome expenses involved in deposing and/or examining them.  Rule 403, however, is intended to limit evidence that is overly prejudicial, confusing, or duplicative; it is not meant to minimize litigation costs incurred by counsel.  Moreover, expert testimony is not rendered cumulative simply based on the number of witnesses who offer evidence at a trial.  *Cf. Coal Resources*, 865 F.2d at 769 ("[L]imiting experts 'because of mere numbers, without reference to the relevancy of their testimony' is an abuse of discretion.") (quoting *Padovani v.*

_____

[2]The court also notes that the plaintiffs have not referred it to *any* opinion in which a court approved the exclusion of cumulative witnesses this far in advance of a trial or pre-trial conference.

23

*Bruchhausen*, 293 F.2d 546, 550 (2d Cir. 1961)).  Even if the defendants could conceivably prove their case through expansive testimony from a small number of expert witnesses, it does not follow that their decision to present it from a large number of specialized witnesses would render any of that testimony duplicative.

At a recent telephonic conference, plaintiffs' counsel requested that these motions regarding defense experts be heard at the expedited hearing sought by defense counsel on motions regarding plaintiffs' experts.  That request is denied, however, because the court deems a hearing unnecessary on the plaintiffs' motions.

For the reasons stated above, the court will deny the plaintiffs' motion to strike or otherwise limit the defendants' expert testimony at this time.  The court will, however, entertain a later motion directed to this issue, if warranted by future facts and circumstances.

Accordingly, **IT IS ORDERED** as follows:

(1)     The defendants' motion for summary judgment as to the personal injury claims of Anissa Alred and Ada Clem and for partial summary judgment as to the personal injury claims of Gail Gooden Daniels (DE 365) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** as to Anissa Alred and as to the claims by Gail Gooden Daniels based on her miscarriage and alleged infertility.  The motion is **DENIED** as to Ada Clem.

(2)     The plaintiffs' motion for Rule 41(a) dismissal of claims by Anissa Alred (DE 375) is **DENIED**.

(3)     The plaintiffs' motion to permit supplementation of the evidentiary record as to Gail Gooden Daniels at a later date if necessary (DE 377) is **DENIED**.

(4)    The plaintiffs' motion for reconsideration of the court's grant of summary judgment as to Bettye Moody, Debra Harris, and Virginia Sharp (DE 378) is **DENIED**.

(5)    The plaintiffs' motion to strike two expert witnesses named by the defendants and to strike or otherwise limit repetitive expert testimony (DE 394) is **DENIED**.

Signed on October 17, 2006

*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

25