**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

**CIVIL ACTION NO. 03-476-JBC**

**CHARLES W. ADAMS, JR., et al.,**                                                    **PLAINTIFFS,**

**V.**                                    **MEMORANDUM OPINION AND ORDER**

**COOPER INDUSTRIES, INC. and**
**MCGRAW EDISON COMPANY,**                                        **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \***

This matter is before the court on the defendants' motion to exclude the

plaintiffs' experts Miller, Bacon, and Dean (DE 447); the defendants' motion to

strike (DE 450); and the defendants' motion to exclude the plaintiffs' studies

regarding other plaintiffs and workers (DE 451).

**I. Factual Background**

This matter is one of several cases arising out of contamination caused by

chemical emissions from the National Electric Coil ("NEC") plant in Harlan County,

Kentucky.  A class action was filed in the Harlan Circuit Court on October 6, 1997.

*Lankford, et. al. v. Cooper Indus., et. al.*, No. 97-CI-00670 (Harlan Cir. Ct. 1997).

The class was later decertified, and many of the plaintiffs in that case settled.

This lawsuit was filed on September 19, 2003, and the complaint alleges various

claims for wrongful death and personal injury.  A related lawsuit, *Moody, et. al. v.*

*Cooper Indus., et. al.*, No. 03-158-JBC, was filed on February 13, 2003, and was

later consolidated with the present case.

**II. Legal Analysis**

*A. The Defendants' Motion to Exclude the Plaintiffs' Experts*

The defendants have moved to exclude the plaintiffs' experts, Drs. Miller, Bacon, and Dean, on the ground that these experts were identified by the plaintiffs in violation of the court's scheduling orders and agreements between the parties. In a scheduling order entered on February 12, 2006, the court mandated that the plaintiffs disclose the identity of their expert witnesses no later than April 17, 2006; the defendants were required to do so no later than May 29, 2006. The parties later agreed to extend these deadlines to May 17, 2006, and June 29, 2006, respectively. The February 12, 2006, order also stated that "[s]upplemental [expert] disclosures shall be made no later than September 1, 2006," *see* DE 335, at 1, and this deadline was later extended to October 1, 2006. *See* DE 427.

In a letter dated May 12, 2006, defense counsel sent a letter to the plaintiffs' counsel memorializing an alleged agreement between the parties that any supplemental experts identified by the parties would testify only "in rebuttal to the subject matter contained in the opposing party's expert witness report." The defendants claim that Drs. Miller, Bacon, and Dean, who were first designated as expert witnesses after the May 17, 2006, deadline, will offer opinions as to the cause of the injuries suffered by the plaintiffs Mary Ann Jessie and Curtis Roper and are therefore not proper supplemental or rebuttal witnesses under the terms of the court's scheduling orders and the parties' agreement.

2

This motion was argued telephonically by the parties on November 15, 2006.  The court will deny the defendants' motion for the reasons stated on the record at that telephonic hearing.  The court declines to address the distinction between supplemental and rebuttal experts.  In accordance with its rulings at that hearing, the court will also order that the plaintiffs are forbidden to identify any new experts without specific permission from the court.  The defendants are permitted to identify new experts solely to rebut the testimony of Drs. Miller, Bacon, and Dean.

*B. The Defendants' Motion to Strike*

The defendants have also moved to strike the re-designation of Ronald Mullenex and Richard Ellis as "available testifying" experts at the trial of this case.  On April 17, 2006, the plaintiffs informed the defendants that they intend to present the testimony given by Mullenex and Ellis at the 1996 trial of *Amburgey v. McGraw Edison Company*, *et al*.  Pursuant to a request by the defendants, the plaintiffs, on September 5, 2006, confirmed that both Ellis and Mullenex will not appear live at trial.  On October 2, 2006, however, the plaintiffs indicated that Mullenex will testify at the trial of this case.  The next day the plaintiffs informed the defendants that Ellis is still unavailable but will be called to testify at trial if summoned by the court to do so.

On November 30, 2006, the defendants informed the court that they waived their objections under Fed. R. Evid. 804(b)(1) to the admission of the former

testimony of several of the plaintiffs' expert witnesses, including Mullenex and Ellis. The defendants having done so, the court will deny their motion to strike as moot.

