**ELECTRONICALLY FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | | |
|---|---|---|
| CHARLES W. ADAMS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. NO. 5:03-CV-476-JBC |
| | ) | |
| COOPER INDUSTRIES, INC. and | ) | |
| MCGRAW EDISON CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERTS REGARDING <u>SPECIFIC CAUSATION</u>**

I.     **INTRODUCTION**

Defendants Cooper Industries, Inc. and McGraw Edison Company respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Evid. 104(a), 702, 703, and 403, to exclude expert testimony of Drs. Carpenter, Kramer, Orris, G. Rodgers, Miller, and Dorfman concerning specific causation and dose.[1]  Appendix A describes the subject matter of each expert's testimony.

Plaintiffs' medical causation opinions must be excluded because they are not supported by plaintiff-specific dose and exposure data, which must be considered by an expert *before* establishing toxicological causation with scientific reliability.  Plaintiffs' experts' exposure and dose testimony does not meet *Daubert* and Rule 702 standards because the objective evidence does not tie plaintiffs' alleged low-level environmental exposures to the occupational, food poisoning, and other large exposures that are the subject of debated epidemiology studies on these substances.  Rather than use scientific methods to reach admissible opinions, plaintiffs' causation experts ignore, deny, or assume away the critical issue of exposure and dose.  *Daubert* case law, particularly in the Sixth Circuit, requires much more.  Plaintiffs' expert testimony on these subjects are therefore unscientific, unreliable, and should be excluded.

II.    **ARGUMENT**

    A.    **Plaintiffs' Specific Causation Opinions Must Be Excluded Because They Were Reached In The Absence Of Evidence Of Plaintiffs' Actual Exposures To Specific Substances Or Dose**

Plaintiffs' specific causation experts - Drs. Dorfman, Miller, Orris, Rodgers -  admit that they did not determine the dose for any of the four bellwether plaintiffs, but rely on the general causation experts for such evidence.  However, plaintiffs' general causation experts - Drs.

---

[1] References to deposition transcripts will be in the following format, "Ex. __ Carpenter 118."

Carpenter and Kramer - likewise admit that they did not determine the dose or even evaluate a range of dose for any of the four bellwether plaintiffs, nor do they have any exposure evidence that is specific to each individual plaintiff. The only plaintiff-specific information, blood levels of PCBs, dioxins and furans, which alone is not evidence of dose, was obtained *after* each general and specific causation expert reached his or her conclusions, an approach flatly unscientific.

> 1. **Plaintiffs' Experts Have Neither Determined nor Relied on Plaintiff-Specific Dose Data, Which is Required for Reliable Causation Testimony in Toxic Tort Cases**

In cases involving alleged exposure to toxic substances, such as this one, scientific principles require, at a *minimum*, that causation is based on specific data of a particular plaintiff's dose and exposure to the substance at issue. *Downs v. Perstorp Components, Inc.,* 126 F. Supp. 2d 1090, 1095 (E.D. Tenn. 1999); Ref. Man. Sci. Evid. 403, 419. The methodology employed by plaintiffs' experts in this case is identical to that which was rejected as a "significant flaw in [the expert's] methodology" by the Sixth Circuit in *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir.), *cert. denied,* 534 U.S. 822 (2001); *see also* FED. R. EVID. 702 (requiring that expert testimony be based on "sufficient facts or data"). In *Nelson*, plaintiffs alleged that they suffered certain neurological and respiratory impairments as a result of environmental exposure to PCBs, and offered two experts to opine on medical causation. The experts' understanding of the dose of PCBs received by the plaintiffs amounted to: "because PCBs were present in the environment in excess of allowable limits and plaintiffs lived and worked in the area, they must have been exposed at a level that could cause neurological and lung impairments." *Nelson*, 243 F.3d at 252-53. The Sixth Circuit upheld the Magistrate's rejection

2

of this "circular reasoning" as well as his determination that the opinions offered by plaintiffs' experts should be excluded under *Daubert*. *Id*. at 254.

