**ELECTRONICALLY FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | | |
|---|---|---|
| CHARLES W. ADAMS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. NO. 5:03-CV-476-JBC |
| | ) | |
| COOPER INDUSTRIES, INC. and | ) | |
| MCGRAW EDISON CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
PLAINTIFFS' EXPERT TESTIMONY AND OPINIONS CONCERNING
<u>GENERAL CAUSATION</u>**

Defendants Cooper Industries, Inc. and McGraw Edison Company respectfully submit this memorandum in support of their motion, pursuant to Fed. R. Evid. 104(a), 702, 703, and 403, to exclude testimony of Shira Kramer, Ph.D., and David Carpenter, M.D.

## I.       INTRODUCTION

Dr. Shira Kramer is plaintiffs' epidemiologist – the only epidemiologist they have presented in this case.  Dr. Carpenter is a public health professional.[1]  Both Drs. Kramer and Carpenter have reviewed carcinogenicity advisory classifications and selected epidemiology studies and reached the conclusion that the five substances at issue in this case (PCB, TCE, vinyl chloride, dioxins, and furans) cause many types of human cancer.  Their lists include non-Hodgkins lymphoma, the disease of bellwether plaintiff Mary Ann Jessie.  Such testimony will also be offered to support fear-of-cancer damages of all four bellwether plaintiffs.

Lawsuits like this one allege causation in the context of low-dose environmental exposures, similar to the background exposures most of us have received from living in an industrialized society.  Whether such alleged exposures actually cause any harmful effects in humans has never been demonstrated in the scientific literature.  Most of the studies of the five substances at issue have focused on significant chemical exposure experienced by highly exposed factory workers, victims of industrial accidents, or the subjects of large-dose accidental food intake.  Even among those, the only studied chemical at issue in this case that is a widely recognized human carcinogen is vinyl chloride, which has been shown to cause angiosarcoma, a rare liver cancer, and even then only at high exposure levels experienced by factory workers in the 1950s and 1960s.  Other studies of the five substances involved here have either found *no*

---

[1] Although Dr. Carpenter has an M.D., he has never been licensed to practice medicine.

*increased risk of cancer in these highly exposed populations*, or only modest and inconsistent elevations interpreted by the authors as "suggestive" of a possible link or as "hypothesis generating."  Low-dose environmental studies provide even less evidence of a cancer link.

Considering the lack of scientific proof of harm from low-dose environmental exposures, Drs. Kramer and Carpenter should be required to follow generally accepted fundamental principles governing the interpretation of epidemiology and other evidence to avoid false and unwarranted causation conclusions not supported by the science.  The most important of these principles are (1) to evaluate carefully the *dose* received before ascribing causation, in order to ensure the doses received are consistent with those in the epidemiological literature demonstrating a causal link to harm; (2) to assess the entire literature and *not cherry-pick* or overinterpret selected articles to support a preconceived opinion; and (3) to properly weigh the scientific evidence, primarily by giving primacy to epidemiology studies and not to animal studies and government classifications based on them.  The Sixth Circuit Court of Appeals has rejected testimony in a similar PCB environmental contamination case when the experts failed to follow these and other principles and thus did not meet *Daubert* criteria.  *Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244 (6th Cir. 2001).

Drs. Kramer and Carpenter violate each of these principles.  First, they completely ignore the issue of dose.  Instead, they opine merely that there is no known safe level of exposure to carcinogens, and then repeatedly state only that the Dayhoit area residents were "exposed" to those substances.  They testified in their depositions repeatedly that *any exposure* to a "known carcinogen," no matter how infrequent or trivial, actually causes cancer, with no citation to any scientific support for this conclusion.  The scientific literature to which they cite arises out of studies of persons highly exposed through occupational activities, food poisonings or other

unusual circumstances where exposures were orders of magnitude higher than the low-dose environmental exposures alleged in this case. Thus, they offer no support in the scientific literature for their causal leap from the low environmental doses allegedly received by the *Adams* bellwether plaintiffs, to the high doses involved in the worker studies and advisory classification analyses on which they rely.

Second, Drs. Kramer and Carpenter have not weighed the entire literature, but have instead carefully selected only the studies that support their opinions. For example, Dr. Kramer's sixty-seven page report does not cite a single article that does not support her opinion (there are dozens of such articles in the published literature). Dr. Carpenter's twenty-six pages of reports are similarly devoid of any citations to publications that do not support his opinions. Nor do these experts offer in their reports any critique of the studies they selected or recognition of their flaws and limitations. Drs. Kramer and Carpenter have developed classic litigation-driven opinions with the eye of advocates not scientific experts.

Finally, plaintiffs' experts rely heavily on advisory classifications and high-dose animal studies for their opinions. Both have been rejected repeatedly by courts as an adequate or appropriate basis for a general causation opinion.

In 1995 the Court permitted testimony on general causation in the *Robinett* trial. Since that time, however, federal courts, including the Sixth Circuit, have greatly strengthened *Daubert* case law and now require trial judges to eliminate litigation-focused experts whose opinions are not fairly born of objective scientific inquiry. The reports of Drs. Kramer and Carpenter and their depositions in this case document how far they have departed from a scientific process inadvocating their personal views. Their testimony on general causation should be excluded in its entirety.

