ELECTRONICALLY FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
AT LEXINGTON

| | | |
|---|---|---|
| CHARLES W. ADAMS, JR., et al. | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CASE NO. 5:03-CV-476-JBC |
| | ) | |
| COOPER INDUSTRIES, INC. | ) | |
| and MCGRAW EDISON CO. | ) | |
| | ) | |
| Defendants | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE PLAINTIFFS' EXPERT
TESTIMONY REGARDING PORPHYRIN FINDING IN CURTIS ROPER**

I.    **INTRODUCTION**

Defendants move under Federal Rules of Evidence 702 and 403 to exclude Plaintiffs'

expert testimony regarding a 2002 laboratory finding of an elevation in a liver byproduct known

as coproporphyrins in Curtis Roper's blood.  Two of Plaintiffs' experts claim that this finding is

a marker of toxic exposure, and thus supports the theory that Mr. Roper's liver cirrhosis was

caused by NEC-site substances.  Plaintiffs' expert Dr. Patrick Dean is the primary proponent of

this theory, but he relied exclusively for his opinion on a single sentence in a laboratory testing

sales catalogue attributing excess coproporphyrins to "industrial chemicals and waste products."

A second Plaintiffs' expert, gastroenterologist Dr. Bruce Bacon, agreed in his first report with

Dr. Dean's conclusions, but then recanted that opinion after learning that excess coproporphyrins

are a common finding in any liver disease, including cirrhosis:

> In light of [defense expert] Dr. Karl Anderson's opinion that the levels found are a non-specific finding that is commonly found in end-stage liver disease . . . I simply withdraw any reliance on the laboratory results regarding coproporphyrins . . . .

Bruce Bacon, Supplemental Report Regarding Curtis Roper, Feb. 12, 2007, p. 2 (Exh. 3).  At his deposition, however, Dr. Bacon did not in fact withdraw his porphyrin opinion, but testified that he still intends to tell the jury that the coproporphyrin excess could be the result of either toxic insult or cirrhosis or both, he just cannot say which.

The porphyrin opinions of both of these experts should be excluded.[1]  Plaintiffs cannot demonstrate that the coproporphryin finding is anything more than an expected byproduct of liver disease, and their opinions to the contrary are unreliable, rendered by unqualified experts, without foundation, and unduly prejudicial.

## II.    ARGUMENT

### A.    Background

Some background on porphyrins is necessary to understand the unscientific approach used by Drs. Dean and Bacon.  The role of porphyrins in the liver is extremely complex – requiring far more than Dr. Dean's five-minute diagnosis based on a sales catalogue.

---

[1]    Dr. Orris jumped on the porphyrin bandwagon after reading Dr. Dean's report, but his opinion consisted of one sentence in his expert report.  Dr. Orris offered nothing additional except a reference to one study, by Daniell 1997.  He otherwise deferred to Dr. Dean's literature review.  *See* Deposition of Peter Orris, Oct. 9, 2006, p. 91-92 (Exh. 10.1).  To the extent Dr. Orris attempts to present a porphyrin argument at trial, Defendants ask that his testimony also be excluded as derivative of Dr. Dean's.  Defendants are not moving to exclude all of Dr. Dean's testimony, as he also presents opinions on the Roper biopsy slides, or all of Dr. Bacon's opinions, as he testifies about non-alcoholic steatohepatitis ("NASH") and cirrhosis as well.

1.     **The Eight Porphyrins Are Different Substances with Different Causes.**

Porphyrins are an intermediate product generated during the liver's production of *heme*, the substance our red blood cells use to attract oxygen.  There are eight well-recognized porphyrins, each appearing at a different stage of the process.  *See* Supplemental Report of Dr. Jonathan Borak, Sep. 22, 2006, at 2, Figs 1 and 2 (Exh. 4).[2]  The two porphyrins of most interest here – *uroporphryin* and *coproporphyrin* – appear at different times in the process and are distinct substances.

Ordinarily, coproporphyrins are routinely excreted through the urine and feces.  In a dysfunctional liver, however, such as one with cirrhosis, the pathway to the feces is often disrupted, forcing coproporphyrins preferentially to the urine.  Borak Report p. 2, 6; Report of Dr. Karl Anderson at 1-2 ("Anderson Report") (Exh. 5); Deposition of Dr. Karl Anderson, Nov. 29, 2006, at 36, 79-80 ("Anderson Dep.") (Exh. 10).  Various diseases or inherited conditions can cause increases in other porphyrins, including a series of crippling diseases known as porphyrias (all experts agree that Mr. Roper does not have porphyria).  These shifts in other porphyrins, however, are due to enzyme disruption, an entirely different mechanism than the liver blockage that causes increased urinary coproporphyrins.  Anderson Dep. at 79-82.  An analysis of the precise pattern of porphyrins that appear in the urine is thus critical to distinguishing one kind of porphyrin condition from another.  Borak Report at 2, 6 and Fig. 3 (chart taken from textbook of Dr. Bacon illustrating the different porphyrins and diseases); Anderson Dep. at 36.

