ELECTRONICALLY FILED

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | |
|---|---|
| CHARLES W. ADAMS, JR., et al., )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>COOPER INDUSTRIES, INC. and )<br>MCGRAW EDISON CO., )<br>)<br>Defendants. )<br>) | C. A. NO. 5:03-CV-476-JBC |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO EXCLUDE TESTIMONY AND OPINIONS OF PLAINTIFFS' EXPERTS REGARDING SPECIFIC CAUSATION (DE #552)**

Plaintiffs' experts assert that Plaintiffs were injured by chemicals from the NEC plant. Defendants moved to exclude the causation opinions because they are unsupported by any dose analysis or a proper exposure assessment (DE Nos. 552 and 583). Without such scientific data, no expert can reliably testify that Plaintiffs were harmed by the NEC plant's operations. In response, Plaintiffs claim that they do not need to quantify the dose to which they were exposed because their experts used "differential diagnosis" or "differential etiology" to determine causation. While differential diagnosis is an accepted method of determining a patient's course of treatment in a clinical setting, it is not tantamount to proving causation, and it is no substitute for determining whether a given exposure range is sufficient to cause disease. In contrast, a properly conducted differential etiology could be probative of specific causation, but Plaintiffs' experts have not conducted a differential etiology because they have not assessed the dose or extent of Plaintiffs' exposure to chemicals from the NEC plant. Plaintiffs' experts' testimony on specific causation should therefore be excluded as unscientific and unreliable.

**A.    Plaintiffs' experts do not possess any reliable scientific information about the dose of substances to which Plaintiffs were allegedly exposed.**

The maxim that "the dose makes the poison" is as true as it is well-known. Indeed, as Plaintiffs' expert David Carpenter testified, "I do believe in the fundamental principle of toxicology that . . . the poison is in the dose." Ex. 3, Carpenter Dep. p. 319. In cases involving alleged exposure to toxic substances, scientific principles require, at a minimum, that causation opinion be based on specific data of a particular plaintiff's dose and exposure to the substance at issue. *Downs v. Perstorp Components, Inc.,* 126 F. Supp. 2d 1090, 1095 (E.D. Tenn. 1999); Federal Judicial Center, *Reference Manual on Scientific Evidence* ("REF. MAN. SCI. EVID.") at 403 and 419 (2d ed. 2000) (West).

Indeed, "[d]ose is ***the single most important factor*** to consider in evaluating whether an alleged exposure caused a specific adverse effect." David L. Eaton, *Scientific Judgment and Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5, 11 (2003-2004) (emphasis added) (attached as Ex. 1). Recognizing this principle, this circuit has held that experts testifying in a toxic tort case should perform a reliable dose assessment. *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244, 252 (6th Cir.) (2001) (affirming exclusion of the plaintiffs' expert testimony in a PCB exposure case because plaintiffs' expert made no attempt to determine the dose that plaintiffs received).

Plaintiffs concede that only three of their experts (Orris, Rodgers and Miller) attempted to conduct "a full-blown" analysis of the potential risk factors that could have caused Plaintiffs' injuries. Sawyer and Bacon did not conduct such an analysis, but they rely on the analysis of Orris, Rodgers and Miller. Plaintiffs' Response (DE #600), p. 6, note 11. Yet <u>none</u> of these

2

three experts made any effort to assess the dose that each of the Plaintiffs allegedly received of the substances at issue:

- Dr. Orris did not quantitatively calculate dose. Ex. 3 (to original motion (DE #552)), Orris Dep. at 282.

- Dr. Rodgers admits that he did not attempt "to reconstruct doses of TCE, vinyl chloride or the PCBs, dioxins and furans in this case at all." Ex. 4 (to original motion (DE #552)), Rodgers Dep. at 268-9.

- Dr. Miller (who offers an opinion only as to Ms. Jessie) did not attempt to reconstruct in any way the dose of TCE to which she was exposed. Ex. 7 (to original motion (DE #552)), Miller Dep. at 133.

