**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**LEXINGTON**

**CIVIL ACTION NO. 03-476-JBC**

**CHARLES W. ADAMS, JR., et al.,**                                   **PLAINTIFFS,**

**V.**                          **MEMORANDUM OPINION AND ORDER**

**COOPER INDUSTRIES, INC. and**
**MCGRAW EDISON COMPANY,**                                   **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on the defendants' motions to exclude the

testimony and opinions of the plaintiffs' expert William Sawyer, Ph.D (DE 561); and

to exclude the testimony of the plaintiffs' expert James Tarr, P.E. (DE 566).

**I. Factual Background**

This matter is one of several cases arising out of contamination caused by

chemical emissions from the National Electric Coil ("NEC") plant in Harlan County,

Kentucky.

> In February 1989, Kentucky officials discovered that the groundwater
> wells adjacent to the NEC plant were contaminated.  According to the
> defendants, after discovery of the contamination, Cooper Industries paid
> for and installed city water lines near the plant so that residents would
> no longer need to rely on the contaminated wells for their water.
> Between 1990 and 1992, over 500 plaintiffs filed actions in this court
> seeking damages relating to the contamination.  Several actions were
> consolidated into what has been referred to as the "*Robinett* litigation,"
> which went to trial in April of 1996.  The *Robinett* litigation was settled
> in October of 1996, with payments being made to the plaintiffs in
> November of that same year.  The Environmental Protection Agency
> established for the NEC plant a clean-up plan which has been in place
> since 1992.

*Blanton v. Cooper Indus., Inc.*, 99 F. Supp. 2d 797, 799 (E.D. Ky. 2000).  A class action was filed in the Harlan Circuit Court on October 6, 1997.  *Lankford, et al. v. Cooper Indus., et al.*, No. 97-CI-00670 (Harlan Cir. Ct. 1997).  The class was later decertified, and many of the plaintiffs in that case settled their claims.  Pursuant to the settlement agreement reached in that case, the statute of limitations for actions by plaintiffs who fit the class description was tolled from the date the *Lankford* action was filed through April 1, 2004.  This lawsuit was filed on September 19, 2003, and the complaint alleges various claims for wrongful death and personal injury.  A related lawsuit, *Moody, et al. v. Cooper Indus., et al.*, No. 03-158-JBC, was filed on February 13, 2003, and was later consolidated with the present case. The trial of this matter is scheduled for August 6, 2007.

**II. Legal Analysis**

*A. General Principles of Expert Evidence*

The defendants have moved to exclude the testimony and opinions of two of the plaintiffs' experts – Dr. William Sawyer and Mr. James Tarr.  The admissibility of expert evidence is governed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).  Rule 702 provides:

> If scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the United States Supreme Court held that trial courts have an affirmative obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Supreme Court further clarified in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), that the "gatekeeping" role it established for trial judges in *Daubert* applies not only to scientific evidence but to all expert testimony, including testimony based on technical and other specialized knowledge. *Kumho Tire*, 526 U.S. at 141.

The Supreme Court has delineated a list of several non-exclusive factors courts should consider in determining the reliability of expert testimony: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) what the theory or technique's known or potential rate of error is; and (4) whether the theory or technique is "generally accepted." *Daubert*, 509 U.S. at 593-94. Courts applying *Daubert* have also considered whether an expert developed his opinions for the purposes of testifying, whether an expert has improperly extrapolated from an accepted premise to an unjustified conclusion, and whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. *See* Fed. R. Evid. 702 advisory committee's note (citing cases). The Court has always emphasized, however, that the *Daubert* inquiry is flexible and that "the law grants a district court the same broad latitude when it decides how to

3

determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141.

In addition, the Supreme Court reminded judges in *Daubert* of the continued importance of all applicable evidentiary rules when assessing the admissibility of scientific evidence.  In discussing Rule 403, the Court noted that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses."  *Id.* at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

*B. Dr. William Sawyer*

Dr. William Sawyer is a toxicologist who intends to offer opinions and testimony regarding the results of the bellwether plaintiffs' blood data.  Specifically, the plaintiffs retained Dr. Sawyer to determine whether the bellwether plaintiffs' blood dioxin levels support the proposition that the plaintiffs were exposed to dioxin and dioxin-like compounds, including PCBs, released from the NEC plant.

