UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

CIVIL ACTION NO. 03-476-JBC

CHARLES W. ADAMS, JR., et al.,                                                      PLAINTIFFS,

V.                      MEMORANDUM OPINION AND ORDER

COOPER INDUSTRIES, INC. and
MCGRAW EDISON COMPANY,                                                          DEFENDANTS.

\* \* \* \* \* \* \* \* \* \*

This matter is before the court on the defendants' motion to exclude the testimony and opinions of the plaintiffs' experts regarding specific causation (DE 552). Fully advised, the court will grant the motion and will also grant the defendants' motion for leave to tender additional authority in support of their motion (DE 788).

**I. Factual Background**

This matter is one of several cases arising out of contamination caused by chemical emissions from the National Electric Coil ("NEC") plant in Harlan County, Kentucky.

> In February 1989, Kentucky officials discovered that the groundwater wells adjacent to the NEC plant were contaminated. According to the defendants, after discovery of the contamination, Cooper Industries paid for and installed city water lines near the plant so that residents would no longer need to rely on the contaminated wells for their water. Between 1990 and 1992, over 500 plaintiffs filed actions in this court seeking damages relating to the contamination. Several actions were consolidated into what has been referred to as the "*Robinett* litigation," which went to trial in April of 1996. The *Robinett* litigation was settled in October of 1996, with payments being made to the plaintiffs in

November of that same year. The Environmental Protection Agency established for the NEC plant a clean-up plan which has been in place since 1992.

*Blanton v. Cooper Indus., Inc.*, 99 F. Supp. 2d 797, 799 (E.D. Ky. 2000). A class action was filed in the Harlan Circuit Court on October 6, 1997. *Lankford, et al. v. Cooper Indus., et al.*, No. 97-CI-00670 (Harlan Cir. Ct. 1997). The class was later decertified, and many of the plaintiffs in that case settled their claims. Pursuant to the settlement agreement reached in that case, the statute of limitations for actions by plaintiffs who fit the class description was tolled from the date the *Lankford* action was filed through April 1, 2004. This lawsuit was filed on September 19, 2003, and the complaint alleges various claims for wrongful death and personal injury. A related lawsuit, *Moody, et al. v. Cooper Indus., et al.*, No. 03-158-JBC, was filed on February 13, 2003, and was later consolidated with the present case. The trial of this matter is scheduled for September 4, 2007.

**II. Legal Analysis**

*A. General Principles of Expert Evidence*

The defendants have moved to exclude the testimony and opinions from the plaintiffs' experts as to specific causation. The admissibility of expert evidence is governed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Rule 702 provides:

> If scientific, technical, or specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if

> (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert*, the United States Supreme Court held that trial courts have an affirmative obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Supreme Court further clarified in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), that the "gatekeeping" role it established for trial judges in *Daubert* applies not only to scientific evidence but to all expert testimony, including testimony based on technical and other specialized knowledge. *Kumho Tire*, 526 U.S. at 141.

The Supreme Court has delineated several non-exclusive factors courts should consider in determining the reliability of expert testimony: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) what the theory or technique's known or potential rate of error is; and (4) whether the theory or technique is "generally accepted." *Daubert*, 509 U.S. at 593-94. Courts applying *Daubert* have also considered whether an expert developed his opinions for the purposes of testifying, whether an expert has improperly extrapolated from an accepted premise to an unjustified conclusion, and whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting. *See* Fed. R. Evid. 702 advisory committee's note (citing cases). The

Court has always emphasized, however, that the *Daubert* inquiry is flexible and that "the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire*, 526 U.S. at 141.

In addition, the Supreme Court reminded judges in *Daubert* of the continued importance of all applicable evidentiary rules when assessing the admissibility of scientific evidence. In discussing Rule 403, the Court noted that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Id.* at 595 (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

*B. Testimony and Opinions Regarding Specific Causation*

The defendants have moved to exclude the testimony of the plaintiffs' experts who seek to provide testimony on specific causation. The defendants originally targeted this motion at the following plaintiffs' experts: Drs. Kramer, Carpenter, Orris, Rodgers, Miller, and Dorfman. In the plaintiffs' response, however, they averred that only Drs. Rodgers, Orris, and Miller "independently conducted a full-blown 'differential etiology' analysis" and that other experts (including Drs. Bacon and Sawyer) relied on the findings of Rodgers, Orris, and Miller. DE 600, at 6 n.11. Further, Drs. Kramer and Carpenter have been designated to testify only as to general causation, not specific causation.