### C. The Defendants' Motion to Exclude the Plaintiffs' Studies

The defendants also move to exclude, pursuant to Fed. R. Evid. 401 and 403, studies conducted by Dr. Shira Kramer in 1995 to determine whether there was an excess rate of cancer and other diseases among Harlan County residents exposed to the NEC plant contamination.  In the *Amburgey* litigation, this court excluded these studies pursuant to Rules 401 and 403 because they "[were] of doubtful probative value and [their] admission [would] create mini-trials regarding the other persons whose illnesses and/or complaints are mentioned or referenced; [would] foster jury sympathy and confusion in plaintiffs' favor; [would] unduly prejudice the jury against the defendants; and [were] contrary to the orderly planning of [the] case . . . ."  *Amburgey, et al. v. McGraw Edison Co., et al.*, Civ. A. No. 92-62-JBC, at 5 (E.D. Ky. Feb. 15, 1996) (hereinafter "*Amburgey* Order").  The court subsequently excluded this evidence on two separate occasions in *Amburgey* and struck it again in another case, *Abner, et al. v. McGraw Edison Co.*, Civ. A. No. 92-46, at 4-5 (E.D. Ky. Sept. 27, 2001).  In their motion, the defendants note that on October 2, 2006, the plaintiffs produced a supplemental disclosure from Dr. Kramer that updated her older studies.

The plaintiffs concede that they do not intend to offer testimony regarding the results of Kramer's studies conducted in 1995.  Thus, the court will grant the defendants' current motion to exclude pursuant to Rules 401 and 403 insofar as it

4

relates to Kramer's 1995 studies that were previously excluded in *Amburgey* and *Abner*.[1]

The plaintiffs claim, however, that they do plan to have Dr. Kramer testify based on the results of similar epidemiological studies she completed earlier this year. These studies examine the incidence of cancer in individuals who lived in the two zip codes closest to the NEC facility from 1995 to 2003. Unlike her previous reports, in which she analyzed the medical records of subjects from a pool that included both plaintiffs and non-plaintiff residents of Harlan County, Kramer utilized data supplied by the Kentucky Cancer Registry ("KCR") in her most recent studies. Further, Kramer's 2006 analysis deals only with cancer incidence rates and does not discuss other disease types. The plaintiffs claim that these distinctions in Dr. Kramer's 2006 studies alleviate the flaws that rendered her 1995 studies inadmissible. For the following reasons, the court disagrees with the plaintiffs.

In general, "[e]pidemiology is concerned with the incidence of disease in populations and does not address the question of the cause of an individual's disease. . . . [T]hat is, epidemiology addresses whether an agent can cause a

---

[1]The plaintiffs also state, however, that "testimony to be offered by the defendants may require [them] to reference Dr. Kramer's earlier studies." Plaintiffs' Response, at 2 n.1. The defendants respond that they have no intention of referring to the earlier Kramer studies at trial. While this may be the case, the court will permit the plaintiffs to introduce evidence of Kramer's 1995 studies *only* in the event that the defendants make allegations regarding the incidence of disease in the affected area. This conclusion is consistent with the result in *Amburgey*. *See Amburgey* Order, at 7 ("[T]he proof will be admitted if the defendants open the door by introducing any evidence at all regarding the relative incidence of diseases in the Dayhoit area, as compared with state and/or national incidence rates.").

disease, not whether an agent did cause a specific plaintiff's disease." Michael D. Green, D. Michal Freedman, & Leon Gordis, *Reference Manual on Sci. Evid.* 381-82 (2d ed. 2000).

As in *Amburgey*, "[t]he focus in this trial should be the effects of the chemicals involved upon persons in general and upon the bellwether plaintiffs in particular." *Amburgey* Order, at 7. There is little question that Dr. Kramer's epidemiological studies, if properly performed, are of some probative value in resolving the former issue.[2] It is equally clear that her research is of limited relevance on the latter issue. Although the plaintiffs emphasize the fact that Dr. Kramer analyzed the precise area at issue in this case, this does not alter the probative value of her testimony. Epidemiology primarily concerns itself with generalities, not specifics. Dr. Kramer's studies are no more relevant than similar

---

[2]The plaintiffs repeatedly claim that the defendants' experts and others in the scientific community approve of epidemiological testing. In the deposition of defense expert Charles Poole, however, Dr. Poole remarked as follows:

> If a [study is performed] in a specific community it's almost certainly very small so its confidence interval would almost certainly be very wide. The weight in terms of data quantity that it would carry would – it's – in my experience when studies are done in one community of this type they are often the least weighty in the weight of evidence in terms of not only their size, they bring very little information, but they're also often questionable in terms of their validity. So, typically, . . . the one study of the community where this person lived would ordinarily provide very little extra information to the totality of the information we have.