*Nelson* is consistent with nearly every federal circuit and numerous state courts in requiring specific evidence of exposure and dose. "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are *minimal* facts necessary to sustain the plaintiffs' burden [of proving causation] in a toxic tort case." *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) (emphasis supplied). Whether satisfying *Daubert* and its progeny requires a precise dose calculation or merely a scientific assessment of dose has received varying responses from courts that have considered this issue. Some appear to require a "hard" calculation. *See, e.g., Wright v. Willamette Indus.*, 91 F.3d 1105, 1107 (8th Cir. 1996). Others explicitly state that estimates of dose will suffice if they place a plaintiff in the same range of exposures as those exposures to individuals shown in the scientific studies to have developed the disease in question. *See, e.g., Parker v. Mobil Oil Corp.*, 824 N.Y.S.2d 584, 590 (N.Y. 2006). The least courts require is a scientific assessment that a plaintiff's level of exposure is in the same range as exposures experienced by individuals in the relevant studies. S*ee McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241 (11th Cir. 2005); *Burleson v. Tex. Dep't of Crim. Justice*, 393 F.3d 577, 586-87 (5th Cir. 2004); *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999); *Wintz v. Northrup Corp.*, 110 F.3d 508, 513 (7th Cir. 1997); *Abuan v. General Elec. Co.*, 3 F.3d 329, 334-335 (9th Cir. 1993), *cert. denied*, 510 U.S. 1116 (1994); *Cano v. Everest Minerals Corp.*, 362 F. Supp. 2d 814, 824-25 (W.D. Tex. 2005); *Savage v. Union Pac. R.R.*, 67 F. Supp. 2d 1021, 1034-35 (E.D. Ark. 1999); *Mercer v. Rockwell Intern. Corp.*, 24 F.Supp.2d 735, 739 (W.D. Ky. 1998); *Gorman-Rupp Co. v. Hall*, 908 So.2d 749, 757 (Miss. 2005); *Norfolk Southern Ry. Co. v. Rogers*, 621 S.E.2d 59, 68 (Va. 2005).

The Sixth Circuit's analysis of this question in *Nelson* affirmed exclusion of the plaintiffs' expert testimony because "[w]ith respect to the question of dose, [plaintiffs' expert] made no attempt to determine what amount" any of the plaintiffs received. *Nelson,* 243 F.3d at 252. Arguably, *Nelson* requires an actual calculation. However, this Court need not decide whether a "hard calculation" is required under *Nelson,* because plaintiffs' experts here also failed to assess the levels of exposure sustained by each of the bellwether plaintiffs or to show how even low-level, environmental exposures, if any, could place these plaintiffs anywhere near the occupational levels or other significant exposures at issue in the studies on which plaintiffs' experts rely for their causation opinions.

To be admissible, causation opinions on alleged toxic exposure require evidence that an individual plaintiff was exposed to a particular dose of a given substance, and that the dose was sufficient to cause the plaintiff's particular condition. *See Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1095 (E.D. Tenn. 1999) (enunciating the elements of toxicological causation); *id.* (requiring proof that "[t]he individual had contact with the chemical (exposure), and the amount of chemical absorbed into the body (dose) was of sufficient magnitude and duration to be capable of producing the alleged effect."). In other words, experts rendering causation opinions in toxic tort cases must rely on plaintiff-specific dose and exposure data in order to be considered reliable and admissible under the *Daubert* standard. "At a minimum,…there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of [an] agent that are known to cause the kind of harm that the plaintiff claims to have suffered." *See Wright*, 91 F.3d at 1107. Plaintiffs' experts have not done so, and thus their opinions must be excluded as scientifically unreliable- "In cases claiming personal injury from exposure to toxic substances, it is essential that the plaintiff demonstrate that she was, in

4

fact, *exposed to harmful levels* of such substances." *Maddy v. Vulcan Materials Co.,* 737 F.Supp. 1528, 1533 (D. Kan. 1990) (emphasis in original) (internal citations omitted). Qualitative characterizations of exposure are insufficient. *Lofgren v. Motorola, Inc.*, 1998 WL 299925, at *19 (Ariz. Sup. Ct. Jun. 1, 1998) (rejecting expert opinions that "persistently avoid[ ] making any quantification of the risk actually associated with the levels of exposure at issue…preferring to make vague assertions that the exposures were 'significant'") (attached as Ex. 1).

      **a)    None of plaintiffs' experts have determined the dose of any substance to which any plaintiff was exposed.**

None of the plaintiffs' experts made any attempt to establish the actual dose or level of dose, if any, each of the plaintiffs allegedly received of the substances at issue.

- At the time he wrote his May 2006 report, Dr. Carpenter had no understanding of the dose in terms of concentration and duration of each of the plaintiffs' exposures to any PCBs that came from the NEC site. Ex. 2 Carpenter 102-103, 214.[2]

   > Q: But none of those data allow you to assess what the exposure levels were in any particular plaintiff in this case, do they?
   >
   > A: No, they do not.