## II.     BACKGROUND

Drs. Kramer and Carpenter apparently intend to testify that the contaminants from the NEC site – together and individually – are a cause of many forms of human cancer, including NHL.[2]  Dr. Kramer does not specifically testify that the four bellwether plaintiffs' diseases were caused by site contaminants, nor could she as she is not a medical doctor or toxicologist.  On the other hand, she will undoubtedly testify, if permitted, that Ms. Jessie was exposed to the site contaminants and would thus fall within Dr. Kramer's universe of persons subject to cancer from even the smallest exposure to these substances.  She thus comes very close to a specific causation opinion, and her testimony will likely be so construed by the jury.  Similarly, as explained in Defendants' Motion to Exclude Testimony and Opinions of Plaintiffs' Expert David Carpenter ("Carpenter Daubert Motion"), Dr. Carpenter has explicitly disclaimed competence to issue specific causation opinions, yet his discussion of the bellwether plaintiffs will likely be construed as such by the jury. [3]

### A.     Plaintiffs' Experts' "Any Exposure" or "One Molecule" Methodology.

As explained in Defendants' Motion to Exclude Testimony Regarding Specific Causation, Drs. Kramer and Carpenter rely on a methodology that permits them to link any exposure (often speculative) involving the five substances to causation of cancers, regardless of and in complete disregard of the dose received.  Their complete failure to address dose can be

---

[2] *See* Ex. 1, Report of Shira Kramer ("Kramer Rep.")  dated April 3, 2006 at 10, Opinion 3 ("In my opinion, . . . the chemicals emitted from the NEC site, individually or in combination, are causal factors in the risk of cancer among the population exposed to NEC site contaminants."); *id.* at Opinion 4 ("In my opinion, . . . the chemicals emitted from the NEC site, individually or in combination, are causal factors in the risk of non-Hodgkin's Lymphoma (NHL) among the population exposed to NEC site contaminants.") ; *see also* Ex. 2, Report of David Carpenter ("Carpenter Rep.") dated May 12, 2006 at 22 ("[T]he exposures from the defendant's plant suffered by these plaintiffs has either caused directly or have substantially contributed to the development of these diseases.").

[3] *See* Defendants' Motion to Exclude Testimony of Plaintiffs' Expert David Carpenter regarding the infirmities in his qualifications to testify on specific causation.

explained by their methodology.  They have chosen to adopt the principle that <u>any</u> exposure to these substances, no matter how small, causes disease:  "Officially accepted methods of assessing carcinogens *assume* there is *no safe level of a carcinogen.  Any amount of exposure* to cancer-causing chemicals increases the chance of developing cancer."  Ex.  1 Kramer Rep. at 15; Ex. 3 Dep. Shira Kramer ("Kramer") 560; Ex. 4 Dep. David Carpenter ("Carpenter") 8, 294.

Thus, their equation for causation is simple:  if there, even "possible" exposure, they conclude, to a reasonable degree of scientific certainty, that the exposure substantially contributed to any cancer in the Dayhoit area.  Under their methodology, one exposure is as sufficient to opine causation as a hundred exposures, and trivial doses are the same as any other dose.  *See, e.g.,* Ex. 3 Kramer 558-559, 573-574, 579-580; Ex. 4 Carpenter 88-90.

> **B.** **Plaintiffs' Experts' Reliance on Agency Classifications and Selective Use of Literature.**

Drs. Kramer and Carpenter rely upon *selected* published literature for their opinion that the substances in this case cause many types of cancers in humans.  Indeed, Dr. Kramer has not conducted appropriate epidemiology or other studies to determine whether this is the case. Dr. Carpenter's research has largely focused on studying PCBs in small populations.  Their analysis of the literature is thus critical to the reliability of their opinions.

They rely first and most heavily on the carcinogenicity classifications of these substances by four entities, the US EPA, the Department of Health and Human Services National Toxicology Program (NTP), the World Health Organization's cancer-classification agency the International Agency for Research on Cancer (IARC), and the Centers for Disease Control's

Agency for Toxic Substances and Disease Registry (ATSDR).[4]   For example, these classifications are the first item Dr. Kramer lists in the bases for her opinions, she discusses them at length, and she cites them repeatedly.  Ex. 1 Kramer Rep. at 9-14, 21-26, 28. Dr. Kramer uses these advisory classifications of the substances as "known or probable human carcinogens," based in part on animal studies, to support her opinion that any exposure to any of them would cause many cancers in humans.  *Id.* at 11; Ex. 3 Kramer 308, 511-515, 581-583.  For instance, she relies on EPA's classification of vinyl chloride as "a known human carcinogen," based on its link with angiosarcoma, to support the notion that vinyl chloride causes more than 17 types of human cancers.  Ex. 1 Kramer Rep. at 13, 23.  Dr. Carpenter follows suit.  Ex. 2 Carpenter Rep. at 5, 21; Ex. 4 Carpenter 342-343.