---

[2]     Defendants have attached the expert reports of Dr. Jonathan Borak, Dr. Karl Anderson, and Dr. Karl Rozman as Exhs. 4 through 6 for background on porphyrins.  Plaintiffs have not presented any witness who is an expert in the role of porphyrins or in the correct interpretation of differential porphyrin increases.

## 2.    Liver Cirrhosis Is a Major Source of Excess Coproporphyrin.

Patients with liver disease, including cirrhosis, often have a specific pattern of porphyrin excess.  The disruption is known as *coproporphyrinuria* (also sometimes called *secondary coproporphyrinuria[3]*), a condition in which coproporphyrins are significantly elevated while others are normal or near normal levels.  Critically, in cirrhosis, the <u>elevated porphyrin is coproporphyrin</u> – the very finding identified in Mr. Roper at the time his cirrhosis was at its worst (less than a year before his transplant).[4]  *See* Anderson Dep. at 26.  As one leading textbook summarizes:

> [Porphyrinuria] is a symptom of some acute febrile states, lead or arsenic poisoning, pernicious anemia, ***cirrhosis***, sprue, acute pancreatitis, blood dyscrasia, and malignancies, ***wherein the excretion of coproporphyrin may be increased.***

Jacobs, S.L., *Porphyrins and their Precursors*, in Henry, R.J., et al. (eds.), CLINICAL CHEMISTRY: PRINCIPLES AND TECHNIQUES at 1222 (1974) (Exh. 17).  *See* Borak Report at 2-3; Anderson Report at 1-2.  The link between cirrhosis/liver disease and coproporphyrins is so well known that one article, published as long ago as 1967, stated it as follows:

> It has been ***known since the end of the last century that an increased porphyrin excretion is a common finding in liver diseases***.  The increase of porphyrin excretion was later shown to be ***mainly due to coproporphyrin***.  A clear deviation from the normal distribution of urinary coproporphyrin Isomers I and III in ***many cases of liver cirrhosis***, obstructive jaundice, and chlorpromazine jaundice has also been noted.[5]

---

[3]    *Secondary* indicates that the elevated coproporphyrin is produced by another condition such as liver disease/cirrhosis.  *See* Anderson Dep. at 83.

[4]    Mr. Roper's laboratory report is attached as Exh. 11.  The report identifies a coproporphyrin level of 767, compared to a reference (normal) range of 155.  His other porphyrin levels are all within normal, with the exception of uroporphyrins which are only slightly elevated (33.7 v. 29.5 high end normal) and his total porphyrins which is elevated because of the high coproporphyrin finding.  Anderson Dep. at 35.

[5]    Koskelo, P., *Urinary Coproporphyrin Isomer Distribution in the Dubin-Johnson Syndrome*, 13 CLINICAL CHEMISTRY 1006 (1967) (Exh. 18); *see also* Gibson, P., *Effect of Hepatobiliary Disease, Chronic Hepatitis C and Hepatitis B Virus Infections and Intereron-α on Porphyrin Profiles in Plasma, Urine, and Feces*, 15 J. GASTROENTEROLOGY AND HEPATOLOGY 192 (2000) (Exh. 16) ("the elevation of

(continued…)

Secondary coproporphyrinuria, Mr. Roper's condition,[6] appears in 30-50 percent of patients with liver disease. *See* Borak Report at 6 and references cited therein; Anderson Dep. at 26. The most frequently diagnosed form of underlying liver disease in these studies showing increased coproporphyrins was fatty liver disease, the condition that Mr. Roper had. Borak Report at 6. Increased levels of coproporphyrins are also regularly associated with other forms of liver disease, including cholestasis and jaundice, both of which Mr. Roper had in 2002 when his porphyrin test was conducted. *See* Borak Report at 6-7 and references; Anderson Report at 2. Thus, an excess of coproporphyrin, far from being a signature for toxic exposure, is in reality a very common and well-recognized finding in people like Mr. Roper who have serious liver disease.

### 3. Toxic Exposures Either Produce No Increase in Porphyrins or a Differential Increase in Uroporphyrin, Rather than Coproporphyrin.

Certain toxic exposures at high doses are known to produce the disease *porphyria cutanea tarda* (PCT). Mr. Roper does not have PCT, however, and the specific porphryin elevated in PCT is not coproporphyrin but uroporphyrin and heptacarboxyporphyrin, which are produced at a different point by the liver. *See* Anderson Dep. at 34. Coproporphyrins are typically normal in the individuals who received these large toxic exposures. *See* Borak Report

---

(continued)

total porphyrins in urine . . . in some patients with hepatobiliary disease is due [to] an elevation of coproporphyrin I").