**B.  Performing a differential diagnosis does not excuse Plaintiffs' experts from assessing dose.**

Nonetheless, Plaintiffs take the position that because their three specific causation experts have performed a "differential diagnosis" or "differential etiology" they are excused from performing a dose assessment. This is not a correct statement of the law. While differential diagnosis is an accepted medical technique, it does not prove legal causation, because the technique is not concerned with finding *cause*. And while a differential etiology may reveal information about cause, Plaintiffs' experts have not properly performed one here because they have not concerned themselves with dose.

**1.  Differential diagnosis is an accepted methodology, but it does not prove specific causation.**

It is important to recognize the difference between "differential diagnosis" and "differential etiology," two terms that are often used interchangeably (as they are in Plaintiffs'

3

response and supporting affidavits), but have distinct meaning. REF. MAN. SCI. EVID. at 433, 443 and 481; Ex. 2, Borak Declaration at ¶ 15.

Differential diagnosis is a physician's consideration of alternative diagnoses suggested by a patient's signs and symptoms in an effort to determine what *illness* a patient has. REF. MAN. SCI. EVID. at 433 and 443; Ex. 2, Borak Declaration at ¶ 20. A treating physician engages in differential diagnosis to determine the best course of treatment for the patient in view of the patient's symptoms. It is reasoning by process of elimination, and is what treating doctors do every day when seeing patients and evaluating their complaints. The purpose of differential diagnosis is *not to determine the cause* of a patient's disease because that is often of little importance to a clinical doctor. A treating physician, after all, is usually much more concerned with treating his patient's illness than with the cause of that illness. REF. MAN. SCI. EVID. at 443-44; Ex. 2, Borak Declaration at ¶ 21. Thus, a doctor who says that he has performed a "differential diagnosis" is not concerned about what caused a particular disease.

In contrast, "differential etiology" is the term used to ascertain which of several possibilities is actually the *cause* of a disease. REF. MAN. SCI. EVID. at 444; Edward J. Imwinkelried, *The Admissibility and Legal Sufficiency of Testimony about Differential Diagnosis (Etiology): of Under—and Over—Estimations*, 56 Baylor L. Rev. 391, 402-3 (2004); Ex. 2, Borak Declaration at ¶ 20. It is not a method normally used in clinical medical practice; rather, it describes what an expert does when he is attempting to determine the cause of an illness in an individual who alleges that chemical exposure was the cause. REF. MAN. SCI. EVID. at 443-44; Ex. 2, Borak declaration at ¶ 21. Accordingly, true differential etiology requires a rigorous analysis of dose, risk factors, biological plausibility, epidemiology, and alternative causes that must be undertaken to identify the cause of disease in the legal setting. A physician usually need

not engage in such rigor when treating a patient (unless the course of treatment depends on the cause of the disease). Ex. 2, Borak Declaration at ¶ 21.

For purposes of the admissibility of Plaintiffs' specific causation experts, therefore, differential etiology is the proper concern because the issue here is what *caused* the Plaintiffs' injuries.[1]

### 2. The Sixth Circuit requires a dose assessment in order to support a specific causation opinion in a toxic tort case.

The Sixth Circuit requires a dose assessment to be performed in toxic tort cases. This is plainly set forth in *Nelson v. Tennessee Gas Pipeline Co.*, 243 F.3d 244 (6th Cir. 2001), which is analyzed at length in Defendants' initial memorandum (DE #583). Plaintiffs take the untenable position that the Sixth Circuit's decision in *Nelson* does not necessarily require a dose-response assessment. Plaintiffs' Response (DE #600), p. 17. This position is wholly ungrounded. The *Nelson* court specifically found that the plaintiffs' causation experts' opinion should be excluded because:

- The expert failed to "demonstrate that the plaintiffs received doses of PCBs sufficient to make them ill"; and

- "With respect to the question of dose, plaintiffs cannot dispute that [their expert] made no attempt to determine what amount of PCB exposure the Lobelville subjects had received and simply assumed that it was sufficient to make them ill."