In essence, Dr. Sawyer's methodology was to compare the levels of certain dioxin-like congeners found in the bellwether plaintiffs' blood (as reported by a laboratory called Analytical Perspectives) to the levels of those same congeners as found in the blood levels of ordinary Americans in the same age group as the plaintiffs.  As a reference for the blood levels of ordinary Americans, Dr. Sawyer used the blood dioxin levels set out in the Center for Disease Control's ("CDC")

4

National Report on Human Exposure to Environmental Chemicals (the "NHANES data") and also the Toxicity Equivalency Quotient ("TEQ") ranges reported in a study performed by M. Deborah Millette, et al., of blood dioxin levels among residents of Calcasieu Parish, Louisiana.  *See* Millette, et al., *An Investigation of Blood Dioxin Levels Among Persons in Calcasieu Parish, Louisiana,* Organohalogen Compounds, Volumes 60-65, Dioxin (2003) ("Millette").

The plaintiffs claim that, in comparing the bellwether plaintiffs' blood dioxin levels with the CDC data, Dr. Sawyer analyzed whether the plaintiffs' blood levels exceeded the 95th percent confidence interval ("CI") surrounding the geometric mean for the appropriate age group, as reported in the NHANES data and Millette. A confidence interval is "[a]n estimate, expressed as a range, for a quantity in a population. . . . [A] 95% 'confidence interval' is the range from about two standard errors below to two standard errors above the estimate.  Intervals obtained this way cover the true value about 95% of the time . . . ."  David H. Kaye and David A. Freedman, *Reference Manual on Sci. Evid.* 83, 161 (2d ed. 2000).  In other words, the CI is a way of correcting for the fact that "an estimate based on a sample will differ from the exact population value, due to random error." *Id.* at 117.  Based on these comparisons, Dr. Sawyer concluded that "the results of the blood dioxin analyses . . . reveal 11 of the 29 PCDDs/Fs and coplanar PCBs as reported by the laboratory were abnormally elevated in comparison to CDC reference ranges."  Sawyer Report of 9/29/06, attached as Exhibit 1 to DE 561 ("Sawyer Report"), at 4.  Dr. Sawyer also found a "striking similarity" between the

5

profiles of "abnormal" congeners detected among the four bellwether plaintiffs. *Id.*

Dr. Sawyer then attempted to ascertain the source of the abnormal congeners detected within the plaintiffs' blood samples by comparing the elevated congeners to sources published in the peer-reviewed scientific literature. Based on his review of the literature, Dr. Sawyer determined that the bellwether plaintiffs exhibit abnormal levels of congeners associated with the combustion of the types of materials burned at the NEC plant. *Id.* at 7. Finally, Dr. Sawyer collected information from the plaintiffs' medical histories to determine what other factors could have affected their blood dioxin levels. *Id.* at 12. After performing all of these analyses, Dr. Sawyer stated that he was "certain to within a reasonable degree of toxicological certainty that all four plaintiffs . . . currently display highly significant serum dioxin abnormalities indicative of historical environmental exposures." *Id.* at 13.

### i. Dr. Sawyer's Definition of "Abnormal"

As previously noted, Dr. Sawyer determined whether the plaintiffs' blood levels were abnormal compared to the CDC data by examining whether the amounts of dioxins, furans, and PCBs in their blood exceeded the 95% CI surrounding the mean level of those chemicals in the United States population. The defendants argue that this methodology is essentially "invented" by Dr. Sawyer and that it is also unreliable because it defines anyone with an "above-average" level of a given congener in his or her blood as "abnormal." The plaintiffs respond that Dr. Sawyer's approach is generally accepted in the scientific community and is

6

therefore appropriate.