Therefore, the court will focus its inquiry on Drs. Rodgers, Orris, and Miller (collectively, "specific causation experts").

Specific causation is defined simply as "whether exposure to an agent was responsible for a given individual's disease." Federal Judicial Center, *Reference Manual on Scientific Evidence* 396 (2d ed. 2000). In determining whether an alleged chemical exposure caused a particular disease or illness, an expert must establish the following criteria: (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes. *See* David L. Eaton, *Scientific Judgment and Toxic Torts – A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5, 38-40 (2003) ("Eaton"); *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1095 (E.D. Tenn. 1999).

In assessing specific causation in this case, the plaintiffs' specific causation experts utilized a methodology known as differential etiology.[1] Differential etiology

---

[1] In their response brief, the plaintiffs refer to this technique as both "differential etiology" and "differential diagnosis." Though both terms have been used to "describe the process by which causes of the patient's condition are identified," differential etiology is the concept that "more closely suggests the determination of cause." Federal Judicial Center, *Reference Manual on Scientific Evidence* 443-44 (2d ed. 2000). Thus, except when quoting another source, the

is a "clinical process whereby a doctor determines which of several potential diseases or injuries is causing the patient's symptoms by ruling out possible causes . . . until a final diagnosis for proper treatment is reached." *Coastal Tankships, U.S.A., Inc. v. Anderson*, 87 S.W.3d 591, 604 (Tex. Ct. App. 2002). "[W]hen properly conducted the technique has important non-judicial uses, is generally accepted as valid by the medical community, and has been subjected to use, peer review, and testing." *Id.* (citation omitted); *see also id.* at 605 n.24 (citing cases approving the use of differential etiology); *Downs*, 126 F. Supp. 2d at 1095 (noting that the process of eliminating confounding causes of an individual's condition "is essentially the same procedure a physician performs when conducting a differential diagnosis").

The defendants argue, however, that the plaintiffs' specific causation experts have improperly relied on the differential etiology method in that they made no attempt to collect plaintiff-specific dose and exposure data before rendering their opinions that the defendants' chemicals caused the plaintiffs' illnesses. One of the central tenets of toxicology is that "the dose makes the poison; this implies that all chemical agents are intrinsically hazardous–whether they cause harm is only a question of dose." Federal Judicial Center, *Reference Manual on Scientific Evidence* 403 (2d ed. 2000).

An opinion on causation should be premised on three preliminary

---

court will use the term differential etiology when referring to the methodology employed by the plaintiffs' specific causation experts.

> assessments. First, the expert should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Third, *the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease.*

*Id.* at 419 (emphasis added). At least one scholar claims that "[d]ose is the single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect." Eaton, at 11. "If [the ability of a chemical to cause the disease in question] has been established . . ., then it must be established that the individual's dose over a defined period of time was sufficient to cause the alleged health effect." *Id.* at 39.

In keeping with this toxicological principle, several appellate courts have held that an expert who seeks to opine on specific causation must pay careful attention to the dose-response relationship (that is, the relationship in which a change in amount, intensity, or duration of exposure to a chemical is associated with a change in risk of disease) and the amount of exposure the plaintiff allegedly suffered. *See, e.g., McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1241-42 (11th Cir. 2005); *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("It is well-established that a plaintiff in a toxic tort case must prove that he or she was exposed to and injured by a harmful substance manufactured by the defendant. . . . In order to carry this burden, a plaintiff must demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or

7

she may recover.'") (citation omitted); *Wintz by and through Wintz v. Northrop Corp.,* 110 F.3d 508, 513 (7th Cir. 1997); *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105, 1106 (8th Cir. 1996); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 199 (5th Cir. 1996) ("Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that the plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case.").