Poole Deposition, at 185. Thus, without discounting the value of epidemiological studies in general, Dr. Poole specifically opined that community studies like the ones conducted by Dr. Kramer often carry little weight.

ones conducted elsewhere, or, if they are more relevant, the increase in degree of

relevance is minimal.

While conceding that the evidence to be provided by Dr. Kramer may have

some probative value, the court nonetheless finds that admitting it would severely

prejudice the defendants.  In *Amburgey,* the court noted that:

> testimony about so many cases will tend to sway the jury in plaintiffs'
> favor and will discourage . . . the jury from considering the cases of
> the bellwether plaintiffs individually.  This constitutes undue prejudice
> which the defendants cannot overcome . . . .  A limiting instruction . .
> . would be unavailing as a brake on the jury's race to the conclusion
> that, where there is so much smoke, there must be fire.

These same concerns are present in this case.  Kramer's testimony would draw the

jury's attention from its proper focus, the bellwether plaintiffs, and essentially put

the defendants on trial for harms they allegedly inflicted on parties whose identities

and backgrounds are unknown and who may not even be plaintiffs in this action.[3]

---

[3]In *Amburgey*, the court also found that there was a substantial risk of juror confusion if Kramer's earlier studies were admitted.  This same risk of confusion is, or at least ought to be, present in this case.  This case is being tried as to the bellwether plaintiffs, and there is no reason to blur the issues in it by introducing the medical conditions of other persons.

The plaintiffs argue, however, that no risk of mini-trials exists here because state law mandates that cancer incidence data reported in the KCR be kept confidential.  *See* K.R.S. § 214.556(5).  This merely substitutes one form of prejudice for another.  If the defendants are unable to access medical information regarding those persons whose conditions are reported in the KCR, they will have no way to fully contest Dr. Kramer's conclusions or provide alternative explanations for them.  This could leave the jury with the impression that a significant number of cancer sufferers reside in Harlan County and that the strongest explanation for this situation is the NEC plant contamination.

The plaintiffs also claim that the defendants have themselves introduced collateral issues into the case.  In support, they cite a report by defense expert Jonathan Borak which discusses the plaintiff Doris Collinger's family history of

7

Moreover, Dr. Kramer will testify not only that the defendants' chemicals are correlated with an increased incidence of cancer *in the abstract*, but will also testify that the defendants' chemicals are correlated with an increased incidence of cancer *in residents of Harlan County*.  From this evidence, a juror might conclude not only that the defendants' chemicals can cause cancer but that they did, in fact, cause the increased rate of cancer reported in the community.  As noted above, however, the effectiveness of epidemiology becomes more limited as the causation inquiry narrows.  Thus, there is a substantial risk that a jury hearing Dr. Kramer's testimony would place greater emphasis on it than her methodology would warrant or that it would discount the relevance of more probative evidence.  While problematic enough in its own right, such a result would further compound the prejudice described in the previous paragraph.

In *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993), the Supreme Court reminded judges of the continued importance of all applicable evidentiary rules when assessing the admissibility of scientific evidence.  In discussing Rule 403, the Court noted that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it."  *Id.* (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).  The court agrees with the plaintiffs that

---

diabetes.  However, Ms. Collinger is a bellwether plaintiff, and the trial of this case will focus on bellwether plaintiffs; it is only natural for the defendants to seek information regarding her medical history.

Dr. Kramer's research could be somewhat relevant.  The risk of undue prejudice to the defendants that would ensue from her testimony, however, greatly exceeds its probative value, a consequence that would only be exacerbated by possible juror confusion over the nature and purposes of her epidemiological studies.  In short, the admission of Dr. Kramer's testimony would lead to the precise problems identified by Judge Weinstein.  Pursuant to Fed. R. Evid. 403, the court will exclude Dr. Kramer's 2006 analyses and her testimony based upon them from the plaintiffs' case-in-chief.  As in *Amburgey*, however, the plaintiffs may introduce them in rebuttal if the defendants present any evidence regarding incidence of cancer in the Dayhoit area as compared with state or national incidence rates. Accordingly,

**IT IS ORDERED** as follows:

(1) The defendants' motion to exclude (DE 447) is **DENIED**.

(2) The plaintiffs are forbidden to identify any new experts without specific permission from the court.

(3) The defendants are permitted to identify new experts solely to rebut the testimony of Drs. Miller, Bacon, and Dean.

(4) The defendants' motion to strike (DE 450) is **DENIED AS MOOT**.

(5) The defendants' motion to exclude (DE 451) is **GRANTED**.

Signed on December 19, 2006



*Jennifer B. Coffman*
JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

9