- Dr. Orris merely guessed at dose. Ex. 3 Orris 282.

   > Q: [D]id you make any attempt to quantitatively reconstruct the dose of dioxins or dioxin-like compounds to which Ms. Abston had been exposed?
   >
   > A: Qualitatively I assessed the dose.

- Dr. George Rodgers flatly stated that "[n]one of us are ever going to know what that dose was unless you hire someone to try and do a dose construction but even then it's going to be a -- more a guess than anything else." Ex. 4 Rodgers 276; *see also id.* at 268-269:

   > Q: … Did you attempt to reconstruct a dose ….?
   >
   > A: I have not tried to reconstruct doses of TCE, vinyl chloride or the PCBs, dioxins and furans in this case at all.

---

[2] *See id.* at 105 – 106 (same for TCE); *id.* at 106 (same for "any other substances"); *id.* at 263-264 (admitting that he did not consider duration of exposure in writing his report).

- Dr. Dorfman admitted that he is unqualified to do dose assessment. Ex. 5 Dorfman 346; *see also id.* at 140:

    > Q: And have you ever had to evaluate, do or review a dose reconstruction in an environmental context figuring out how much somebody actually got of something?
    >
    > A: Not in that context, no.

- Dr. Kramer admitted that she had *no* information about dose. Ex. 6 Kramer 547–548. "I do not have that information; so I formed no specific opinions about it."

- Dr. Miller merely thought it sufficient to know that there was TCE in wells in Dayhoit and that Ms. Jessie sometimes drank from them.

    > Q: Did you attempt to reconstruct in any way the dose of TCE to which you believe Ms. Jessie was exposed?
    >
    > A: No.

Ex. 7 Miller 133.

Rather, the plaintiffs' experts circularly rely on each other's reports and testimony to establish *qualitative* statements about the plaintiffs' exposures in this case. *See, e.g.,* Ex. 4 Rodgers 193 (stating his intention to rely on Drs. Carpenter and Sawyer to relate blood levels of PCBs, dioxins and dibenzofurans back to particular environmental sources); Ex. 5 Dorfman 269–271, 273-74 (admitting reliance on Dr. Carpenter for qualitative description of exposure and admitting that "if they're [the other experts on whom he relies] not right, then I suppose I'm not right, yes."); *id.* at 276 (relying on Dr. Rodgers that the exposures were "adequate" even though Rodgers "didn't specifically give levels"); Ex. 7 Miller 139 (admitting reliance on Dr. Carpenter for characterization of amount of TCE to which Ms. Jessie was exposed); Ex. 3 Orris 279-280 (relying on other experts to qualify Ms. Abston's exposure to dioxin and dioxin-like compounds and admitting that he had no "independent quantitative opinion" about dose).

In *Carroll v. Litton Systems, Inc.*, 1990 WL 312969, at *43 (W.D.N.C. Oct. 29, 1990) (attached as Ex. 8), a case involving two of the experts offered by the plaintiffs in the present

6

action, the district court first found that "Dr. Hugh Spencer fail[ed] to meet the standards for admissibility under the Federal Rules" and that his "methods violate well-established precepts of…modeling." *Id.* at *16, *36. The court then properly excluded the testimony of all other plaintiffs' experts, including Dr. George Rodgers, who relied on Dr. Spencer's inadmissible data in reaching their opinions:

> Because the medical causation opinions of Drs. Broughton, Feldman, and Rodgers are dependent upon their reliance on Dr. Spencer's proposed testimony concerning levels of TCE that allegedly occurred in plaintiffs' wells from 1970 to 1987, they fall of their own weight and cannot satisfy plaintiffs' burden…

*Id.* at *39. Here, as in *Carroll*, the opinions offered by plaintiffs' experts are themselves premised upon other inadmissible opinions and testimony and must, therefore, be excluded.

### b) The reliance of plaintiffs' specific causation experts on plaintiffs' general causation experts is misplaced, because the general causation experts also fail to determine the dose of any plaintiff's exposure.

Although it is well-settled that district courts should not admit expert testimony "that is connected to existing data only by the ipse dixit of the expert," *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997); *accord Nelson*, 243 F.3d at 254, plaintiffs nevertheless invite this Court and the jury to *assume* that sufficient dose would be established simply because their experts say so.