Drs. Kramer and Carpenter also discuss published articles reporting on studies of these five substances.  However, they are *selective* with the scientific literature.  For instance, Dr. Kramer cites <u>only</u> to the studies that she believes <u>support</u> her opinion.  There is no discussion or acknowledgment of the many contrary studies, no weighting of the competing studies, and no recognition of the widespread disagreement with their position in the literature.  Nor do they include any critique of any of the studies they cite, noting their weaknesses, lack of power, small numbers, high exposures, irrelevance to the facts in this case, etc.  Even though the authors of virtually all of these studies state their conclusions very cautiously, e.g., that they are only "suggestive" of a possible link or are only "hypothesis generating," plaintiffs' experts here draw firm opinions from them, such as Dr. Kramer's conclusion for NHL:

---

[4] The impact of plaintiffs' experts' improper use of these classifications, over and above the role in their methodology, is the subject of Defendants' Motion in Limine to Exclude Classifications of Chemical Carcinogenicity, Docket Entries 517-518.

> "Exposures to TCE, Dioxins, and PCBs have caused non-Hodgkin's lymphoma and other adverse health effects in humans and experimental animals." (Ex. 1 Kramer Rep. at 27).

or her broad declaration as to all of the substances:

> "The chemicals emitted from the NEC-site are associated with an increased risk of cancer and other serious health conditions in humans and animals, and have been shown to be multi-potent carcinogens in humans and animal studies." (*Id.* at 9).

Again, Dr. Carpenter follows suit:

> "[T]he exposures from the defendant's plant suffered by these plaintiffs has either caused directly or have substantially contributed to the development of these diseases." (Ex. 2 Carpenter Rep. at 22).

### C.  Plaintiffs' Experts' Reliance on Animal Studies.

Finally, Drs. Kramer and Carpenter, neither of whom is an animal toxicologist, draw heavily upon animal studies for their causation opinions.  In doing so, they state unequivocally and repeatedly that it is appropriate to extrapolate directly from animal studies to determine human causation:

- "Simply put, if a substance causes disease in test animals, then that same substance is considered harmful to humans."  Ex. 1 Kramer Rep. at 8; repeated at 21.

- "There is general acceptance for at least a qualitative relationship between experimental animals and humans with regard to the pathophysiology of disease." *Id.* at 8.

-  "[E]valuation of the potential risk posed by environmental contaminants to the human body is supported by extrapolation of experimentally derived animal data to humans."  *Id.* at 21.

- That data from animals can be extrapolated to humans "is a correct statement of what I believe to be the case."  Ex. 4 Carpenter 265-266.

- "TCDD is … a known human carcinogen, based on both evidence in humans and absolute proof that dioxin causes cancer in animals."  Ex.2 Carpenter Rep. at 5.

7

- Trichloroethylene is listed as "'reasonably anticipated to be [a] human carcinogen' … on the basis of proof in animals but less than definitive proof in humans." *Id.* at 21.

Drs. Kramer and Carpenter acknowledge that many of the agency classifications of these substances are based on animal studies, not human data, but nevertheless rely on those classifications to determine human causation. Ex. 1, Kramer Rep. at 11; Ex. 2 Carpenter Rep. at 5, 21.

## III.   ARGUMENT

### A.   Plaintiffs' Experts Are Not Using a Scientific Methodology to Conclude that These Substances Cause All Cancers Regardless of Exposure Level.

Plaintiffs' experts' general causation opinions – that exposures of any kind to these substances cause many types of cancer, including NHL and other diseases – are not scientifically-derived opinions.  They fail to assess dose, use a biased and selective approach to the literature, and improperly rely on advisory classifications and animal studies to support their opinions.

### 1.   *Daubert* Requires Exclusion of Testimony That Is Litigation-Driven and Not Based on Scientific Principles and Evidence.

Today, the role of the trial court addressing general causation testimony is well settled – the court must "give a 'hard look' and carefully assess the scientific conclusions and reasoning of experts because jurors are frequently overly impressed by conclusory opinions of scientific experts paid by a party." *Downs v. Perstorp Components,* 126 F. Supp. 2d 1090, 1118 (E.D. Tenn. 1999), citing *Turpin v. Merrell Dow Pharms.*, *aff'd*, 26 Fed. App'x 472 (6th Cir. 2002).  It is no longer adequate to defer to a "battle of the experts," *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1072 (6th Cir. 1999) or resort to cross-examination as the solution, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (U.S. 1993).  The

Sixth Circuit requires that its trial courts examine the studies on which the expert relies (and those the expert ignores) to see if they support the causation opinion. The Court should also determine whether the expert is ignoring vital scientific principles and engaging instead in guesswork. *See, e.g., Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244 (6th Cir.), *cert. denied,* 534 U.S. 822 (2001); *Turpin v. Merrell Dow Pharmaceuticals*, 959 F.2d 1349 (6th Cir.), *cert. denied,* 506 U.S. 826 (1992); *Elkins v. Richardson-Merrell, Inc.*, 8 F.3d 1068 (6th Cir. 1993).[5]