[6]     Curtis Roper's coproporphyrin finding was the result of a 2002 urine analysis requested by University of Kentucky physician Dr. Michael Simons. Dr. Simons does not indicate why he ran the test, but such tests are commonly performed to eliminate a diagnosis of the disease porphyria in patients complaining of stomach pain. Anderson Dep. at 32. Dr. Simon apparently found the result entirely unremarkable as he ran no further tests and never commented on it.

at 2-4; Comments Regarding Expert Report of Dr. Bacon, by Dr. Karl Rozman, Sep. 29, 2006, at

1 ("Rozman Report") (Exh. 6); Anderson Report at 2-3; and references discussed in reports.

Moreover, studies of the effects of the specific substances at issue in this case,

particularly PCBs and dioxins, typically either show no change at all in porphyrins or, if

anything, a pattern inconsistent with Mr. Roper's and even then only at very high doses:

- In the NIOSH dioxins morbidity study, 281 chemical workers exposed to high levels of TCDD showed no increases of either copro or uroporphyrins; the researchers found "*no association between TCDD exposure and PCT or porphyrinuria among* workers with high body burdens of TCDD."  Calvert, G.M., et al., *Evaluation of Porphyria Cutanea Tarda in U.S. Workers Exposed to 2,3,7,8 Tetrachorodibenzo-p-dioxin*, 25 Am. J. Indus. Med. 559 (1994) (Exh. 14).

- In 159 Austrian chemical factory workers with dioxin exposures heavy enough to cause chloracne, *none had elevated coproporphyrins* when tested twenty years after the last exposure.  Neuberger, M., et al., *Persistent Health Effects of Dioxin Contamination in Herbicide Production*, 81 Env. Res. 206 (1999) (Exh. 19).

- In the well-known Ranch Hand study of Vietnam veterans, personnel exposed to dioxins had *no clinically significant differences in either uroporphyrins or coproporphyrins* when compared to unexposed controls.[7]

*See* Borak Report at 4-6.  Studies with similar outcomes were cited, surprisingly, by Dr. Dean to

support his opinion, even though they contradict it – they are discussed below in the context of

Dr. Dean's report.[8]  Even animal studies do not support Dr. Dean's conclusion – a classic EPA

study of rats fed high levels of PCBs induced "tremendous levels of uroporphyrins" in every rat

tested, but normal coproporphyrins – exactly the opposite of Mr. Roper's laboratory report.  *See*

---

[7]     Institute of Medicine:  Veterans and Agent Orange:  Health Effects of Herbicides Used in Vietnam, at p. 681 (National Academies Press 1994), available at http://www.nap.edu/openbook.php?record_id=2141&page=681 (last visited March 14, 2007).

[8]     A Czechoslovakian study also identified an increase in uroporphyrin, but not coproporphyrin, in workers exposed to industrial dioxins.  Padzerova-Vejlupkova, J., et al., *The Development and Prognosis of Chronic Intoxication by Tetrachorobenzo-p-dioxin in Men*, 36 Arch. Env. Health 5 (1981) (Exh. 20). *See* Anderson Dep. at 38-39.  Most of the levels of uroporphyrins found in the exposed workers in these studies, even though higher than controls, were still very low, within the normal range.  Anderson Dep. at 31-32.

Borak Report, discussion of Goldstein study at p. 5; Anderson Dep. at 38 (dioxin increase of uroporphyrins is well-documented in animal studies).[9]   The few studies that indicated excess coproporphyrins over control groups have had mild results within the range of normal measures. Anderson Dep. 30-32.  Dr. Dean was not aware of any of this literature.

As Dr. Dean readily admits, the science of porphyrins is a very complex, specialized subject and difficult to understand.  Deposition of Dr. Patrick Dean, Dec. 1, 2006, at 115, 122 (porphyrins "are a difficult subject") ("Dean Dep.") (Exh. 8).  There are only a handful of porphyrin experts in the world.  Defendants asked one of them, Dr. Karl Anderson of the University of Texas Porphyria Laboratory (the only specialty porphyria laboratory in the United States), to review the laboratory results for Mr. Roper.  Dr. Anderson noted that urinary porphyrins, especially coproporphyrins, can be increased in many liver diseases and conditions. He thus considers the result to be a "nonspecific elevation" of coproporphyrin that is "very consistent simply with liver disease" rather than compelling a conclusion that toxic exposures are responsible.  Anderson Report at 2.  As Dr. Anderson testified, "the obvious cause is cirrhosis." Anderson Dep. at 46-47.

### B.   Dr. Dean Inadequately Evaluated Coproporphyrin Excess in Reaching His Opinion that Toxic Exposures Caused Mr. Roper's Finding.

Dr. Dean and Dr. Bacon jumped to the conclusion that Mr. Roper's coproporphyrin finding was a marker of toxic exposure without conducting the scientific investigation one would expect to support such a conclusion.  Relying primarily on Dr. Dean's unique "methodology" –

---

[9]   Dr. Dean cited to no literature supporting his view that PCB or dioxin exposures cause an increase in coproporphyrins.  Dr. Orris cited only to the Daniell 1997 article, which notes that coproporhyrinuria occurs with liver disease and that the studies showing elevated porphyrins in humans typically involved excess uroporphyrins and occurred with "doses much greater than the range of human experience" (p. 41).

exclusive reliance on the Mayo Clinic sales catalogue – these experts unsurprisingly reached a very erroneous conclusion, as Dr. Bacon has recently essentially admitted.