*Id.* at 253-54.

---

[1] Differential etiology *assumes* that general causation has been proven for the list of possible causes that the physician is considering. However, as set forth in Defendants' general causation motion (DE Nos. 554 and 576), Plaintiffs' experts have not shown that any of Plaintiffs' diseases can be caused by exposure to the chemicals at the NEC plant, as a general proposition. Accordingly, the court need not even reach the issue of specific causation. But if it does, the fact that Plaintiffs cannot show specific causation is a separate reason to bar Plaintiffs' expert testimony.

This is consistent with the approach taken by the Federal Judicial Center in its *Reference Manual on Scientific Evidence*, which provides that the expert on causation "should offer an opinion as to whether *the dose to which the plaintiff was exposed is sufficient* to cause the disease". REF. MAN. SCI. EVID. at 419 (emphasis added). Indeed, "[t]he certainty of the expert's opinion depends on the strength of the research data demonstrating a relationship between exposure and the disease *at the dose in question*." Id. at 423 (emphasis added).

Plaintiffs seek refuge in *Hardyman v. Norfolk & Western Railway Co.*, 243 F.3d 255 (6th Cir. 2001), which was issued a few days after the *Nelson* decision. Plaintiffs rely on a quotation in *Hardyman* taken from a Fourth Circuit case, which provides " . . . exact details pertaining to the plaintiff's exposure are beneficial . . . [but] need not invariably provide the basis for an expert's opinion on causation." *Hardyman*, 243 F.3d at 265-66 (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 264 (4th Cir. 1999)).

Defendants, however, are not arguing that Plaintiffs must provide an exact dose calculation. But in a toxic tort case, Plaintiffs must at least provide a scientific assessment of Plaintiffs' level of exposure, whether by mathematical modeling or by showing that Plaintiffs' level of exposure is in the same range as exposures experienced by individuals in relevant studies. *Parker v. Mobil Oil Corp.*, 824 N.Y.S.2d 584, 590-91 (N.Y. 2006).

It is also important to note that *Hardyman* was decided under the Federal Employers' Liability Act (FELA), which employs a much relaxed "scintilla of evidence" standard, and not the cause-in-fact standard that Plaintiffs must prove in this case. *Hardyman*, 243 F.3d at 258-59. Further, *Hardyman* is not a toxic-tort case; rather, the case concerned whether a doctor could testify as to whether the extremely strenuous work requirements of a long-term railroad worker

6

could have caused carpal tunnel syndrome.[2]  In fact, the thrust of the holding in *Hardyman* is that the district court illogically treated the alleged carpal tunnel syndrome as if it could be analyzed by the same dose-response methods that are used to analyze chemical exposure claims.  *Id.* at 255, 262 and 265.  The court did not criticize *Nelson*'s requirement of dose-response evidence in a toxic tort case.

In a toxic tort case in this circuit, whether through a precise calculation of dose or a scientific assessment of dose, an expert must establish that "[t]he individual had contact with the chemical (exposure), and the amount of chemical absorbed into the body (dose) was of sufficient magnitude and duration to be capable of producing the alleged effect."  *Downs v. Perstrop Components*, 126 F. Supp.2d at 1095 (E.D. Tenn. 1999).  Plaintiffs' experts have performed no such does analysis here; indeed, they insist that it is not necessary.  Plaintiffs' Response (DE #600, p. 12.[3]

### 3. Ultimately, even Plaintiffs tacitly recognize that dose evidence is needed to support a specific causation opinion.

Having failed to quantify the dose of their alleged exposures from the NEC plant, Plaintiffs take the position that there is no safe threshold dose for carcinogens, dioxins and certain PCBs, so that even minute exposures to these substances should be presumed to be a substantial risk factor and a cause of their illness.  Plaintiffs' Response (DE #600, pp. 9 - 10). Thus, Plaintiffs argue, because they were surely exposed to *something* from the NEC plant by virtue of living, visiting, or working in some proximity to the plant, they therefore can establish

---

[2]  The plaintiff in *Hardyman* had worked for the railroad for 30 years.  His job duties included winding hand brakes, coupling hoses, throwing switches, pulling valves, aligning drawbars, carrying 85-pound tools and catching and climbing onto moving locomotive cars.  *Id.* at 257-58.