In *Allgood v. General Motors Corp.*, 1:02-cv-1077, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006), which involved a claim by the plaintiffs for a medical monitoring program, the district court excluded an expert because he compared the plaintiffs' blood levels to mean levels reported in relevant literature without taking into account the "background ranges" of the samples in the study on which he relied. *Id.* at *28-*29.

> Dr. Carpenter failed to use reliable methodology in determining how to rate such levels as either usual or above background levels. In other words, plaintiffs have not demonstrated that Dr. Carpenter employed reliable methodology in determining that "normal" exposure levels are between 0.9 ppb and 1.5 ppb. . . . He drew from the ATSDR publication the mean values of blood serum levels. He relied on the means but ignored the relevant background range cited by Hanrahan as between 0.5 and 9.7 ppb. . . . Under this approach, one would expect half the world's population of approximately six billion people (everyone with levels above the median) to be entitled to a special medical monitoring program . . . . While this evidence provides at a minimum fodder for cross-examination or rebuttal, Dr. Carpenter's misapplication of his own source reveals a methodological flaw critical to his opinion of whether plaintiffs' exposure is significant. . . . Dr. Carpenter's use of the reported means (instead of the background ranges observed by the study) into the ranges themselves reveals a methodological flaw that cannot be overlooked by the court.

*Id.*

The court finds the reasoning of *Allgood* both persuasive and applicable to Dr. Sawyer. Dr. Sawyer essentially opines that congener levels above the mean are "abnormal." As noted by the district court in *Allgood*, this method would permit an expert to allege that roughly one-half of the United States population exhibits abnormal levels of dioxins, furans, and PCBs. Such a definition of abnormality

would deprive the term of all meaning.  Although above-average levels of these chemicals may be a cause for medical concern (as Dr. Sawyer claims), this does not mean that such levels are indicative of unusual or abnormal exposures.  Dr. Sawyer's failure to account for the statistical spread or range of the NHANES data is a severe problem with his methodology.

The plaintiffs attempt to distinguish *Allgood* on the grounds that the study relied upon by the expert in that case did not purport to establish any statistical boundaries or percentiles and that the expert also failed to utilize the 95% CI, as Dr. Sawyer has done here.  *Allgood*, however, did not turn on either of these factors.  Rather, *Allgood* was premised on the idea that equating "unusual" or "abnormal" with "above-average" is not a scientifically valid methodology because it does not take into account the normal distribution of data within a given population.  Deficiencies in the study on which Dr. Carpenter relied do not alter the underlying rationale of *Allgood*.

Further, though Dr. Sawyer claims that the "[d]efendants have distorted [his] use of the 95th percent confidence interval (CI) by characterizing it as merely an attempt to determine if a result appears greater than the mean," Affidavit of William Sawyer, attached as Exhibit 1 to DE 637 ("Sawyer Affidavit"), at ¶3, the definition of the term "confidence interval" suggests that this is exactly what Dr. Sawyer has done.  As previously discussed, the CI is a statistical way of correcting for random error in a testing sample.  Because of the disparity between the size of a population to be estimated and the size of a sample, scientific researchers can

8

never be certain if the mean value they find in their sample is the "true" mean.  The CI is therefore used to estimate that true mean to a given degree of confidence; a "95% CI" is simply a statistical way for the CDC to say that it is 95% certain that the true mean falls within the range provided as the CI.  Thus, Dr. Sawyer essentially equates abnormal with "above average, after taking random error into account."[1]

However, correcting for random error is not the same as determining the range of the data, which has more to do with assessing whether a result is normal or customary.  Indeed, "laboratories commonly supplement reports with statements as to whether or not a result is 'normal.'  By convention, the term 'normal' usually

---

[1]The court is also not fully satisfied that Dr. Sawyer's opinions are based only on results that are above the 95% CI.  In his affidavit, Dr. Sawyer states:

> All of my comparisons included in Defendants' Exhibit 11 (Sawyer Report Table "Plaintiffs' Lipid Adjusted Results Compared to US Population Geometric Mean with 95% Confidence Interval") are based upon excess of the 95% confidence interval of the mean (highlighted in yellow) or the 95th percentile (highlighted in red). . . . My opinions with respect to highly significant toxicological findings and dioxin congener pattern recognition are based upon these statistically significant findings, not merely upon whether or not a value appeared greater than the mean, as stated in Defendants' motion.