In arguing for exclusion of the plaintiffs' specific causation experts' opinions, the defendants rely heavily on the decisions by the district court and Sixth Circuit Court of Appeals in *Nelson v. Tennessee Gas Pipeline Co*. In that case, the plaintiffs were individuals who lived near a natural gas pipeline. *Nelson v. Tennessee Gas Pipeline Co*., No. 95-1112, 1998 WL 1297690, at *1 (W.D. Tenn. Aug. 31, 1998). They alleged that the defendant released toxic substances, including PCBs, into the atmosphere, water, and soil of the area in which they lived and recreated and that these substances had injured them. *Id.* The district court excluded a causation expert retained by the plaintiffs for a number of reasons, one of which was that he had made no attempt to determine the dosage the plaintiffs received. *Id.* at *6 ("An appropriate methodology requires evidence from which the trier of fact could conclude that the plaintiff was exposed to levels of toxin sufficient to cause the harm complained of.") (citing *Wintz*, 110 F.3d at 513; *Wright*, 91 F.3d at 1107).[2]

---

[2]Other factors relied upon by the court in excluding this expert were his failure to rule out potential alternative causes, failure to consider the temporal

The Sixth Circuit affirmed the district court's decision on appeal. In doing so, it specifically stated:

> [P]laintiffs cannot dispute that [their expert] made no attempt to determine what amount of PCB exposure the [plaintiffs] received and simply assumed that it was sufficient to make them ill. On appeal, plaintiffs argue only that because PCBs were present in the environment in excess of allowable limits and plaintiffs lived and worked in the area, they must have been exposed at a level that could cause neurological and lung impairments. . . . Without any factual basis from which a jury could infer that the plaintiffs were in fact exposed to PCBs from Station 79, the reasoning and methodology underlying the testimony is not scientifically valid.

*Nelson v. Tennessee Gas Pipeline Co*. 243 F.3d 244, 252-53 (6th Cir. 2001).

The methodology used by the instant plaintiffs' specific causation experts similarly falls short of the standards for admissibility set forth in the authorities discussed above. In determining whether the plaintiffs were exposed to the defendants' chemicals, the plaintiffs' specific causation experts reviewed material from a number of different sources. First, they considered Dr. Hugh Spencer's description of industrial activities that occurred at the NEC plant and his description of activities that allegedly resulted in chemical releases into the groundwater. DE 600, at 3; Affidavit of Peter Orris attached as Exhibit 1 to DE 600 ("Orris Affidavit"), ¶16. Second, they examined Dr. Spencer's air dispersion modeling which, as supplemented by James Tarr, "showed that such releases of PCBs and dioxin-like compounds would have traveled to areas in which each of the four

---

relationship between the plaintiffs' conditions and their exposure, failure to use a generally accepted causation theory, and use of a study which was performed for litigation purposes. *Id.* at *5-*9.

9

Plaintiffs lived." Orris Affidavit, ¶16.  Third, they considered the soil sampling work done by Dr. Wesley Birge which allegedly "corroborated that the general shape and direction of the plume of contaminants released from the NEC facility covers the areas where Plaintiffs were located at the relevant times." DE 600, at 4.  Fourth, they examined the testing that allegedly showed that groundwater in the vicinity of the NEC facility was contaminated. *Id.* at 4-5.  Finally, the specific causation experts reviewed the plaintiffs' medical histories and their deposition testimony to determine where the bellwether plaintiffs lived, worked, and recreated and at what times they did so. *Id*.

When taken together, however, this evidence shows, at most, that the plaintiffs were in an area during a given time frame and that chemicals released by the defendants were in that area during the same general time frame.  Though the plaintiffs' experts focused on whether the defendants' chemicals could have reached the plaintiffs, they made no inquiry into the *amounts* of the chemicals to which the plaintiffs were exposed.[3]  Rodgers Deposition, at 268-69; Orris Deposition, at 282; Miller Deposition, at 133.  Rather, Dr. Miller admitted that it was sufficient to him to know that "there was TCE in the wells in Dayhoit and that Ms. Jessie sometimes drank from them" and that he did not know the amount of dioxins to which Ms. Jessie was exposed. Miller Deposition, at 133, 172.  Dr.

---

[3]Indeed, Mr. Tarr's testimony is not being offered to show exposure but only the geographic reach of the air plume.  Therefore, the air plume data cannot be used to establish any particular level of *actual* exposure suffered by the bellwether plaintiffs.  *See* DE 786.