In support of their allegations, plaintiffs offer proof for only two assertions: (1) plaintiffs lived in a particular area at some point in time, and (2) defendants released substances into the environment at some point in time. This methodology employed by plaintiffs' experts in this case is identical to that which was rejected by the Sixth Circuit in *Nelson*. *Nelson*, 243 F.3d at 252-53; *see also Nelson v. Tennessee Gas Pipeline Co.,* 1998 WL 1297690, at *11 (W.D. Tenn., Aug. 31, 1998) (attached as Ex. 9) (finding insufficient evidence of causation). Indeed, here as in *Nelson*, the information relied on by plaintiffs' experts for the proposition that plaintiffs were

7

exposed to substances—the groundwater data, soil data, and air plume models—fails to link any plaintiff to any exposure of any substance of any dose during any time period. Such qualitative musings fall far short of the requirement to demonstrate that plaintiffs' doses were comparable to the underlying studies on which plaintiffs' experts rely. It is proper for courts to exclude opinions where "experts' background information concerning [plaintiffs'] exposure to [the substances at issue] is so sadly lacking as to be mere guesswork." *See Allen*, 102 F.3d at 199.

To fill the enormous gap between their meager proof and a showing of actual dose, plaintiffs offer only their experts' unsupported word, who take great leaps of faith and logic and rely on "no[thing] more than…hypothes[e]s not adequately supported by the scientific method." *Siharath v. Sandoz Pharms. Corp.*, 131 F. Supp. 2d 1347, 1355 (N.D. Ga. 2001), *aff'd sub nom. Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194 (11th Cir. 2002). Where "there is simply too great an analytical gap between the data and the opinion proffered," as is the case here, "[a] court may conclude that" the opinion is unreliable. *See Nelson*, 243 F.3d at 254 (quoting *Joiner*, 522 U.S. at 146) (internal quotations omitted); *see, e.g., Turpin v. Merrell Dow Pharmaceuticals, Inc.*, 959 F.2d 1349, 1360 (6th Cir.) (establishing that mere theoretical possibilities offered by plaintiffs' experts are not enough), *cert. denied,* 506 U.S. 826 (1992). Plaintiffs' experts' opinions are no more than inadmissible "scientific hunch[es]." *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1115 (5th Cir. 1991); *see also* FED. R. EVID. 403 (excluding otherwise relevant evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury").

### (1) Limited Groundwater Data is Scientifically Insufficient

The groundwater data relied upon plaintiffs' experts in assuming that plaintiffs were exposed to TCE and VC through drinking water tells us nothing about their *actual* doses and

8

exposures to TCE and VC from the drinking water. The data does not in any way connect the individual plaintiffs to the small amounts of TCE and VC found in limited groundwater analyses conducted between 1989 and 1991.[3] It certainly provides no information whatsoever regarding whether an individual plaintiff actually drank the water from any of the wells tested, when that plaintiff drank the water, how much water that plaintiff drank, nor the ultimate question—how much TCE and VC that plaintiff actually consumed by drinking the water. Instead, "[p]laintiff[s'] experts…persistently avoided making any quantification of the risk actually associated with the levels of exposure at issue in this case, preferring to make vague assertions that the exposures were 'significant.'" *Lofgren*, 1998 WL 299925, at *19.

Indeed, plaintiffs' experts concede that they did not or could not determine a dose from groundwater based on the data. *See* Ex. 3 Orris 208 ("I find on the data I have I can't make an estimate about the -- with more likely than not about how much water [Roper] contained [sic]."); *id.* at 264 (admitting same for Abston); *id.* at 308 (acknowledging that he does not have any information as to the quantitative dose of contaminants to which Ms. Jessie was exposed through groundwater); Ex. 4 Rodgers 271 (conceding that he did not have sufficient data from which to calculate a dose of Ms. Jessie's exposure to TCE and vinyl chloride in groundwater); Ex. 7 Miller 133 (admitting that he did not attempt to reconstruct Ms. Jessie's dose of TCE through groundwater); Ex. 5 Dorfman 282 (admitting no knowledge of amounts of substances in water).

An expert's opinion suffers a "significant flaw" where, as here, the expert did not properly "determine what amount of [substance] exposure the [plaintiffs] had received and simply assumed that it was sufficient to make them ill." *Nelson*, 243 F.3d at 252-53. Because

---

[3] Drs. Orris, Rodgers, Kramer and Dorfman expressly rely on the groundwater data in forming their opinions. *See* attached Findings of Fact and Conclusions of Law.