The Sixth Circuit's *Nelson* case is a particular impediment to the general causation testimony of Drs. Kramer and Carpenter. In *Nelson*, the plaintiffs were a group of neighbors of a pipeline facility alleged to have leaked PCBs into groundwater, air, and other media. The *Nelson* bellwether plaintiffs asserted that low-dose environmental exposures were sufficient to cause a host of neurological and pulmonological impairments, epileptic seizures, cancer, and other conditions. *See Nelson v. Tennessee Gas Pipeline Co.*, 1998 WL 1297690 at *4 (W.D. Tenn., Aug. 31, 1998) (attached as Ex. 5). Both the trial court and the Sixth Circuit rejected the general causation expert testimony on a host of grounds. Most critical for Drs. Kramer and Carpenter on the issue of general causation here was the key finding in *Nelson* of *lack of support in the published studies.* The trial court carefully reviewed a set of at least nine published studies relied on by the experts and found, in fact, that none of them actually supported a causation opinion. *Id.* at *7-9.

---

[5] The companion *Daubert* motions addressing the opinions of Drs. Carpenter and Sawyer, as well as the issue of specific causation, contain substantial additional *Daubert* case law, which defendants incorporate by reference into this brief. This motion as to general causation will focus on the case law most pertinent to such general causation opinions and methodologies.

Similarly, in *Lofgren v. Motorola*, 1998 WL 299925 at *12 (Ariz. Super. Jun. 1, 1998) (attached as Ex. 6), plaintiffs' expert cited "no studies either epidemiological or animal that demonstrate TCE . . . can be linked to any of the diseases at issue [including NHL] in this case at low level, environmental doses . . . .").[6] Here, Drs. Kramer and Carpenter are equally guilty of the selective use of epidemiology studies that was so criticized in *Nelson*:

> [T]he fact that epidemiological studies are universally utilized by scientists, does not inexorably lead to the conclusion that the way they were utilized by plaintiffs' experts in this case are [*sic*] appropriate.  The court finds that the **selective utilization of epidemiological studies to the exclusion of other confounding and conflicting epidemiological studies**, without sufficient scientific explanation made the epidemiologic methodology one that **clearly was not appropriate or generally accepted amongst scientists.**

*Id.* at *16.

Thus, developments in *Daubert* law now require Drs. Kramer and Carpenter to demonstrate how the scientific literature as a whole, not just selected studies, support their opinions regarding low-dose environmental causes of human cancer.  They have not done so.

### 2.   Drs. Kramer and Carpenter Improperly Rely on Advisory Classifications and Animal Studies for Their Opinions.

Dr. Kramer's primary basis for her general causation opinions is the classification of the five substances as known or probable human carcinogens by EPA, IARC, NTP, and ATSDR.[7] This is the entire focus of her "Opinion 1", Ex. 1 Kramer Rep. at 9, and she liberally refers to the classifications throughout the report and her deposition.   The classifications of these organizations, she believes, provide a basis for her to opine that any exposure, including low-dose environmental exposures, to these substances are a cause of NHL and are "multi-potential"

---

[6] *Lofgren* was actually decided under *Frye*, but the court held that *Daubert's* observations were "equally applicable to the consequences of the court's role and function pursuant to *Frye*."  *Lofgren*, 1998 WL 299925 at *9.

[7] Dr. Kramer initially mentions the ATSDR in her report, but fails to identify any classifications of the five substances by ATSDR elsewhere in the report.

carcinogens in humans.  Dr. Carpenter follows suit.  Ex. 2 Carpenter Rep. at 5, 21; Ex. 4 Carpenter 342-343.

Reliance on advisory classifications, however, is not an accepted scientific or legal methodology for determining causation.  Entities such as EPA and IARC are tasked with protecting human health from <u>possible</u> disease and thus use evidence and standards designed to err on the side of caution.  Many courts have addressed this problem and have consistently reasoned that government and regulatory agencies do not use the same causation standard as required either in court, or in toxicology/epidemiology to identify actual causes of disease.  The Tenth Circuit in *Mitchell v. Gencorp, Inc.* is an example:

> The methodology employed by a government agency "results from the preventative perspective that agencies adopt in order to reduce public exposure to harmful substances.  The agencies' threshold of proof is reasonably lower than that appropriate in tort law, which traditionally makes more particularized inquiries into cause and effect and requires a plaintiff to prove it is more likely than not that another individual caused him or her harm."

165 F.3d 778, 783 n.3 (10th Cir. 1999) (quoting *Allen v. Pennsylvania Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996)); *see also Siharath v. Sandoz Pharm. Corp.*, 131 F. Supp. 2d 1347, 1366 (N.D. Ga. 2001) (FDA statement regarding risks of prescription drug was not relevant to causation testimony), *aff'd,* 295 F.3d 1194 (11th Cir. 2002); *Sutera v. Perrier Group of Am.,* 986 F. Supp. 655, 664 (D. Mass. 1997) ("A regulatory standard, rather than being a measure of causation, is a public-health exposure level that an agency determines pursuant to statutory standards."); *Wright v. Williamette Indus.*, 91 F.3d 1105, 1007 (8th Cir. 1996).  Even if the classifications had any bearing on actual causation, many of them do not support Dr. Kramer's broad-based, definitive conclusions.  Among the discrepancies are the following.