### 1. Dr. Dean Relied Improperly on the Mayo Test Catalogue for His Porphyrin Opinion and Ignored the Contradictory Literature.

Defendants' expert Dr. Stephen Caldwell, a widely-published clinician and researcher on liver disease, has diagnosed Mr. Roper as having suffered from a form of fatty liver disease known as non-alcoholic steatohepatitis, or NASH, one of the leading causes of cirrhosis. Dr. Caldwell will testify that Mr. Roper fits both the clinical and histopathological criteria for diagnosing NASH as the cause of a later-discovered cirrhosis, and that his disease is largely due to his obesity and related metabolic factors. Dr. Caldwell's report is attached as Exh. 7.

Plaintiffs' primary experts, in turn, blame toxic exposures for Mr. Roper's cirrhosis but in their initial reports never mentioned Mr. Roper's coproporphyrin laboratory result. For their toxic causation opinion they relied primarily on their theories about the effects of exposure to the substances at issue in this case. Plaintiffs initially retained Dr. Dean, a pathologist who owns a consulting firm in Memphis, merely as a rebuttal expert to counter Defendant's NASH diagnosis by reviewing Mr. Roper's liver slides for evidence of prior NASH.

Dr. Dean departed from his assignment, however, when he reviewed Mr. Roper's medical records and claimed to have "found" the coproporphyrin result. He believed that the excess of coproporphyrins was surprising, but acknowledged that he did not know what the finding meant:

> A.   In this case, I looked at these lab values and I see this – what to my eye, from my experience looking at these, was a rather impressive relative increase in coproporphyrins in the urine. And I found that very curious, says [*sic*], "What is this?
> . . . .
>
> Q.   When you first saw the finding in the lab report, I think you said the first thing you did was pull the Mayo catalogue off the shelf and look at it?

A.    Yes, sir.

Q.    So at that point you didn't really know what it meant, you wanted to look at the Mayo catalogue to find out what it meant?

A.    I wanted to – yeah, that's fair enough. . . .

*Id.* at 116, 121-22. Dr. Dean's unfamiliarity with this finding is not surprising, given that by his own admission he is not an expert in porphyrins:

Q.    I need to ask you, do you feel like you're an expert in porphyrins?  Is this an expert area of yours?

A.    Well, it depends.  And I'm not trying to give the weasly [*sic*] answer.  It depends on the definition of "expert." . . . If you ask me if I'm a porphyrin maven who has written books on porphyrins, and goes around the country, you know, putting people to sleep lecturing on it, the answer is no. . . .

Q.    Would you put yourself in the same league as [Dr. Anderson] as a porphyrin expert?

A.    Relative to what he does for a living, focusing on porphyrins, the answer is that's what he does and I don't.

Dean Dep. at 114, 118-120. Dr. Dean has never published any articles addressing porphyrins (*id.* at 119), and his curriculum vitae lacks any credentials that relate to the interpretation of porphyrin findings.

Rather than consulting an acknowledged expert in the field such as Dr. Anderson, Dr. Dean went to his bookshelf and, as he testified, pulled out the Mayo Clinic's "2004 Test Catalogue" (excerpt attached as Exh. 12).  This book is a listing of the various laboratory tests Mayo offers for sale to laboratories and hospitals.  It does not purport in any way to be a medical textbook or reference volume for determining the causes of disease, nor does it state that the book should be used to diagnose conditions rather than order tests.  Dr. Dean turned to the section describing porphyria, and found the following statement:

> Coproporphyrinuria has been observed in many cases of intoxication with industrial chemicals and waste by-products.

*See* Exh. 12, p. 549.  There are no citations to any medical textbook, literature, or other authority to support this statement.[10]  Nor does the Mayo statement mention PCBs or dioxins or otherwise identify which specific chemicals and wastes produced this result.  Dr. Dean marked this sentence with an asterisk and concluded, from this one sentence alone, that Mr. Roper's coproporphyrin finding, and his cirrhosis as well, must have been caused by toxic exposures:

> A.     And then I'm looking through the Mayo Medical laboratory book, and low [*sic*] and behold it says right there that coproporphyria [*sic*][11] is relatively increased in patients with environmental toxic injury.
>
> Q.     This is the Mayo catalogue you're referring to?
>
> A.     Yes, sir.  Yes, sir.  I mean it's right there in black and white.  I couldn't believe it.  You have a patient with cryptogenic cirrhosis and you have this lab value where the Mayo Medical Handbook[12] is telling you flat out right there that this is associated with environmental toxins, okay, and then along comes Ms. Holt with this list of environmental toxins that this patient has, it's compelling evidence.

Dean Dep. at 116-17.  He used no other reference source for his opinion:

> Q.     When you read the Mayo catalogue section on porphyrins, did you then reach the opinion you have expressed in your report, that Mr. Roper's excess coproporphyrins is due to toxic injury?
>
> A.     Yes, sir.