[3]  Plaintiffs' experts Orris and Rodgers have submitted supplemental affidavits attached to plaintiffs' response brief (DE #600, Exhibits 1 and 2), in which they now claim that exposure to NEC plant chemicals were the "but for" cause of Plaintiffs' injuries.  The relevance and admissibility of these new opinions is addressed in Defendants' Reply in Support of its Motion on Proximate Cause, which analysis is incorporated here by reference. For purposes of this reply brief, it is sufficient to point out that despite having new opinions, Plaintiffs' experts have done no new work (e.g., dose reconstruction) that would meet the dose assessment requirements of *Nelson*.

causation; i.e., any exposure to any chemical in any amount is enough to cause their disease. But the Plaintiffs' argument proves too much. There are many (if not an almost infinite number of) putative risk factors that occur regularly and to which most of us are routinely exposed. The argument that all of the risk factors should be regarded as causal erodes the meaning of causality and robs it of any testable scientific definition. Ex. 2, Borak Declaration, ¶ 15.

And Plaintiffs' argument that "one molecule is enough" to cause disease not only proves too much, it also is incorrect. For almost every dose-response relationship a threshold exists, "such that there is some dose below which even repeated, long-term exposure would not cause an effect in any individual." Ex. 1, Eaton, *supra* at p. 16. The idea that any exposure even to a "non-threshold" chemical is presumptively a cause of disease is not generally accepted in the scientific community and ignores the importance of linking the risk of disease to the level of exposure. Ex. 2, Borak Declaration, ¶ 19; *Lofgren v. Motorola, Inc.*, 1998 WL 299925, at *19 (Ariz. Sup. Ct. Jun. 1, 1998) (rejecting expert opinions that "persistently avoid[ ] making any quantification of the risk actually associated with the levels of exposure at issue).

It is true that for policy reasons, many regulatory agencies assume that there is no "threshold" or safe levels for carcinogens. This is done to build in safety factors in setting exposure limits or conducting quantitative risk assessments. However, this policy decision should not be confused with the scientific reality that the significance of such low-level risks, if they even exist, becomes trivial and is lost in the background of other daily risks. Ex. 1, Eaton, *supra* at 16. Thus, the decision to assume a no-threshold risk for public health guidelines is "of marginal relevance to estimating 'causation' in an individual—e.g., whether a particular chemical caused or contributed to a particular disease or illness in a given person." Ex. 1, Eaton, *supra* at 34, *see also* 36 and 38; Ex. 2, Borak Declaration, ¶ 19 (explaining that even where a

8

federal agency classifies a chemical as a "non-threshold" carcinogen, it nonetheless recognizes that there is no increased risk if the levels of exposure are not very high; therefore, one needs to know the exposure levels in order to determine the risk).

"For example, it is well known that cigarette smoking is strongly associated with increased risk for lung and bladder cancer" and that the probability of developing such cancers is strongly linked to the amount of cigarettes smoked and the years of smoking. It might also be assumed that, as a hypothetical matter, there is no safe threshold at which a dose-relationship between cigarette smoking and cancer does not occur. "However . . . from a practical perspective, one's level of increased risk from smoking one cigarette over a lifetime, or even one cigarette a month for a lifetime, is not likely to be distinguishable from 'background' risk for cancer from all other causes, known and unknown." Ex. 1, Eaton, *supra* at 16-17.