Sawyer Affidavit, ¶12. However, despite the fact that Dr. Sawyer claimed that eleven congeners were abnormally elevated (defined as above the 95% CI surrounding the mean) in the bellwether plaintiffs' blood, his table included as Exhibit 11 to DE 561 shows that only *seven* congeners in the bellwether plaintiffs' blood exceeded the 95% CI around the mean.  This discrepancy suggests that Dr. Sawyer described results that did not exceed the 95% CI surrounding the mean as abnormally elevated, a methodology that he acknowledges is not reliable.  Sawyer Affidavit, ¶6.

9

means that a test result falls within a range of results for 95% of the healthy population.  For a few tests, other guidelines are used by convention . . . ." *Textbook of Clinical Occupational and Environmental Medicine* 39 (Linda Rosenstock et al. eds., 2005).  Though the parties dispute what the proper definition of "normal" is under the circumstances, it is undisputed that Dr. Sawyer based his definition of "abnormal" on what was above-average, not on any other such guideline range, such as a comparison with 95% of the healthy population. For the reasons stated above, this is not a proper scientific methodology.

Dr. Sawyer also cites a number of studies performed by other researchers to show that his comparison of the plaintiffs' blood levels to the 95% CIs found in the NHANES data is a generally accepted methodology.[2]  In the studies Dr. Sawyer references, however, the researchers did not compare the blood level of an *individual person* to that of a mean for a control population.  Rather, they compared the mean of an exposed population to the mean for a control population to test for the differences across the groups.  While comparing the average results for a given population to the average for a control group may be a proper way of assessing differences between the groups, the plaintiffs have not shown that comparing the blood levels for one person to the average for a control group is generally accepted,

---

[2]*See, e.g.*, Millette; De Roos, et al., *Persistent Organochlorine Chemicals in Plasma and Risk of Non-Hodgkin Lymphoma,* 65(23) Cancer Res. 11214 (2005); Lee, et al., *A Strong Dose-Response Relation Between Serum Concentrations of Persistent Organic Pollutants and Diabetes: Results from the National Health and Examination Survey 1999-2002*, 29(7) Diabetes Care 1638 (2006).

tested, published, or peer-reviewed.

In sum, the court finds that Dr. Sawyer's labeling of above-average blood levels as abnormal is unreliable and misleading and that his opinions are therefore inadmissible pursuant to Fed. R. Evid. 403 and 702.  Out of an abundance of caution, however, the court will analyze the defendants' remaining arguments that persuade the court that Dr. Sawyer's testimony must be excluded.

ii. Dr. Sawyer's Literature Review

After he determined that the bellwether plaintiffs had elevated levels of the defendants' chemicals in their blood, Dr. Sawyer reviewed relevant literature in an attempt to assess the source of these elevated levels.  Dr. Sawyer found three articles[3] in which researchers had determined that the congeners that were abnormally elevated (as defined by Dr. Sawyer) in the plaintiffs' blood were also "primary combustion products of incineration, hazardous waste incineration, or combustion of PCBs, chlorinated solvents or polyvinyl chloride (PVC)."  Sawyer Affidavit, ¶25.  The results of this research are presented in Table 3 of Dr. Sawyer's report, which is titled "Comparison of 11 PCDD, PCDF & PCB Congeners which tested Abnormal in Plaintiffs' Blood Samples Compared to Congeners Originating from Incineration of Electrical Equipment, PVC, Municipal and Hazardous

_____

[3]Luthardt, et al., *Total TEQ emissions (PCDD/F and PCB) from industrial sources,* 46 Chemosphere 1303 (2002) ("Luthardt"); Vikelsoe, et al., *Estimation of dioxin emissions from fires in chemicals,* 40 Chemosphere 165 (2000) ("Vikelsoe"); Rappe, et al., *Electrical PCB Accidents, An Update,* 15 Chemosphere 1291 (1986) ("Rappe").