Rodgers similarly stated that "if the PCBs and dioxins were, in fact, the true cause of [Mr. Roper's] cirrhosis, then the dose in his circumstances, whatever his other risk factors may have been, was sufficient." Rodgers Deposition, at 468.  As the legal discussion above indicates, evidence of this type is simply insufficient to form the basis for a toxic causation opinion.  *See, e.g., Nelson*, 244 F.3d at 252-53; *see also* Eaton, at 39 ("It is not adequate to simply establish that 'some' exposure occurred.").  Indeed, the court sees the evidence of exposure relied upon by the specific causation experts in this case as strikingly similar to that which was held insufficient in *Nelson*.

Further, the plaintiffs' specific causation experts also did no detailed assessment of the frequency and duration of the plaintiffs' alleged exposure, two other "important elements" of dose.  Eaton, at 12.  This is significant because "it is . . . possible that repeated low dose exposures – even for many years – will have no consequence at all, since the body is often able to completely detoxify low doses before they do any damage." *Id.* at 13.  The specific causation experts' failure to take frequency and duration into account casts more doubt on the reliability of their methods.

The plaintiffs also assert that the opinions of Dr. Mark Hermanson as to the amounts of PCBs in the trees in the area around the NEC plant, and the blood data and analysis thereof performed by Dr. Sawyer, corroborate their specific causation experts' opinions.  DE 600, at 5-6.  The plaintiffs concede, however, that their specific causation experts reviewed this evidence only after reaching their initial

opinions.  *Id.* at 5.  An expert may not come to a firm conclusion first and then collect the data to substantiate that conclusion.  *See Downs*, 126 F. Supp. 2d at 1127 ("Certainly, scientists may form an initial tentative hypothesis.  However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed . . . as lacking the objectivity that is the hallmark of the scientific method.") (citation omitted).

    Even if this were not the case, the court would be unconvinced that Dr. Hermanson's opinions and the plaintiffs' blood data provide evidence on which an expert may properly base a specific causation opinion.  The tree bark opinions provided by Dr. Hermanson are subject to the same limitations as the air plume, soil, and groundwater data described above: they provide no evidence of the amount, frequency, and duration of exposure suffered by the bellwether plaintiffs.  The blood levels (the only evidence of exposure that is specific to the bellwether plaintiffs) are similarly unavailing.  First, the court has already excluded the testimony and opinions of Dr. Sawyer upon which the plaintiffs' specific causation experts purport to rely.  *See* DE 786.  Second, as discussed in the court's order excluding Dr. Sawyer, the range and distribution of the plaintiffs' blood data do not suggest any abnormality.  *Id.*  Finally, and most importantly, the mere fact that the plaintiffs' blood levels were allegedly elevated does not excuse the specific causation experts from their well-established duty to base their causation opinions on reliable evidence of exposure and dosage.  Without some credible evidence of

the amount, frequency, and duration of the plaintiffs' exposure, elevated blood levels standing alone are insufficient evidence upon which to ground a specific causation opinion.[4]

In opposing the defendants' motion, the plaintiffs rely on *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255 (6th Cir. 2001), and similar cases from other circuits for the proposition that quantified dose information is not required for an expert to render a specific causation opinion. *Hardyman* involved a plaintiff's claim pursuant to the Federal Employers' Liability Act that the complex motor tasks he performed for his employer caused his carpal tunnel syndrome. *Id.* at 257. The district court excluded the plaintiff's expert on the ground that the "differential etiology" he used was not scientifically performed. The Sixth Circuit reversed. In doing so, it explicitly noted that the district court had required "a dose/response relationship where none can be had . . . ." *Id.* at 264. It also stated that "while