9

this data does not demonstrate any actual dose or exposure information for any individual, plaintiffs' experts' reliance upon it is not a scientifically valid methodology. FED. R. EVID. 702.

### *(2) Reliance on Soil Data is Scientifically Insufficient*

Similarly, any testimony that plaintiffs were exposed to substances through contact with soils and consumption of produce based on the soil sampling data generated by Dr. Wesley Birge must be excluded because it establishes nothing about these plaintiffs' *actual* doses and exposures to substances from the soil. Dr. Birge conducted a limited sampling exercise in 1995 for the presence of PCBs in soil and sediment. Dr. Birge selected the majority of the sampling locations based upon Dr. Spencer's air modeling data. He did not sample any of the plaintiffs' properties, and he has no data for compounds other than PCBs. He did not attempt to establish a dose or even a level of dose of PCBs received by any of the plaintiffs or otherwise characterize the duration of their exposure.

"Knowledge of the amount and duration of exposure are 'essential element[s] to a valid toxicological opinion determining whether a chemical caused certain reactions." *Cuevas v. E.I. DuPont de Nemours & Co.*, 956 F. Supp. 1306, 1312 (S.D. Miss. 1997). There is no demonstrated connection, however, between the Birge soil data, derived from only a few soil samples in off-site locations, and the soil to which any individual plaintiffs were actually exposed.

Plaintiffs' experts admit that the soil data does not permit calculation of dose. *See, e.g.*, Ex. 4 Rodgers 274-275; *see also* Ex. 5 Dorfman 285 (admitting no knowledge of actual contact between plaintiffs and soils). The data does not provide any information whatsoever regarding how any individual plaintiff actually came into contact with soil containing PCBs, when and for how long that individual was exposed to the soil, to what quantities of PCBs that individual was exposed, nor the ultimate question—how much PCBs was actually absorbed by that individual's

person. "An appropriate methodology requires evidence from which the trier of fact could conclude that the plaintiff was exposed to levels of toxin sufficient to cause the harm complained of." Ex. 9 *Nelson*, 1998 WL 1297690, at *6. Because this data does not demonstrate any actual dose or exposure information for any individual, plaintiffs' experts' reliance upon it is scientifically invalid. *Nelson*, 243 F.3d at 254.

### (3) *Reliance on Air Plumes is Scientifically Insufficient*

Most of plaintiffs' causation experts—including Miller, Kramer, Rodgers, Carpenter, Orris, Dorfman—relied on air plume modeling of Hugh Spencer in assuming that plaintiffs were exposed to various airborne substances. *See* Ex. 7 Miller 150-151; Ex. 6 Kramer 118, 128-129, 131, 144-145, 189-190; Ex. 4 Rodgers 269; Ex. 2 Carpenter 212, 437; Ex. 3 Orris 323.

Even assuming that models can, in some cases, constitute reliable evidence of levels of airborne substances and even if Dr. Spencer's model produced reliable results,[4] his model was not intended to establish a dose of any of the substances at issue received by any of the bellwether plaintiffs. Dr. Spencer himself, along with several other experts, admitted that his model did not establish any *actual* air quality data or any plaintiffs' dose or exposure to any substance, but rather served *only* as a predicted dispersion pattern for a composite of substances. Ex. 10 Tr. 5/21/96 at 99 – 100[5] (admitting that that the modeling example upon which he based his opinions may ***not*** have occurred); *see also* Ex. 4 Rodgers 269 ("I think that the air monitoring data was an attempt to get some estimate of what airborne exposure *might have been*. I think

---

[4] The insufficiency of Dr. Hugh Spencer's modeling results as competent evidence and the deficiencies in Dr. Spencer's methodology are the subject of Defendants' Motion to Exclude Testimony and Opinions of Hugh Spencer, Sc.D. *See* Docket Entry 545.

[5] Unless otherwise noted, citations to "Ex. 10 Tr. 5/__/96 at __" refers to Dr. Spencer's testimony during the trial of *Amburgey, et al. v. McGraw-Edison, et al.*, Consolidated C. A. No. 92-62 (E.D. Ky., London Division).

trying to reconstruct individual doses from that data would be problematic.").[6] Plaintiffs' new air modeling expert, James Tarr, also confirmed that his air model does not provide for any of the bellwether plaintiffs quantitative assessments of exposure to airborne contaminants from the NEC facility:

> Q: … What I'm trying to find out is what concentrations was a person who says that they visited briefly the location of C06, they visited that location twice in 1965, what was their exposure to contaminants according to each of the seven air modeling runs that you did?
> A: My answer is I don't know.