***Differences in exposures***.  The classifications are frequently based on human exposures far in excess of the NEC-site population, and their authors often expressly so qualify their findings, e.g.:

> Results from several studies have suggested that breathing air or drinking water containing moderate levels (100 ppm) of vinyl chloride might increase their risk for cancer.  However, the levels used in these studies were much higher than levels found in the ambient air and/or most drinking water supplies.

ATSDR Draft on Vinyl Chloride at 6 (excerpts attached as Ex. 7).

> "There is no clear indication that environmental exposure to PCBs has caused adverse liver effects in humans."

ATSDR Draft on PCBs at 108 (excerpts attached as Ex. 8).

***Contrary studies.***  Similar to their one-sided literature review, plaintiffs' experts fail to acknowledge the agencies' references to contrary literature, often more recent and more powerful.  As one example, ATSDR qualifies any link between vinyl chloride and lymphatic cancers based on older studies because "[m]ore recent studies, however, have not demonstrated an association between vinyl chloride exposure and brain, lung, or lymphatic/hematopoietic system cancers."  Ex. 7 ATSDR Draft on Vinyl Chloride at 15, 22; *see also* Exh. 9 NTP Report on Carcinogens - Vinyl Chloride at 1 (noting that additional studies "suggest that lung cancer, lymphoma, and leukemia may not be associated with vinyl chloride exposure").

***Overinterpretation of findings***.  Whereas Dr. Kramer relies heavily on known or probable human carcinogen classifications, she often extrapolates more than the agencies themselves are willing to say.  For example, in discussing PCBs, which Drs. Kramer and Carpenter opine are a cause of human non-Hodgkin's lymphoma, the ATSDR actually says:

> [t]here is no clear association between occupational exposures to PCBs and cancer in . . .the lymphatic system.  Case-control studies of the general population are inconclusive with respect to . . . non-Hodgkin's lymphoma.

Ex. 8 ATSDR Draft on PCBs at 251.  Drs. Kramer and Carpenter rely on EPA's risk assessments

where their opinions are supported, but ignore EPA's own qualifications regarding its dioxin risk

assessments:

> It is important to realize that assessments like EPA's do not predict actual health effect risk for any one person, or health effect rates in the population.  EPA used its best judgment with the available data . . . .

Ex. 10 Interagency Workgroup on Dioxin (including EPA), Questions and Answers about Dioxins (July 2006), *available at* http://www.cfsan.fda.gov/~lrd/dioxinqa.html (last accessed Feb. 28, 2007).

*Reliance on animal studies and uncertain classifications*.  Both EPA and IARC, whom

Drs. Kramer and Carpenter rely on for their PCB opinions, have classified PCBs only as a

"probable," not known, human carcinogen, and have done so based on animal evidence, not

human.   EPA, for instance, relies on a rat study for its "probable" classification, as Dr. Kramer

acknowledges.   Ex. 1 Kramer Rep. at 15.   EPA, in contradiction to plaintiffs' experts'

conclusions, declares that the human evidence for PCB carcinogenicity is "inadequate."  Exh. 11

EPA IRIS PCB Listing, http://www.epa.gov/iris/subst/0294.htm#carc. The failure of these

entities to classify PCBs as a known human carcinogen means there is insufficient evidence to

conclude that PCBs actually cause cancer in humans.  TCE is also classified by EPA and IARC

as only a "probable" human carcinogen, based largely on experimental animal studies.  Ex. 1

Kramer Rep. at 14; Ex. 2 Carpenter Rep. at 21.  Yet, the ATSDR report for TCE reported that

"[e]xtrapolating animal toxicity data to predict human risk is often controversial and is especially

so in the case of [TCE] since some of the mechanisms implicated in its animal effects do not

apparently exist in humans."  ATSDR, Toxicological Profile For Trichloroethylene (1997) at 125

(excerpts attached as Ex. 12).