---

[10]     Dr. Anderson, who deals with porphyria disease and injury on a daily basis, disagreed with the Mayo statement because there were no citations to support it, and the statement was inconsistent with the literature and too vague to be of diagnostic value.  Anderson Dep. at 52-53.

[11]     Demonstrating his lack of porphyrin expertise, Dr. Dean incorrectly identified Mr. Roper's condition here as *coproporphyria*, which is one of the diseases known as PCT.  Mr. Roper had *coproporphyrnuria*, which is not a disease but only an increase in coproprophyrins.

[12]     Dr. Dean again mispoke here – the Mayo book is entitled "2004 Test Catalogue."  *See* Exh. 12.  It is not a medical handbook.

*Id.* at 123-124 (research conducted only after reaching his opinion); Dean Rpt. p. 3 (relying on Mayo catalogue).  He later admitted that the catalogue did not state that the only cause of elevated coproporphyrins is exposure to chemicals and wastes, yet he still concluded that Mr. Roper's coproporphyrin excess could not be the result of anything else.  *Id.* at 141.

From this "investigation," Dr. Dean concluded, unequivocally, that Mr. Roper's coproporphyrin finding was the result of his NEC-site toxic exposures:

> I can say to a reasonable degree of medical certainty … that the findings on Mr. Roper are more consistent with a chemical injury to his liver than for any other causes.  The basis for this conclusion is … the preferential and dramatic increase in his urine coproporphyrins. …

Report of Dr. Patrick Dean, Aug. 30, 2006, p. 1 (Exh. 1).

### 2.    Dr. Dean Failed to Investigate or Consider Any of the Literature Regarding Porphyrins, Including Studies Contradicting His Opinion.

Dr. Dean failed to search for any literature addressing whether cirrhosis or liver disease can cause excess porphyrins.  At his deposition he was completely unfamiliar with the link between the two, which has been well-known for more than a century.  *Id.* at 137-38.  Dr. Dean was also unfamiliar with the literature dealing with toxic exposures and porphyrins, or more specifically addressing the effects of PCBs and dioxins on porphyrins.  This literature is discussed at length in the reports of Drs. Borak and Rozman (Exhs 4, 6).  As noted above, the literature clearly identifies uroporphyrins (not coproporphyrins) as most affected by exposures to high doses of substances such as hexachlorobenzene.  Dr. Dean looked at none of it:

> Q.    Did you make any attempt to investigate whether [Mr. Roper] was exposed to specific substances that have been related in the literature to excessive coproporphyrins?
>
> A.    No, sir.

Q.   All right.  Did you make any attempt to determine whether the pattern of porphyrins in his lab reports, some increased, some not, in any way matched up with any of the literature on exposure to substances like dioxin and PCBs? . . .

A.   No, sir.

Q.   Have you done that as you sit here today?  Would you be able to talk to me about the pattern of porphyrins found in this literature?

A.   No, sir. . . .

Q.   Would you be able to talk to me at all about what the literature says in regard to, for instance, dioxin and what it has been shown to produce?

A.   No, sir. . . .  To go and look at such and such an article . . . that talks about the relative profiles, I don't feel an obligation to do that.

Dean Dep. at 127-29.  He did not even know what substances Mr. Roper alleges he has been exposed to.  *Id.* at 127.  He testified, without apparent qualm, that his opinion would be the same for "a thousand other" substances that could be classified as "industrial chemicals" or waste by-products" (the language in the Mayo catalogue), again without any further investigation or inquiry into the specific effects of those substances.  *Id.* at 130.

The most extreme example of Dr. Dean's willful ignorance of the literature is his inability to discuss any of the six articles cited in his own report purportedly to support his porphyrin opinion.  When asked to discuss these studies, Dr. Dean claimed that he had only briefly reviewed them and was unprepared to testify about them.  *Id.* at 141.  He could not remember which one was an animal study.  *Id.* at 142.  He stated: "I forget if these were supplied to me by Ms. Holt or I got them myself from the library."  *Id.* at 124.  He could not identify which porphyrin was elevated in these PCB/dioxin studies, or what dose was involved, or whether they supported or contradicted the Mayo catalogue statement.  *Id.* at 142.

If he had reviewed them, he would have discovered that one of his cited studies is irrelevant and the other five actually <u>contradict</u> his opinion:

- 12 -

- Bleiberg 1964 reported on 11 cases of elevated **uroporphyrins** in workers exposed to quantities of 2,4-D and 2,4,5-T heavy enough to cause chloracne. Exh. 13 at 793, Table p. 795, 796.

- Poland 1971 reported on 13 dioxin factory workers with chloracne who previously had **elevated uroporphyrins**; the chloracne was "**not, however, correlated significantly with . . . coproporphyrin excretion**." Exh. 22 at 316, 319.

- Strik 1979 briefly reviewed three sets of studies that either did not involve any substances at issue in this case (PBB, hexachlorocyclopentadiene, allylchloride, epichlorohydrin, endrin), or, **for PCB exposures, showed no elevated porphyrins**. Exh. 24 at 308-09.