Plaintiffs' position, that even one molecule of PCBs or dioxins increases the risk of cancer or their other diseases is a medical fiction. Plaintiffs know this to be the case. This is why they subtly shift in their brief from arguing that there is no safe level of exposure to carcinogens (Plaintiffs' Response (DE #600), p. 9) to arguing that exposure to carcinogens "must be considered harmful at any ***non-trivial*** level of exposure." Plaintiffs' Response (DE #600), p. 11 (emphasis added). Plaintiffs' experts use the term "non-trivial" as though it were a generally objective and scientifically meaningful concept. But as they use it, it is arbitrary and subjective, because it is undefined. Ex. 2, Borak Declaration, ¶ 13.[4]

Moreover, Plaintiffs' experts' recognition that a non-trivial level of exposure exists is simply an admission that dose-response is important when determining causation. By invoking the "non-trivial" standard, Plaintiffs are merely begging the questions that the case law puts to

---

[4] The term "non-trivial" is rarely used in the medical literature. But where it is used, unlike what the Plaintiffs' experts do here, the non-trivial dose can be measured and quantified. Ex. 2, Borak Declaration, ¶ 16.

9

them: what dose level of exposure do Plaintiffs contend is harmful? And have Plaintiffs been exposed at that level? That question remains unanswered by Plaintiffs' experts.

## **CONCLUSION**

The core concept underlying toxicology is the "dose-response" relationship. "If [general causation] has been established for a given chemical, then it must be established that the individual's dose over a defined period of time was sufficient to cause the alleged health effect. It is not adequate to simply establish that 'some' exposure occurred. Because most chemically induced adverse health effects clearly demonstrate 'thresholds,' there must be reasonable evidence that the exposure was of a sufficient magnitude to exceed the threshold before a likelihood of 'causation' can be inferred." Ex. 2, Eaton *supra* at 39.

Yet here, Plaintiffs' experts fail to link any Plaintiff's illness to any particular dose of any substance during any particular time period. It is proper for courts to exclude opinions where the "experts' background information concerning [plaintiffs'] exposure to [the substances at issue] is so sadly lacking as to be mere guesswork." *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 199 (5th Cir. 1996).

Dated: April 2, 2007.

Respectfully submitted,

Harry K. Herren  
Angela Logan Edwards  
Woodward, Hobson & Fulton, L.L.P.  
2500 National City Tower  
Louisville, Kentucky 40202  
Tel: (502) 581-8000  
Fax: (502) 581-8111  
hherren@whf-law.com  
aedwards@whf-law.com  

and

s/Tracie J. Renfroe  
Robert E. Meadows  
Tracie J. Renfroe  
King & Spalding LLP  
1100 Louisiana, Suite 4000  
Houston, Texas 77002-5213  
Tel: (713) 751-3214  
Fax: (713) 751-3290  
rmeadows@kslaw.com  
trenfroe@kslaw.com  

and

| | |
|---|---|
| Clifford J. Zatz | Linnea Brown |
| Crowell & Moring LLP | Holme Roberts & Owen LLP |
| 1001 Pennsylvania Avenue, N.W. | 1700 Lincoln Street, Suite 4100 |
| Washington, DC  20004-2595 | Denver, Colorado  80203-4541 |
| Tel:  (202) 624-2810 | Tel:  (303) 866-0608 |
| Fax:  (202) 628-5116 | Fax:  (303) 866-0200 |
| czatz@crowell.com | nea.brown@hro.com |

*Counsel for Defendants, Cooper Industries, Inc. and McGraw Edison Company*

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served via electronic filing on this 2nd day of April, 2007 to the following:

| | |
|---|---|
| Donna Keene Holt | Charles L. Cunningham, Jr. |
| P.O. Box 10307 | Suite G |
| Knoxville, TN 37939 | 6010 Brownsboro Park Boulevard |
| | Louisville, KY 40207 |
| Nancy Seidler Eichler | |
| Masry & Vititoe | Ellen Presby |
| Second Floor | Laura Baughman |
| 5707 Corsa Avenue | Jory Lange |
| Westlake Village, CA  91362 | Baron & Budd, P.C. |
| | 3102 Oak Lawn Ave., Suite 1100 |
| | Dallas, TX  75219 |

          s/Tracie J. Renfroe
           Tracie J. Renfroe

HOU_IMANAGE-469660