11

Waste, PCBs & Organic Chlorine Solvents."  Sawyer Report, at 8.  This Table indicates that, of the eleven congeners which Dr. Sawyer found to be statistically significantly elevated above the mean in the bellwether plaintiffs, nine of them were also reported as a primary combustion constituent of chlorine in the studies he reviewed.  In his deposition, Dr. Sawyer also stated that the remaining two congeners which were elevated in the bellwether plaintiffs were found to be a byproduct of industrial burning in a fourth study.[4]  Based on this analysis, Dr. Sawyer concluded that the bellwether plaintiffs' blood samples exhibited "a pattern of congeners associated with the combustion of chlorinated wastes."  Sawyer Report, at 9.

The defendants claim that Dr. Sawyer's methodology in determining that this congener pattern exists is misleading in that it artificially shows a connection between the bellwether plaintiffs' blood levels and congeners released from chlorine combustion when no such connection actually exists.  The plaintiffs respond that Dr. Sawyer appropriately evaluated the literature and that his reported pattern is based upon sound scientific judgment.  For the following reasons, the court agrees with the defendants.

First, an examination of the studies relied on by Dr. Sawyer reveals that he has somewhat exaggerated their findings.  For example, in his Table 3, Dr. Sawyer

---

[4]S Kumagai, et al., *Polychlorinated dibenzo-p-dioxin and dibenzofuran concentrations in serum samples of workers at intermittently burning municipal waste incinerators in Japan,* 59 Occup. Med. 362 (2002) ("Kumagai").

reports that the researchers in Kamagai found that 1,2,3,7,8,9-Hexa-CDF and

1,2,3,4,7,8,9-Hepta-CDF were primary combustion constituents of chlorine.

Sawyer Report, at 8.  However, Kamagai involved an examination of three different

waste incineration plants, and the levels of these two congeners were found to be

significantly statistically elevated in the serum drawn from the workers at only *one*

of these plants.  Kumagai, at 364-68.  Indeed, the authors of Kumagai explicitly

state that the "dominant constituents [of the concentrations of PCDD/Fs in the test

subjects' serum] were . . . 1,2,3,4,6,7,8-heptachlorodibenzofuran (HpCDF) and

octachlorodibenzofuran (OCDF) among the PCDFs," not 1,2,3,7,8,9-Hexa-CDF and

1,2,3,4,7,8,9-Hepta-CDF.  *Id.* at 362.

Dr. Sawyer also cites Luthardt for the proposition that two PCBs, 3,3,4,4,5,-

PeCB (126) and 3,3,4,4,5,5-HxCB (169) were primary combustion constituents of

chlorine.  Sawyer Report, at 7, 8.  However, though the authors of Luthardt did

find that PCB 126 "mostly influenced" the PCB-TEQ in their study, they also stated

that PCB 169 was present in most samples but contributed only up to 6% of the

PCB-TEQ.  Luthardt, at 1307.  The authors ultimately concluded that, aside from

PCB 126, "[o]ther PCB congeners are mostly insignificant with respect to total TEQ

emissions."  *Id.* at 1308.  Dr. Sawyer's use of empirical studies, to support

conclusions that the authors of those studies apparently did not affirm, detracts

from the reliability of his methodology.

The more glaring problem with Dr. Sawyer's "pattern" methodology,

however, is his selective presentation of his data.  Dr. Sawyer's Table 3 depicts

13

only the congeners which he found to be significantly statistically elevated in the plaintiffs' blood data and only the results from studies which showed those specific congeners to be elevated.  In other words, Dr. Sawyer presents only the overlap between the plaintiffs' blood results and the relevant literature and reports that overlap as a pattern.  In doing so, he ignores findings in these studies that tend to indicate that no such pattern exists.