---

[4]When this motion was orally argued, counsel for the plaintiffs presented the court with data showing that certain congeners appeared in the bellwether plaintiffs at levels that were considered significant in relevant toxicological studies. Putting aside the fact that this presentation reflects the same selectivity problem that was discussed in the court's order excluding Dr. Sawyer, *see* DE 786, correlations between the plaintiffs' blood levels and the results of studies are not synonymous with a dosage calculation. As noted by the New York Court of Appeals, "[c]omparison to the exposure levels of subjects of other studies could be helpful [in determining exposure] *provided that the expert made a specific comparison sufficient to show how the plaintiff's exposure level related to those of the other subjects*." *Parker v. Mobil Oil Corp.*, 824 N.Y.S.2d 584, 591 (N.Y. 2006) (emphasis added). This suggests that comparing the blood levels of the bellwether plaintiffs to the scientific literature would be proper only after the plaintiffs' experts performed some initial assessment of the plaintiffs' exposure levels. The plaintiffs' experts, however, never attempted to perform this assessment.

13

precise information concerning the exposure necessary to cause specific harm to humans and exact details pertaining to the plaintiff's exposure are beneficial, such evidence is not always available, or necessary, to demonstrate that a substance is toxic to humans *given substantial exposure* and need not invariably provide the basis for an expert's opinion on causation." *Id.* at 266 (emphasis added) (citing *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 266 (4th Cir. 1999)). The plaintiffs assert that, since the Sixth Circuit has recognized that an exact dosage measurement is not necessary in forming a specific causation opinion, their experts' failure to quantify the dosage received by the bellwether plaintiffs is not fatal to their opinions.

   The court agrees with the plaintiffs that neither *Hardyman* nor *Daubert* requires "precise" or "exact" information concerning dosage or the dose-response relationship. *See McClain*, 401 F.3d at 1241 n.6 ("One should not conclude . . . that to pass *Daubert* muster an expert must give precise numbers about a dose-response relationship. Some ambiguity about individual responses is expected."). At the same time, the boundaries of allowable expert testimony are not so wide as to permit an expert to testify as to specific causation without having made *any* attempt to measure the extent of a plaintiffs' exposure to an allegedly harmful substance. Indeed, the court in *Hardyman* emphasized the fact that the plaintiff's expert "in fact did quantify the number of risk factors present in Plaintiff's job and the amount of Plaintiff's exposure to these factors . . . ." *Hardyman*, 243 F.3d at 264; *see also id.* at 263-64 (discussing the methodology employed by the

plaintiff's expert). In doing so, it distinguished another case in which a plaintiff's experts were excluded because their testimony revealed a "total lack of any objective, quantified measurements regarding any of the alleged work related risk factors." *Id.* at 267. As the plaintiffs' experts have equally failed to perform any objective research on the amount of exposure suffered by the bellwether plaintiffs, the plaintiffs' reliance on *Hardyman* is misplaced. If nothing else, *Hardyman* highlights the deficiencies in the plaintiffs' specific causation experts' methodologies.[5]

The plaintiffs also allege that their specific cause experts' failure to

---

[5]*Westberry*, the case relied upon by the Sixth Circuit panel in *Hardyman*, is similarly distinguishable. In *Westberry*, the court described in detail the evidence that supported a finding that the plaintiff had suffered a "substantial exposure" to the substance at issue, talc.

> Westberry testified that he was exposed to very high levels of airborne talc throughout his workday. According to his testimony, when he removed the gaskets from the box in which they had been shipped, the gaskets, which were black, had so much talc on them that they appeared to be white or gray. And, talc was released into the air as the gaskets went through the cutting machines. Westberry testified that the talc that settled from the air around his work area was so thick that one could see footprints in it on the floor. He further stated that he worked in clouds of talc and that it covered him and his clothes. Moreover, at the close of his workday Westberry was required to blow off his work area . . ., stirring up all of the talc that had fallen. This testimony concerning the level of airborne talc was adequate to permit a factfinder to conclude that Westberry was exposed to high concentrations of airborne talc . . . .

*Westberry*, 178 F.3d at 264. In the present case, however, there is no similar evidence that the plaintiffs actually suffered "very high" levels of actual exposure to the defendants' chemicals; the plaintiffs' specific cause experts have stated that they made no effort to measure the bellwether plaintiffs' exposure.