Ex. 11 Tarr 354. Indeed, he admitted: "My expert report *doesn't address exposure in a quantitative sense* that existed at point -- or at receptor point C06 in the year 1965." Ex. 11 Tarr 353 (emphases added).

Thus, "plaintiffs cannot dispute that [their experts] made no attempt to determine what amount of…exposure" the plaintiffs received from their alleged airborne contaminants. *See Nelson,* 243 F.3d at 252. Indeed, Dr. Spencer's model does nothing to establish any plaintiff's exposure because it is premised on modeling of peak one-hour concentrations at only 81 receptor locations. The isopleth maps produced by his modeling program are meaningless because they represent only the single hour in an entire year (out of a possible 8,760 annual hours) in which the concentrations of a particular substance were at their highest level for a particular receptor. Only one of his receptors was placed at a location claimed by any plaintiff to be a point of possible exposure. Thus, for 38 of the 39 exposure locations claimed by plaintiffs, Dr. Spencer's modeling provides no contaminant concentration information, merely his guesswork of what concentrations could have been at points between his receptors. And, further, the peak one-hour

---

[6] Dr. Rodgers also testified that Hermanson's tree bark sampling would not allow reconstruction of airborne exposures. Ex. 4 Rodgers 272 (answering "No" when asked if he would testify about tree bark data and noting "I have no idea how accurate that data is."); *see also* Ex. 3 Orris 301 ("Q: So you didn't make any attempt to translate from the tree bark samples to quantitative dose to the plaintiffs, correct? A: I wouldn't know how to do that, no.").

modeling and maps prepared by Dr. Spencer tell nothing about a plaintiff's potential exposure unless that plaintiff was at the particular receptor location during the *specific hour* on the specific day in which his model predicted the maximum concentration. If the plaintiff was not at that particular location during that peak hour, Dr. Spencer's contaminant concentration for that receptor location, and the areas between the receptors, is of no relevance to the issue of plaintiffs' specific exposures.

Additionally, plaintiffs provide no evidence of the frequency and duration of their contacts with the alleged plume. There is simply no link between the modeled air contamination and the actual airborne exposure of any bellwether plaintiff. The fact that a plaintiff's house falls within plumes is insufficient to establish that the plaintiff *actually* was exposed to any airborne substances. *See Nelson*, 243 F.3d at 253. To link the model to individual dose and exposure, plaintiffs *should have* demonstrated which substances were *actually* dispersed, where they were dispersed, in what concentrations were they dispersed, over what time periods were they dispersed, which plaintiffs were exposed, when and for how long plaintiffs were exposed, and in what concentrations or doses they were exposed. "[K]nowledge of the extent of exposure to a potentially harmful substance is essential to any reliable expert opinion that the particular substance caused a disease." *Savage*, 67 F. Supp. 2d at 1031.

Moreover, the modeling results provide no data, estimated or otherwise, about dioxins or furans in air, because Spencer modeled only PCBs, TCE and "hazardous waste." Ex. 10 Tr. 5/21/96 at 94. Spencer acknowledges that his model does *not* account for the dispersion of the other substances at issue in this case. *Id.* at 55, 57; Ex.10 Tr. 5/22/96 at 97 (modeling of open burning limited to PVC); *Id.* at Tr. 5/21/96 at 51-52 (modeling of solvents limited to TCE); *see* Ex. 11 Tarr 389 (Tarr did not model TCE); *see also id.* at 165-167, 507-508.

13

Finally, Dr. Spencer's model output and plume maps are premised upon an obsolete model, erroneous data and a flawed methodology. As such, they are speculative, unreliable, and irrelevant to any issue in these proceedings.[7]

### c) The Only Plaintiff-Specific Data - Blood Levels of PCBs, Dioxins and Furans - Cannot Fill the Gap in Plaintiffs' Dose Evidence.

Plaintiffs attempt to remedy the deficiencies in their dose proof by the use of certain results of tests done by the parties of plaintiffs' blood.[8] First, plaintiffs' blood data does not establish the dose of PCBs, dioxins or furans any plaintiff received. Second, the plaintiffs' blood levels are within normal ranges.[9] these data provide no information about TCE and vinyl chloride. Third, even if such blood data were useful for PCBs, dioxins and furans,[10] none of plaintiffs' causation experts had such data at the time they formed their opinions, clearly violating proper scientific principles.

None of the plaintiffs' experts had blood concentrations for any of the plaintiffs at the time he formed his opinions and wrote his expert report. (*See, e.g.,* Ex. 2 Carpenter 103-104 (stating that "at the time in May when I wrote [his initial report with general causation opinions] I had no information at all on blood levels in individuals"); Ex. 3 Orris 282-283 (stating that he only had modeling data which he wrote his report); Ex. 4 Rodgers 317 ("Q: What, if any, effect did the blood level data have on your opinion that Ms. Jessie's non-Hodgkin's lymphoma was caused or contributed to by exposure to PCBs and dioxins.? A: … I only got the blood level

---

[7] *See* footnote 4, *supra.*

[8] Defendants' Motion to Exclude Testimony of Plaintiffs' Expert William Sawyer will provide a detailed summary of the blood testing, its circumstances, and results.

[9] Defendants' Motion to Exclude Testimony of Plaintiffs' Expert David Carpenter addresses the normality of plaintiffs' blood levels.

[10] The insufficiency of plaintiffs' blood data as proof of dose is covered in Defendants' Motion to Exclude Testimony of Plaintiffs' Expert David Carpenter and will be covered in Defendants' Motion to Exclude Testimony of Plaintiffs' Expert William Sawyer.

14

data recently; so at the time I wrote my reports it didn't contribute at all."); Ex. 5 Dorfman 87-88, 91 (stating that he was never told anything about blood levels); Ex. 7 Miller 152 ("Q: So you reached an opinion that Ms. Jessie had been exposed to sufficient quantities of PCBs to cause her non-Hodgkin's lymphoma before you had that [blood] data, correct?  A: Correct."). Where an expert "admit[s] that he did not know [plaintiffs'] dose when he gave his opinion," the Court should properly exclude it. *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1396-97 (requiring "knowledge of a patient's dose *before* finding causation") (emphasis in original), *aff'd,* 13 F.3d 1090 (7th Cir.), *cert. denied,* 512 U.S. 1222 (1994); *see also* Ex. 9 *Nelson*, 1998 WL 1297690 at *6 (same). An expert "ha[ving] no idea of the amount of the chemical to which plaintiff was exposed" at the time he gives his opinion is considered a "red flag" under *Daubert*. *See Downs*, 126 F. Supp. 2d at 1124.

It is axiomatic that scientists obtain data first and reach conclusions second. Many courts have recognized this obvious fact: "Coming to a firm conclusion first and then doing research to support it is the antithesis of [the scientific] method." *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994); *see also Downs*, 126 F. Supp. 2d at 1127 (same); *Wills v. Amerada Hess Corp.*, 2002 U.S. Dist. LEXIS 1546, *29 (S.D.N.Y. Jan. 31, 2002) (excluding testimony where expert "was ready to form a conclusion first, without any basis, and then tr[ied] to justify it") (attached as Ex. 12); *Rutigliano v. Valley Bus. Forms*, 929 F. Supp. 779, 787 (D.N.J. 1996) (same), *aff'd,* 118 F.3d 1577 (3d Cir. 1997).

The willingness demonstrated by all plaintiffs' experts to assume causation in the absence of *any* plaintiff-specific information runs afoul of *Daubert* and Federal Rule of Evidence 702 and thus presents an additional ground for the Court to exclude the testimony of plaintiffs' experts. Both *Daubert* and Rule 702 require, *inter alia*, that expert testimony be based on "sufficient facts

or data." FED. R. EVID. 702(1); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993) (noting that, to be admissible under Rule 702, expert testimony must be "more than subjective belief or unsupported speculation").

During his deposition, Dr. Miller was clear that he did not rely on any plaintiff-specific exposure information in forming his opinions:

> Q: Was it important to you in trying to reach your causation opinion to recreate the amount of dioxins to which Ms. Jessie was exposed?
> A: No.
> …
> Q: And my question is how do you know dioxins from the NEC site reached Ms. Jessie?
> A: I don't.

Ex. 7 Miller 172, 175. The other experts offered by plaintiffs make comparable assumptions. *See, e.g.,* Ex. 4 Rodgers 468 ("I think if the PCBs and dioxin were, in fact, the true cause of his cirrhosis, then the dose in his circumstances, whatever his other risk factors may have been, was sufficient."); Ex. 7 Miller 145 ("Q: Is it your opinion, then, that at least qualitatively Ms. Jessie was simply exposed to enough TCE to cause her non-Hodgkin's lymphoma? A: In combination with the other agents, correct."); Ex. 5 Dorfman 306-314 (admitting that dose information could change his opinions). As the Sixth Circuit has made clear, expert opinions on causation must be excluded where, like here, the expert "has been perfectly willing to assume that plaintiffs had a sufficient dose of [a substance] to cause their illnesses and to give an opinion on causation devoid of any information concerning dosage." *See* Ex. 9 *Nelson,* 1998 WL 1297690, at *6. Such "proof" is an insufficient basis for determining causation. *See id. at* 252-53 (rejecting plaintiffs' argument "that because PCBs were present in the environment in excess of allowable limits and plaintiffs lived and worked in the area, they must have been exposed at a level that could cause [the plaintiffs'] impairments.").

Because plaintiffs' opinions—not based on *any* specific dose or exposure data—are no "more than subjective belief or unsupported speculation," *Daubert*, 509 U.S. at 590, they must properly be excluded under the "exacting standards of reliability." *See Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000). As is often stated, "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 924 (N.D. Ind. 2006) (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.), *cert. denied,* 519 U.S. 819 (1996). "Guesses, even if educated, are insufficient to prove the level of exposure in a toxic tort case." *Mitchell*, 165 F.3d at 781. Moreover, as Rule 702 plainly states, the purpose of expert testimony is to "assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. Plaintiffs seek to turn this standard on its head by asking a jury to determine the doses received by each plaintiff of the substances at issue when their own experts were unable or unwilling to do the same.

## III.    CONCLUSION

Plaintiffs have the burden of showing specific causation. The testimony of plaintiffs' specific causation experts is inadmissible under *Daubert* and Rule 702 because they fail to show a reliable evidence of dose, fail to account for other sources of exposures, and they fail to rule out other causes of their diseases. For the foregoing reasons, defendants respectfully request that this Court exclude all testimony by Drs. Carpenter, Kramer, Orris, George Rodgers, Miller and Dorfman regarding specific causation.

17

|  |  |
|---|---|
|  | Respectfully submitted, |
| Harry K. Herren | s/Tracie J. Renfroe |
| Angela Logan Edwards | Robert E. Meadows |
| Woodward, Hobson & Fulton, L.L.P. | Tracie J. Renfroe |
| 2500 National City Tower | King & Spalding LLP |
| Louisville, Kentucky  40202 | 1100 Louisiana, Suite 4000 |
| Tel:  (502) 581-8000 | Houston, Texas  77002-5213 |
| Fax:  (502) 581-8111 | Tel:  (713) 751-3214 |
| hherren@whf-law.com | Fax:  (713) 751-3290 |
| aedwards@whf-law.com | rmeadows@kslaw.com |
|  | trenfroe@kslaw.com |
| and |  |
|  | and |
| Clifford J. Zatz |  |
| Crowell & Moring LLP | Linnea Brown |
| 1001 Pennsylvania Avenue, N.W. | Holme Roberts & Owen LLP |
| Washington, DC  20004-2595 | 1700 Lincoln Street, Suite 4100 |
| Tel: (202) 624-2810 | Denver, Colorado  80203-4541 |
| Fax: (202) 628-5116 | Tel:  (303) 866-0608 |
| czatz@crowell.com | Fax:  (303) 866-0200 |
|  | nea.brown@hro.com |

*Counsel for Defendants, Cooper Industries, Inc. and McGraw Edison Company*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via electronic filing on this 1st day of March, 2007 to the following:

| | |
|---|---|
| Donna Keene Holt | Charles L. Cunningham, Jr. |
| P.O. Box 10307 | Suite G |
| Knoxville, TN 37939 | 6010 Brownsboro Park Boulevard |
|  | Louisville, KY 40207 |
| Nancy Seidler Eichler |  |
| Masry & Vititoe | Ellen Presby |
| Second Floor | Laura Baughman |
| 5707 Corsa Avenue | Jory Lange |
| Westlake Village, CA  91362 | Baron & Budd, P.C. |
|  | 3102 Oak Lawn Ave., Suite 1100 |
|  | Dallas, TX  75219 |

s/Tracie J. Renfroe
Tracie J. Renfroe

18