Drs. Kramer and Carpenter ignore these limitations and qualifications by the agencies to conclude that the substances <u>are</u> virtually unlimited human carcinogens. The Sixth Circuit has determined that animal studies are "'simply inadequate . . . [to] permit a jury to conclude that [a substance] more probably than not causes [certain injuries].'" *Elkins*, 8 F.3d at 1071 (first alteration in original) (quoting *Turpin*, 959 F.2d at 1360). They are "at most . . . only evidence that [a particular substance] may produce some unidentified effect on humans" and are clearly inadequate to support an opinion that a substance does cause the condition in humans. *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 424 (5th Cir. 1987) (cited with approval in *Turpin*, 959 F.2d at 1360); *see also General Electric Co. v. Joiner*, 522 U.S. 136, 144-45 (1997); *Raynor v. Merrell Pharms. Inc.*, 104 F.3d 1371, 1375 (D.C. Cir. 1997); *Wade-Greaux v. Whitehall Labs., Inc.*, 874 F. Supp. 1441, 1480 (D.V.I.), a*ff'd,* 46 F.3d 1120 (3rd Cir. 1994). Scientists must distinguish between effects that have been reported, and those which are merely feasible or biologically plausible. Ex. 4 Carpenter 51-52. Yet, often unable to cite reliable statistically-significant epidemiological data to support his general causation hypotheses, Drs. Carpenter and Kramer improperly seek refuge in substantially weaker, as well as legally and scientifically insufficient, animal studies. Such "studies furnish[] at best speculative support for [a] causation theory." *Allen*, 102 F.3d at 197; *see also Brock v. Merrell Dow Pharmaceuticals, Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (noting "the very limited usefulness of animal studies when confronted with questions of toxicity").

In the landmark *Agent Orange* litigation, Judge Weinstein observed that "animal studies are not helpful . . . because they involve different biological species. They are of so little probative force and are so potentially misleading as to be inadmissible." *In re Agent Orange Litigation*, 611 F. Supp. 1223, 1241 (E.D.N.Y. 1985), *aff'd,* 818 F.2d 187 (2nd Cir. 1987), *cert.*

*denied,* 487 U.S. 1234 (1988).  Indeed, "with respect to animal studies generally, what happens in an animal would not necessarily happen in a human being."  *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

*Old classifications.*   Drs. Kramer and Carpenter rely most heavily on IARC's classifications (for all five substances), yet those classifications are a minimum of 10 years old and for two substances (vinyl chloride and PCBs) almost <u>twenty</u> years old.   A tremendous amount of research has been conducted since then, including major updates of the studies relied on by IARC that have failed to confirm earlier suggestions of carcinogenicity.

For the above reasons, it is improper for any expert to derive a human causation opinion in reliance on these governmental classifications.  They do not demonstrate general causation and should not form part of an expert causation opinion in a court of law.  The unquestioning reliance of Drs. Kramer and Carpenter on them is simply an inappropriate methodology under current *Daubert* standards.

### 3.   Drs. Kramer and Carpenter Have Improperly "Cherry-Picked" Literature <u>to</u> Support a Pre-Conceived, Litigation-Driven Opinion.

Dr. Kramer's and Dr. Carpenter's review of the literature is heavily biased toward supporting their predetermined conclusions.  The failure to cite a single study contradicting their opinions is remarkable and can only reflect the work of an advocate seeking to bolster a predeveloped theory or strongly held belief with selective use of the literature.  Lawyers write this way, but scientists should not.  *See Carnegie Mellon Univ. v. Hoffman-LaRoche*, 55 F. Supp. 2d 1024, 1039 (N.D. Cal. 1999); *Lust v. Merrell Dow Pharms,* 89 F.3d 594 (9th Cir. 1996) (excluded experts who "pick and chose from the scientific landscape"); *Miller v. Pfizer, Inc.*, 196 F. Supp. 2d 1062, 1086-87 (D. Kan. 2002) ("selective reliance . . . 'is not generally accepted

practice'"; experts should review all literature that supports, refutes, or is neutral to the proposition), *aff'd* 356 F.3d 1323 (10th Cir.), *cert. denied,* 543 U.S. 917 (2004).

Drs. Kramer and Carpenter write as if there is widespread support for their conclusions. In reality, the literature supporting associations between some of the chemical substances in this case and non-Hodgkin's lymphoma is at best inconclusive, and for others nonexistent. Not only do the studies not support their position, Drs. Kramer and Carpenter have failed even to take into account contrary studies. A sampling of the studies they ignore, yet which directly contradict their view that these substances cause NHL, includes the following:

- *Prince 2006[8]:* An increase in NHL was only "moderate" and not statistically significant.

- *Mallin 2004[9]:* "The non-Hodgkins lymphoma SMRs in females were not associated with length of employment, and the highest SMR was found in those with less than 1 year of employment," (i.e., no dose response). There were no NHLs in males. (573)

- *Kimbrough 2003[10]:* "The [non-significant] SMRs for cancer of the lymphatic and hematopoietic system … did not differ from the United States population." Also, the few statistically significant excesses in cancer mortality reported in the literature were not seen in this study."

- *Loomis 1997[11]:* The authors report fewer NHLs (SMR=0.82) in the exposed cohort than in the control population. (723, tbl. 1) Moreover, they conclude that "[n]either all cause not all cancer mortality was related to cumulative exposure" to PCBs. (725)

Dr. Kramer at least implies in her opinion that vinyl chloride is also responsible for NHL and other cancers, yet she does not cite a single study to support the NHL conclusion. In contrast,

---

[8] M. Prince, et al., *Update: cohort mortality study of workers highly exposed to polychlorinated biphenyls (PCBs) during the manufacture of electrical capacitors, 1940-1998,* 5 Environ. Health 42 (2006) (attached as Ex. 13).

[9] K. Mallin, et al., *Cohort Mortality Study of Capacitor Manufacturing Workers, 1944-2000,* 46 J. Occ. Envtl. Med. 565 (2004) (attached as Ex. 14).

[10] R. Kimbrough, et al., *A Mortality Update of Male and Female Capacitor Workers Exposed to Polychlorinated Biphenyls,* 45 J. Occ. Envtl. Med. 271 (2003) (attached as Ex. 15).

[11] D. Loomis, et al., *Cancer mortality among electric utility workers exposed to polychlorinated biphenyls,* 54 Occ. Envtl. Med. 720-728 (1997) (attached as Ex. 16).

Dr. Carpenter concedes that "[t]he situation with vinyl chloride for non-Hodgkin's lymphoma is weak at best." Ex. 4 Carpenter 378.

Not only do Drs. Kramer and Carpenter fail to address the contrary NHL literature, they also draw far more out of the few studies they cite than the studies themselves can possibly support, as the following sampling demonstrates:

- *Bertazzi 2001[12]:* The authors themselves <u>expressly rejected direct extrapolation of their findings to environmental exposures</u>:  "The possible risk, if any, to human health of widespread low-level dioxin contamination of the environment has still to be assessed." (1031)  "Extrapolation of these high-exposure risk levels to current environmental dioxin levels is problematic."  (1041)

- *Floret 2003* and *Viel 2000[13]:*  These two studies involve a municipal incinerator in France that burned <u>67,000 tons</u> of waste every year.  Both of these articles noted that "whether low levels of dioxin affect the general population has yet to be determined."  Viel 2000 at 14; Floret 2006 at 2149.[14]  The Viel authors recommended "caution" before ascribing <u>any</u> causation of NHL by dioxin:   "These findings should be confirmed by further investigation (e.g, a case-control study in which dioxins are measured in biologic tissues) <u>before clusters of . . . non-Hodgkins lymphoma are ascribed to dioxin</u> . . . ."  13, 18.

- *Wartenberg 2006[15]:*  Wartenberg published a TCE review article, relied on by Kramer and Carpenter, in which he conducted a metaanalysis of several previous studies.  Even though <u>none</u> of the underlying studies found an increased incidence of NHL,

---

[12] P. Bertazzi, et al., *Health Effects of Dioxin Exposure:  A Twenty-Year Mortality Study* , 153 Am. J. Epid. 1031, 1033, 1042 (2001) (attached as Ex. 17).

[13] N. Floret, et al., *Dioxin Emissions from a Solid Waste Incinerator and Risk of Non-Hodgkin Lymphoma*, 14 Epid. 392 (2003); Ex. 19, J. Viel, et al., *Soft Tissue Sarcoma and Non-Hodgkins Lymphoma Clusters Around a Municipal Solid Waste Incinerator with High Dioxin Emission Levels,* 152 Am. J. Epid. 13 (2000) (attached as Ex. 18).

[14] Floret conducted a follow up study in 2006 that detected substantial amounts of dioxins in soil near the plant.  Ex. 20, Floret, N., *Dispersion Modeling as a Dioxin Exposure Indicator in the Vicinity of a Municipal Solid Waste Incinerator: A Validation Study,* 40 Env. Science Tech. 2149 (2006).  No such levels of dioxin (or anything above background) have ever been detected near the NEC site.  In addition, Floret's 2006 study found that the use of an air modeling program that failed to take into account the hilly terrain substantially overpredicted exposures based on the real soil data.  Kramer and Carpenter do not even cite this study, presumably because it undercuts their reliance on Dr. Spencer's similarly flawed air modeling approach.  *See* Defendants' Motion to Exclude Testimony and Opinions of Plaintiffs' Expert Hugh Spencer, Docket Entry 545.

[15] D. Wartenberg, et al., *Trichloroethylene and Cancer: Epidemiologic Evidence,* 108 Envtl. Health. Persp. Supp. 2, at 161 (2000) (attached as Ex. 21).

Wartenberg's reanalysis did.  This study has been criticized, and subsequent large cohort studies have failed to confirm this link.[16]

- *Hansen 2001*[17]:  This study focused on workers who directly handled TCE solvents for years, not on low-dose environmental exposures.  The authors themselves never concluded that their modest increase in NHL represented a causation finding, instead noting the mixed literature on the subject and the lack of a dose-response relationship in their findings, and concluding only that their findings "warrant further attention." (*Id.* at 138).

- *Rothman 1997*[18]:  The authors explicitly stated that their results "should be regarded as hypothesis-generating.  Before causal inferences can be made about PCB exposure and increased risk of non-Hodgkin lymphoma, these results require replication and potential confounding by risk factors not ascertained here should be examined."  (243).

Utilizing studies for conclusions their authors were unwilling to reach is simply not a permissible methodology.  *See Joiner,* 522 U.S. at 145; *Chambers v. Exxon Corp.,* 81 F. Supp. 2d 661, 665 (5th Cir. 2001) (excluding experts because they "seek to substitute their personal opinions for the conclusions of the studies").

Thus, the analysis of Drs. Kramer and Carpenter do not reflect a fair and balanced assessment of the literature.[19]  Coupled with their other methodological errors, they have failed

---

[16] Boice, J.D., and McLaughlin, J.K., *Errors in TCE Analysis,* 109 Environ Health Perspect. A108 (2001) (attached as Ex. 22); Raaschou-Nielsen, O., et al., *Cancer Risk Among Workers at Danish Companies Using Trichloroethylene:  A Cohort Study,* 158 Am J. Epidemiol. 1182 (2003) (attached as Ex. 23); Zhao, Y., et al., *Estimated Effects of Solvents and Mineral Oils on Cancer Incidence and Mortality in a Cohort of Aerospace Workers,* 48 Am. J. Ind. Med. 249 (2005) (attached as Ex. 24).  *See also*  Mandel, J., et al., *Occupational Trichlorethylene Exposure and Non-Hodgkin's Lymphoma:  A Review and Metaanalysis,* Occup. Env. Med. *at* http://oem.bmjjournals.com/cgi/content/abstract/oem.2005.022418v1 (metaanalysis found insufficient evidence to link TCE and NHL) (attached as Ex. 25).

[17] Hansen, J., et al, *Cancer Incidence Among Danish Workers Exposed to Trichloroethylene,* 43 J. Occup. Environ. Med. 133  (2001) (attached as Ex. 26).

[18] N. Rothman, et al., *A nested case-control study of non-Hodgkin lymphoma and serum organochlorine residues,* 350 Lancet 240 (1997) (attached as Ex. 27).

[19] For a fuller list of relevant studies, see the Report of Defendants' expert Dr. Peter Shields, of Georgetown University, attached as Ex. 28.  While Dr. Shields reaches the opposite conclusion of Drs. Kramer and Carpenter, he does so with a full assessment of the literature, addressing and critiquing where necessary studies that find an association and articulating his reasons for relying on the larger and more persuasive studies finding no increased risk.

to satisfy the *Daubert* criteria for admissible expert testimony, and their general causation opinions are unreliable and irrelevant, and should be excluded.[20]

## IV.   CONCLUSION

Any fair reading of the reports and testimony of Drs. Kramer and Carpenter leads to the conclusion that they are not acting as an impartial experts but as advocates for the plaintiffs. They cannot do so under *Daubert* standards, and their failure to satisfy critical scientific parameters such as a dose assessment put them even farther outside the world of normal science. Their general causation testimony should be excluded.

Dated:  March 1, 2007

Respectfully submitted,

s/Tracie J. Renfroe

| | |
|---|---|
| Harry K. Herren | Robert E. Meadows |
| Angela Logan Edwards | Tracie J. Renfroe |
| Woodward, Hobson & Fulton, L.L.P. | King & Spalding LLP |
| 2500 National City Tower | 1100 Louisiana, Suite 4000 |
| Louisville, Kentucky  40202 | Houston, Texas  77002-5213 |
| Tel:  (502) 581-8000 | Tel:  (713) 751-3214 |
| Fax:  (502) 581-8111 | Fax:  (713) 751-3290 |
| hherren@whf-law.com | rmeadows@kslaw.com |
| aedwards@whf-law.com | trenfroe@kslaw.com |
| | |
| and | and |

---

[20] The three *Daubert* grounds noted above are not the only violations of *Daubert* standards by Drs. Kramer and Carpenter.  Dr. Kramer's credentials are highly suspect given her complete absence from the professional world of epidemiologists for the last 15 years.  Both Drs. Kramer and Carpenter have failed to consider alternative causes of the cancers in the Dayhoit area, a clear violation of *Nelson*.  "Before any inferences are drawn about causation, the possibility of other reasons for [an] association must be examined, including chance, biases such as selection or informational bias, and confounding causes."  *Nelson*, 243 F.3d at 253.  They have not published their extreme theories about cancer causation and the irrelevance of dose, and their theories have never been peer-reviewed; they have not tested those theories with any studies of their own; their theories are not generally accepted in the scientific community; and the rate of error of their "any exposure" approach is enormous, given that their theory would require virtually every cancer in the country to be ascribed to background exposures to these five substances, rather than the many other suspected causes of cancer (e.g., genetics).

Clifford J. Zatz
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Tel:  (202) 624-2810
Fax:  (202) 628-5116
czatz@crowell.com

Linnea Brown
Holme Roberts & Owen LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
Tel:  (303) 866-0608
Fax:  (303) 866-0200
nea.brown@hro.com

*Counsel for Defendants, Cooper Industries, Inc.
and McGraw Edison Company*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via electronic filing on this 1st day of March, 2007 to the following:

Donna Keene Holt
P.O. Box 10307
Knoxville, TN 37939

Charles L. Cunningham, Jr.
Suite G
6010 Brownsboro Park Boulevard
Louisville, KY 40207

Nancy Seidler Eichler
Masry & Vititoe
Second Floor
5707 Corsa Avenue
Westlake Village, CA  91362

Ellen Presby
Laura Baughman
Jory Lange
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX  75219

s/Tracie J. Renfroe
Tracie J. Renfroe