- Chang 1980 reported that "PCB poisoning" in subjects who ate contaminated rice oil "caused in an **increase in excretion of . . . uroprophyrin [sic] . . . but not the excretion of . . . coproporphyrin**." Exh. 15 at 547, 550.

- Van Birgelen 1996, a rat study, demonstrated **increased uroporphyrin** and heptacarboxylic porphyrin, not coproporphyrin. Exh. 25 at 5, 7.[13]

*See* discussion of studies in Borak Report at 4-5; Rozman Report at 1.

Dr. Dean likewise did not consider whether the dose of NEC-site substances Mr. Roper allegedly received was comparable to the doses involved in the studies. He merely "assumed" that any exposure would cause the same effect. Dean Dep. at 143.[14] He testified that the extreme time lag between Mr. Roper's 2002 coproporphyrin finding and his decades-old

---

[13] The last study cited by Dr. Dean, Peters, involves exposures to hexachlorobenzene, not the substances at issue in this case. *See* Peters 1982 (Exh. 21).

[14] As set forth in Defendants' Motion to Exclude Testimony and Opinions of Plaintiffs' Experts Regarding Specific Causation [DE 552], Dr. Dean's ignorance of dose alone renders his causation opinion inadmissible. Defendants therefore move to add Dr. Dean to the list of plaintiff experts subject to that motion.

exposures[15] would not "make any difference" to his opinion because he assumes that a porphyrin manifestation can persist. *Id.* at 132. He could not cite any literature for his "persistence" theory. *Id.* at 134 ("I am unaware of any literature on that subject, sir"). When he fell back on his "twenty-two years of experience" for this opinion, he could not even support that:

> Q.   [Y]ou have instances in your experience where you can confirm that a coproporphyrin elevation in a person was caused by a toxic exposure many, many years earlier?
>
> A.   No, sir. (*Id.* at 133).

Dr. Dean is thus standing on the shakiest reed possible for his opinion, a vague statement in a laboratory sales catalogue, and that reed would have broken completely if he had made even the most basic inquiry into the porphyrin literature.

### C.   Dr. Dean's Coproporphyrin Testimony Is Not Based on a Scientific Methodology and Should Be Excluded.

*Daubert* requires that testifying experts engage in a reliable and scientifically acceptable methodology in reaching their opinions. Drs. Dean methodology cannot in any sense be considered either reliable or scientific:

(1)   *Reliance on a test catalogue's non-specific description in lieu of any, much less a thorough, investigation of the literature is not a scientific methodology.* Dr. Dean's simplistic and unjustified reliance on a very broad statement in a sales catalogue is egregiously unscientific. The catalogue does not even state that every excess coproporphyrin finding can be attributed to any industrial exposure, which is the manner in which Dr. Dean used it. Dr. Dean engages in a

---

[15]   Mr. Roper claims to have been exposed to groundwater containing vinyl chloride during his youth (1950s-1960s) and to have experienced some air exposure to PCBs and dioxins in later years. Even these speculative exposures could not have extended much past the 1970s, and certainly not past the discovery of groundwater contamination in 1989, when residents of Dayhoit ceased using their groundwater wells for drinking water. Cooper Industries resold the NEC plant in 1987, moveover, and could not have contributed to airborne exposures to PCBs and dioxins past that date.

great leap, without support even in the Mayo catalogue, in jumping from the general statement that coproporphyrinuria can be caused by industrial exposures, to the very specific conclusion that Mr. Roper's 2002 lab result proves he was exposed to PCBs and dioxins.

Apart from overinterpreting the catalogue's description, Dr. Dean has stepped outside of recognizable science in using a nonspecific sales catalogue comment for a diagnostic opinion. Dr. Anderson, when shown the catalogue by Plaintiffs' counsel, expressed surprise and disagreed with its use in this manner:

> Generally I don't think physicians refer to – to a catalogue like this from a commercial laboratory for interpretation so much. . . . [I]t would be found in a clinical chemistry laboratory [to order tests], it wouldn't be found in a physician's office . . . . People usually have textbooks.

Anderson Dep. at 49-50.  Even Dr. Orris, who also relied on the Mayo catalogue reference, called the Mayo reference "this little squibbett."  Orris Dep. 85, 89.  The catalogue might serve as a starting point for someone not well versed in porphyrins, like Dr. Dean, but it is no substitute for medical research.

(2)     *Reliance on a coproporphyrin elevation as a marker of toxic exposure is not an accepted methodology.*  Elevated coproporphyrins are so nonspecific – they can be caused by many things, including cirrhosis itself – that reliance on them to claim toxic exposure would generate a false conclusion far more often than a correct one.  *See* Silbergeld, Ellen, *Porphyrins as Indicators of Chemical Injury and Exposure*, 514 ANN. NY ACAD. SCI. 170, 171 (1987)  (Exh. 23) ("There are problems in the simple use of heme-related parameters as markers.")  Dr. Anderson testified to the same effect:  "[Y]ou can't use porphyrins or coproporphyrins in general as an indication of chemical exposure with the exception of lead where the relationship is very clear . . . ."  Anderson Dep. at 63.  Dr. Dean has not cited to any publication or other source that justifies reliance on an elevated coproporphryin as a marker of toxic exposure.

(3)     *Dr. Dean fails to distinguish between types of porphyrins, or acknowledge the widespread literature attributing elevated coproporphyrins to cirrhosis and liver damage.*  No acceptable scientific methodology would permit Dr. Dean to assume that toxic exposures producing elevations in <u>uroporphyrins</u> in some studies would therefore produce an increase in <u>coproporphyrins</u> in Mr. Roper.  To use the language of *Joiner*, there is a massive analytical gap in this deduction, and no scientific foundation for it.  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  Likewise, since it has been widely known for a century or more that cirrhosis itself causes excess coproporphyrins, Dr. Dean should have eliminated Mr. Roper's cirrhosis as the cause of the 2002 finding (which he cannot do) before leaping to the conclusion that the cause was an unknown amount of toxic exposures decades earlier.  The literature-supported temporal link between Mr. Roper's finding and the extremity of his cirrhosis, jaundice, and choleastasis in 2002 is compelling, without resort to speculative toxic exposures.

(4)     *Dr. Dean's complete ignorance of the porphyrin literature is not a scientific basis for a causation opinion.*  Dr. Dean's willful ignorance of his own-cited studies may have protected him from deposition cross-examination, but it should not protect him from the strictures of *Daubert*.  *Daubert* case law does not permit an expert to ignore the obvious conclusion of the published literature that PCBs and dioxins are not established causes of excess coproporphyrins.

(5)     *Dr. Dean ignores critical toxicology concepts such as dose and timing of exposure:*  Any legitimate toxicology or causation methodology would require a scientific assessment of the dose and timing of exposure before blindly attributing causation to a random laboratory finding.  *See, e.g., Nelson v. Tennessee Gas Pipeline Co.,* 243 F.3d 244, 252-53 (6th Cir. 2001).  Dr. Dean did not take these factors into account.

The porphyrin opinion of Dr. Dean is without scientific foundation and is not based on a recognized methodology and should be excluded under *Daubert*.   In addition, as the Court can likely discern from the discussion in this memorandum, the subject of porphyrins is extremely complex and difficult to explain.  The language alone is daunting.  Dr. Dean's testimony would be confusing to the jury and thus a violation of Rule 403 as well as a significant detour from the immediate and more pertinent scientific issues the jury already has to deal with.

### D.    Dr. Bacon Has Abandoned His Porphyrin Opinion and Should Not Be Permitted to Speculate About Possible Interpretations.

Dr. Bacon is a gastroenterologist retained by Plaintiffs to testify about Mr. Roper's cirrhosis and to counter Dr. Caldwell's diagnosis of NASH.   In his first report, however, Dr. Bacon also relied on Dr. Dean's porphyrin opinion to agree that the porphyrin finding was the explanation for Mr. Roper's disease:

> Added to the findings on multiple tissue samples over a three year period is the laboratory testing done on July 11, 2002, which showed a very high level of coproporphyrins and total porphyrins in a 24 hour urine sample. . . .  ***[I]t must be assumed that the elevated porphyrins represent a chemical-induced state, most likely due to exposures from polychlorinated biphenyls and dioxin*** as has been described by others relative to the toxic community in which Mr. Roper lived. . . . The chemical exposure was more likely than not a substantial factor in the development of his liver disease as evidenced by the increased levels of porphyrins in his urine.

*See* Bacon First Report, Aug. 31, 2006, at 3-4 (Exh. 2) (emphasis added).  This is in contrast to porphyrin specialist Dr. Anderson, who documented that Mr. Roper's excess porphyrin is actually a very common result in any type of damaged liver, including those with cirrhosis, and has nothing to do with toxic injury.  *See* Anderson Report; Deposition of Bruce Bacon, Feb. 28, 2007, p. 52 (Exh. 9).

When Plaintiffs gave Dr. Bacon a copy of Dr. Anderson's report and deposition, Dr. Bacon apparently realized the gross error he had made in his first report by relying on Dr. Dean's

- 17 -

porphyrin "diagnosis."  To deal with this problem, Dr. Bacon issued a second, "supplemental"

report on February 12.  In Dr. Bacon's own words:

> I would modify my previous report with regard to the importance of Mr. Roper's
> elevated urinary coproporphyrin in light of Dr. Anderson's opinion that the levels
> found are a non-specific finding that is commonly found in end-stage liver
> disease. With regard to any debate about the capacity of the chemicals at issue to
> also affect coproporphyrins is *outside my expertise* and I simply *withdraw any
> reliance on the laboratory results regarding coproporphyrins on Mr. Roper
> from consideration in the formulation of my opinions*.

*See* Bacon Second Report at 2 (emphasis added).[16]

It is thus apparent that Dr. Bacon realized his previous error – that he <u>did not know that</u>

<u>coproporphyrins were a common result of liver cirrhosis</u>.  Bacon Dep. p. 34-35, 40-41.  In his

second report, Dr. Bacon implicitly acknowledges the superior qualifications and expertise of Dr.

Anderson regarding porphyrins by relying on Dr. Anderson's findings and literature citations,

and by accepting the correctness of Dr. Anderson's conclusion that this finding is entirely

without meaning because it occurs as a result of cirrhosis.  Dr. Bacon thus acted correctly in

withdrawing his porphryin opinion in his supplemental report.

At his deposition, however, Dr. Bacon tried to backtrack.  When asked if his porphryin

opinion was off the table, as stated in his second report, he testified that he expected to opine that

Mr. Roper's coproporphyrin finding could be caused either by his cirrhosis, or by toxic insult,

but Dr. Bacon could not say which.  Bacon Dep. pp. 23-26, 40, 44.  Considering that this revised

testimony contradicted Dr. Bacon's second report, counsel read Dr. Bacon the statement in his

report that he is withdrawing his porphryin opinion and asked whether that statement is true.  He

---

[16]   Dr. Bacon tried to salvage some form of toxic-cause opinion by expressing a whole series of new chemical toxicity and cirrhosis assertions.  Those assertions are the subject of a motion to strike as untimely, filed Feb. 22, 2007, and a separate motion to exclude those conclusions under *Daubert*, filed March 15, 2007.

answered, "Yes." Dr. Bacon was also asked whether he stood by the statement, and the answer was also, "Yes." Bacon Dep. p. 190. Nevertheless, he persisted in offering his revised porphyrin opinion.

Dr. Bacon's guesswork as to the cause of Mr. Roper's coproporphyrin finding should not be admitted. First, his opinion that Mr. Roper's excess coproporphyrin *might* be caused by toxic exposure suffers from all the flaws of Dr. Dean's opinion – Dr. Bacon is no more qualified than Dr. Dean to discuss the toxic causes of porphyrin increases (Bacon Dep. pp. 52-53: "I can't sit here today and say I'm an expert in that area"); he has done no porphyrin research to support his opinion (*id.* 37-38); he was not prepared to discuss the porphyrin literature;[17] and he could not document any published basis for concluding that toxic insults produce excess coproporphyrins. Second, Dr. Bacon cannot offer an opinion that is in any way helpful to the jury because he has no opinion as to whether Mr. Roper's coproporphyrin finding is in fact caused by toxic injury. An opinion that "it might be this, it might be that" is not proper expert testimony under Rule 702 because it will not assist the trier of fact. Finally, Dr. Bacon stated in his latest report that he was abandoning the porphyrin opinion, and he should not be permitted to reintroduce it through equivocal and confusing testimony.

## III.   CONCLUSION

Defendants request that Plaintiff's expert testimony regarding Mr. Roper's porphyrin finding be excluded.

---

[17]     When defense counsel tried to question Dr. Bacon about the porphyrin literature, his counsel Ms. Holt interrupted to state that "he's not going to discuss this literature at trial, if that's what you're wanting to know." Bacon Dep. p. 239.

Respectfully submitted,

s/Angela Logan Edwards
Harry K. Herren
Angela Logan Edwards
Mary E. Eade
WOODWARD, HOBSON & FULTON, L.L.P.
2500 National City Tower
Louisville, KY  40202
Tel:    502/581-8000
Email: hherren@whf-law.com
        aedwards@whf-law.com
        meade@whf-law.com

Clifford J. Zatz
William L. Anderson
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, DC  20004-2595
Telephone:  (202) 624-2810
Email: czatz@crowell.com
        wanderson@crowell.com

Linnea Brown
Holme Roberts & Owen LLP
1700 Lincoln Street
Suite 4100
Denver CO 80203-4541
Tel: (303) 861-7000
Email: nea.brown@hro.com

Robert E. Meadows
Tracie J. Renfroe
King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
(713) 751-3214 (Direct)
Email: rmeadows@kslaw.com
        trenfroe@kslaw.com

*Counsel for Defendants, Cooper Industries, Inc.
and  McGraw Edison Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th of March, 2007, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following:

Donna Keene Holt
P.O. Box 10307
Knoxville, TN 37939

Charles L. Cunningham, Jr.
Suite G
6010 Brownsboro Park Boulevard
Louisville, KY 40207

Nancy Seidler Eichler
Masry & Vititoe
Second Floor
5707 Corsa Avenue
Westlake Village, CA  91362

Cary McDougal
Ellen Presby
Laura Baughman
Jory Lange
Thomas Sims
Scott Summy
Baron & Budd PC
3102 Oak Lawn Ave, Suite 1100
Dallas, TX 75219

s/Angela Logan Edwards
Angela Logan Edwards

P:\Fileroom\A-G\COOPER\ADAMS\_Pleadings\Porphin Motion\Porphyrin Memo.doc