For example, the researchers in Kamagai reported that the test subjects' levels of 1,2,3,7,8-Penta-CDD; 1,2,3,7,8,9-Hexa-CDD; 1,2,3,4,6,7,8-Hepta-CDD; and OCDD were normal in the workers in all of the three plants that they tested. Kamagai, at 365-66.  The levels of these chemicals in the bellwether plaintiffs was abnormal according to Dr. Sawyer.  *See* Sawyer Report, at 8.  Moreover, the authors of Luthardt found that the highest parts of the PCDD/F-TEQ were contributed by 2,3,4,7,8-penta-CDF and 1,2,3,7,8-penta-CDD and that contributions of OCDD to the PCDD/F-TEQ were neglible.  Luthardt, at 1307.  Dr. Sawyer, however, found that the bellwether plaintiffs' OCDD levels were abnormal and that their 2,3,4,7,8-penta-CDF levels were normal, the reverse of what Luthardt would support regarding these two chemicals.  Dr. Sawyer's failure to discuss results from the very studies on which he relies that detract from a correlation between the plaintiffs' blood results and the congeners associated with hazardous waste burning suggests that he did not perform an objective review of the scientific literature.

Finally, Dr. Sawyer's presentation of congeners that were found at

14

"Abnormal Levels in Plaintiffs' Blood" in Table 3 is over-inclusive and misleading.  If any of these congeners appeared in any of the bellwether plaintiffs' blood at levels above the 95% CI surrounding the mean, then a "Yes" was placed next to that congener in the column labeled "Abnormal Levels in Plaintiffs' Blood."  Thus, for three congeners (1,2,3,7,8,9-Hexa-CDF; 1,2,3,4,7,8,9-Hepta-CDF; and 3,3,4,4,5,5-HxCB (169)) that were "abnormally" elevated in only two plaintiffs (according to Exhibit 11 to DE 561), Dr. Sawyer's Table 3 gives off the impression that they were uniformly elevated among the plaintiffs.  Not only is this somewhat deceptive in itself, it also accentuates the defendants' concerns regarding the creation of a false link between the relevant literature and the objective data in this case.

The plaintiffs argue that "it is nonsensical for Defendants to argue that every congener found in the combustion studies relied on by Dr. Sawyer should be elevated in Plaintiff's blood and/or that all of the studies should find the same congeners to be elevated."  DE 637, at 16.  This somewhat misstates the defendants' argument and the court's concern regarding Dr. Sawyer's proposed testimony.  The court does not purport to require a perfect connection between the plaintiffs' blood samples and the studies upon which Dr. Sawyer relied.  For his testimony to be admissible, however, an expert must apply a neutral and objective methodology, and the court is not convinced that Dr. Sawyer has done so here.  Indeed, as the above analysis shows, a researcher applying Dr. Sawyer's method could use the same studies upon which he relies to show that there is little or no

connection between the plaintiffs' blood data and hazardous waste burning. This type of procedure does not satisfy the standards set forth in *Daubert*, Rule 702, and Rule 403, and the court therefore finds that Dr. Sawyer's pattern methodology is both unreliable and misleading.

### iii. The Normalcy of the Plaintiffs' Blood Data

Although the Supreme Court stated in *Daubert* that the focus of a court's inquiry into the admissibility of expert evidence "must be solely on principles and methodology," *Daubert*, 509 U.S. at 595, it later recognized that "conclusions and methodology are not entirely distinct from one another. . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Though not dispositive, the court finds that the gap between the plaintiffs' blood data and Dr. Sawyer's conclusions is rather wide in this case.

Although Dr. Sawyer has opined that the levels of congeners found in the plaintiffs' blood are abnormally elevated above the mean, his table attached as Exhibit 10 to DE 561 actually shows that roughly half of the congener levels found in the bellwether plaintiffs' blood were below the geometric mean and the other half were above the mean. The court is mindful of the fact that this table does not take into account the 95% CI surrounding the mean. Nonetheless, it is difficult to discern how such a distribution could be considered unusual; the definition of "average" suggests that a distribution in which one-half of the data points are above the mean and the other half are below it would be expected. Dr. Sawyer

16

does not explain why this distribution is unexpected or abnormal.

Dr. Sawyer also does not indicate whether he performed any analysis on the average or below-average results to determine whether they were statistically significant.  Such an examination would have been helpful as a means of confirming or refuting his finding of a correlation between the plaintiffs' blood levels and hazardous waste exposure and as a way of placing the plaintiffs' allegedly abnormal blood levels in their proper context.  Dr. Sawyer's focus on the elevated results to the exclusion of the normal or below-average results creates a false impression that the plaintiffs' blood samples were more elevated than they actually were.

iv. Conclusion

Although Dr. Sawyer is clearly a well-qualified toxicologist, the court finds that the methodology he used in this case is unreliable and misleading, and his opinions are therefore inadmissible.  His definition of "abnormal" and his review of the relevant literature are not generally accepted or peer-reviewed for the uses to which Dr. Sawyer seeks to put them.  Further, the potential error rate inherent in construing above-average as abnormal and selectively analyzing the literature is enormous; as previously discussed, one could apply Dr. Sawyer's methods and reach a conclusion that is almost diametrically opposed to his.  Finally, when considered as a whole, Dr. Sawyer's methods appear designed to support the pre-ordained conclusion that the congener levels in the plaintiffs' blood were unusually high and that this condition was caused by the defendants' chemicals.  When

17

expert testimony is not based on independent research, the party proffering it must come forward with other objective evidence that the testimony is based on scientifically valid principles. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317-18 (9th Cir. 1995) ("*Daubert II*"). The plaintiffs have failed to present such objective evidence here. The court will grant the defendants' motion to exclude Dr. Sawyer's testimony and opinions.[5]

   *C. Mr. James Tarr*

   James Tarr is an air-modeling expert retained by the plaintiffs to update the air-modeling work performed by Dr. Hugh Spencer ten years ago in connection with the *Robinett* litigation. Mr. Tarr adopted the air-modeling input data selected by Dr. Spencer for the *Robinett* trial and inserted that data into an air-modeling program called AERMOD. Mr. Tarr used AERMOD to simulate the releases of: (1) PCBs from the coal-fired burner; (2) PCBs from the oil-fired burner; and (3) gaseous emissions from the low-level fire/burn box. He then plotted the emissions data he received from AERMOD onto an isopleth map.

   The defendants originally moved to exclude Mr. Tarr's opinions on seven grounds. However, following the entry of orders denying the defendants' motion to exclude Dr. Spencer's opinions, *see* DE 693, and granting the defendants' motion to strike certain of Tarr's opinions, *see* DE 662, only two of those grounds remain

---

   [5]Though the court had previously notified the plaintiffs that it may hold a supplemental *Daubert* hearing at which Dr. Sawyer would be present, the court now finds that no such hearing is necessary to a determination of this motion.

disputed.

    i. Mr. Tarr's Use of AERMOD

First, the defendants claim that AERMOD is an unreliable methodology as applied to this case because it does not account for the geography of Harlan County.  More specifically, they allege that "AERMOD assumes that air travels in a straight line using the hourly average wind direction for that line."  DE 566, at 9.  Because of this "straight-line" approach, the defendants claim that AERMOD is incapable of accurately depicting the flow of gaseous emissions from the NEC plant in the mountainous Dayhoit area.  They assert that the appropriate air-modeling program for the Dayhoit area is one called CALPUFF, which their air-modeling expert, Dr. Gale Hoffnagle, recommends.

When this motion was orally argued on May 16, 2007, the court stated on the record that it considered AERMOD a reliable methodology, as it was designated by the EPA as "preferred" and had previously been approved for use in mountainous terrain.  *See, e.g., Revision to the Guideline on Air Quality Models: Adoption of a Preferred General Purpose (Flat and Complex Terrain) Dispersion Model and Other Revisions*, 70 Fed. Reg. 68,218 (Nov. 9, 2005).  Though there may be some dispute among the parties' experts as to the appropriate methodology to use in the Harlan County environment, "*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and

19

methodologically reliable fashion." *Ruiz-Troche v. Pepsi Cola of Puerto Rico*

*Bottling Co.,* 161 F.3d 77, 85 (1st Cir. 1998).  In light of the preceding discussion

and the court's comments at the May 16, 2007, hearing, the court finds that

AERMOD is a reliable methodology; that Mr. Tarr was qualified to use AERMOD;

that he based his opinions on sufficient facts and data; and that he applied

AERMOD reliably to the facts of this case.

        ii. Maximum One-Hour Concentrations

        In performing his air modeling work, the plaintiffs instructed Mr. Tarr to

model only the "maximum one-hour average concentration over the course of a

year."  Tarr Deposition, at 206.  In other words, each of his plotted data points

depicts a single hour at which the maximum concentration of emissions occurred at

a given site in a given year.  *Id.*  Thus, the results provided by Mr. Tarr do not

depict a situation that ever actually occurred at a given time.  They instead show

the highest recorded concentrations for each data point he surveyed.

        The defendants contend that this presentation of the evidence is irrelevant,

misleading, and prejudicial and should be excluded under Rules 702 and 403.  They

claim that Mr. Tarr's opinions are irrelevant because, since he modeled only

maximum hourly concentrations instead of average annual concentrations, his

results say nothing about the exposure levels of the bellwether plaintiffs.  For

similar reasons, they assert that his results are prejudicial and misleading because

they suggest that the exposures of the bellwether plaintiffs are much higher than

they actually were.

20

The plaintiffs admit that Mr. Tarr's air-modeling opinions are not being offered to demonstrate the level of exposure that any plaintiff received.  DE 694, at 11.  Rather, they intend to offer the modeling results to "demonstrate that airborne releases were transported to areas where the trial plaintiffs lived, worked, and recreated." *Id.*  In other words, Mr. Tarr's models are being used to demonstrate the predicted geographic distribution of the defendants' chemicals. *See id.* at 12 (indicating that Mr. Tarr's maps would be used to show "where the plume would travel and its relative impact").

In describing the relevance requirement in *Daubert*, the Supreme Court stated that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92. With regard to the relevance of Mr. Tarr's testimony, exposure via the air plume is a disputed issue in this case.  Therefore, evidence tending to show (1) the existence of the air plume and (2) that chemicals from the air plume could have reached the plaintiffs is relevant.  Since this is exactly what Mr. Tarr's testimony will show, the court finds that his testimony is probative.  The fact that Mr. Tarr did not attempt to model the actual exposures that any of the bellwether plaintiffs received may affect the testimony of the experts who relied on his opinions, but it does not render Mr. Tarr's opinions themselves inadmissible.

The court also finds that Mr. Tarr's opinions and isopleth maps would not unduly prejudice the defendants.  The plaintiffs and Mr. Tarr have been candid about the purposes of his testimony, and the court is satisfied that this testimony

21

will not mislead or confuse the jury.  So as to ensure clarity, however, the court

will issue an instruction to the jury at trial, cautioning them as to the limitations

inherent in Mr. Tarr's opinions and the uses to which it may be put.  Further, the

court will also require the parties to submit such an agreed instruction to the court,

or, if the parties cannot reach an agreement regarding this instruction, to prepare

separate submissions for the court.

**III. Conclusion**

Accordingly,

**IT IS ORDERED** that the defendants' motion to exclude the testimony and opinions of William Sawyer, Ph.D (DE 561) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion to exclude the testimony of the plaintiffs' expert James Tarr, P.E. (DE 566) is **DENIED**.

**IT IS FURTHER ORDERED** that no later than July 2, 2007, the parties shall submit to the court an agreed cautionary instruction regarding the limitations of Mr. Tarr's opinions and the issues as to which his testimony is relevant.  If the parties cannot reach an agreement regarding this instruction, they shall submit separate submissions to the court by that date.

Signed on June 21, 2007

*Jennifer B. Coffman*

JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

22