15

objectively assess the exposure or dose levels of the bellwether plaintiffs is of no moment because there is no safe "threshold" of exposure below which the chemicals allegedly released from the NEC plant will not cause the types of diseases suffered by the bellwether plaintiffs. *See* DE 600, at 11 ("[T]oxins must be considered harmful at *any* non-trivial level of exposure if the weight of the scientific evidence fails to establish a 'safe' threshold.") (emphasis in original). However, the plaintiffs have presented neither supporting scientific evidence nor cases holding that the "no-safe-dose" theory is reliable. To the contrary, courts have opined that this principle is not an appropriate one on which to ground a specific causation opinion. *See McClain*, 401 F.3d 1233, 1242-43 ("O'Donnell offers no opinion about the dose of Metabolife that caused ischemic strokes in three plaintiffs and a heart attack in the other. He only said that any amount of Metabolife is too much, which clearly contradicts the principles of reliable methodology . . . ."); *Cano v. Everest Mineral Corp.*, 362 F. Supp. 2d 814, 849 (W.D. Tex. 2005) ("Several courts have considered and rejected the use of the linear no-threshold model in the litigation context.") (citing cases); *see also* Eaton, at 34 ("[P]rocedures commonly used in 'risk assessment' for the purposes of establishing public health guidelines that represent 'acceptable' exposure levels for large populations are often, in this author's opinion, of marginal relevance to estimating 'causation' in an individual.").[6] Further, as the defendants point out, the

---

[6] Dr. Eaton suggests that, for some carcinogenic substances, the "no-safe-dose" theory may not even be correct as a matter of science.

16

plaintiffs' argument proves too much. The substances which the plaintiffs allege caused their illnesses are ubiquitous in the environment; thus, if "any" exposure is sufficient to cause the plaintiffs' illnesses, then differential etiology would not work to rule out other sources of exposure to the same substance.[7] The court finds that the "no-safe-dose" theory is not a reliable methodology, and it rejects the plaintiffs' claim that said theory entitled their specific causation experts to pay so little attention to the level of exposure in the bellwether plaintiffs.

Though the court recognizes the validity of the differential etiology methodology utilized by the plaintiffs' specific causation experts as a general matter, Rule 702 requires not only that an expert utilize reliable principles and methods, but also that those methods be applied reliably "to the facts of the case." Scholarly treatises and case law from a number of federal circuits, including the

---

> For carcinogenic chemicals that act via mutagenic action, a threshold may not be evident. Thus, although any level of exposure will theoretically increase the probability of developing the disease, the risk follows a dose-response relationship, and the dose must be sufficient to "significantly" elevate the risk above the background. What represents a "significant" increase . . . is of course subjective and influenced by many factors. However, . . . because the process of chemical carcinogenesis is always associated with a "latency," and the latency period is generally inversely related to dose, at very low doses of even "direct acting," mutagenic carcinogens, the latency period might exceed life expectancy, thereby imparting a "practical" threshold.

Eaton, at 39.

[7] The court notes that there is an ongoing debate among the courts and among scientists themselves as to the appropriate model "to depict the dose-response relationship for such carcinogens." *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* 408 n.19 (2d ed. 2000).

17

Sixth Circuit, establish that, while an expert seeking to opine on specific causation is not required to determine dosage or threshold levels to a mathematical certainty, the expert must demonstrate that there was a "substantial exposure" to the substance that allegedly caused the plaintiff's injury.  *See Hardyman*, 243 F.3d at 266.  Because the plaintiffs' specific causation experts have not attempted to quantify or measure the amount or dosage of a substance to which a plaintiff was exposed and did not rely on any other expert who did so, their specific causation opinions are unreliable.  Accordingly, the court will exclude the opinions and testimony of Drs. Orris, Miller, and Rodgers, insofar as they seek to opine on specific causation.  To the extent that any of the plaintiffs' other experts rely on the opinions of Drs. Orris, Miller, and Rodgers, the testimony of such experts on specific causation is hereby excluded as well.

### III. Conclusion

Accordingly,

**IT IS ORDERED** that the defendants' motion to exclude the testimony and opinions of the plaintiffs' experts regarding specific causation (DE 552) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion for leave to tender additional authority in support of their motion to exclude testimony and opinions of plaintiffs' experts regarding specific causation (DE 788) is **GRANTED**.

Signed on July 30, 2007



JENNIFER B. COFFMAN, JUDGE
U.S. DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY