**ELECTRONICALLY FILED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

| | | |
|---|---|---|
| CHARLES W. ADAMS, JR., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C. A. NO. 5:03-CV-476-JBC |
| | ) | |
| COOPER INDUSTRIES, INC. and | ) | |
| MCGRAW EDISON CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'
MOTION FOR RECONSIDERATION OF PRIOR ORDERS**
**(Relates to D.E. No. 984)**

## I.      INTRODUCTION

Central to plaintiffs' motion for reconsideration is their request that the Court reverse its order excluding plaintiffs' expert opinions on specific causation (D.E. No. 959). Although plaintiffs ask the Court to reconsider two other rulings, only a reversal of the specific causation ruling would serve as a basis to deny defendants' motion for summary judgment. The Court has correctly ruled that plaintiffs' experts' opinions on specific causation are inadmissible because plaintiffs' experts failed to quantify the dose of chemicals from the NEC plant to which plaintiffs allegedly were exposed. Perhaps all that needs to be said about plaintiffs' position on dose and specific causation is that they do not mention *Nelson v. Tennessee Gas Pipeline Co*. a single time in their 40-page motion to reconsider. *Nelson* calls on plaintiffs to prove their exposure in terms of dose—a quantitative concept—in order to carry their burden of proving specific causation. *Nelson* is the leading authority in the Sixth Circuit on proving specific causation in a toxic tort case, and plaintiffs' decision to simply ignore it is a tacit concession that they cannot meet its

standard.  Indeed, plaintiffs fail to present a single argument regarding specific causation that the Court has not already rejected, and the Court's decision on that issue should stand.

Plaintiffs also ask the Court to reverse its order striking Dr. Sawyer's opinions on the blood test results  (D.E. No. 786).  But even if the Court were to admit Dr. Sawyer's opinions on blood testing, those opinions are not sufficient to satisfy the Sixth Circuit's requirements for dose quantification in a toxic tort case.  And, in any event, the Court correctly excluded Dr. Sawyer's opinions as unreliable.

Lastly, plaintiffs ask that the Court reverse its order excluding Dr. Kramer's Dayhoit-area studies.  The Court has heard and rejected many times the arguments over the admissibility of these studies.  Plaintiffs offer no new answer to the Court's concerns about the undue prejudice inherent in this evidence, nor have plaintiffs shown (or even contended) that these studies are sufficient proof of dose to require reconsideration of the Court's ruling excluding their expert testimony on specific causation.

The Court's rulings are well-reasoned and should stand.  If plaintiffs wish to challenge those rulings, they should do so before the Sixth Circuit.

## II.    ANALYSIS

### A.    There is no Basis for the Court to Reconsider and Reverse its Prior Rulings.

Plaintiffs move for reconsideration under Federal Rule of Civil Procedure 54(b).  Neither Rule 54(b) nor any other federal rule explicitly allows a party to move for reconsideration.  The Sixth Circuit and lower courts in the circuit have acknowledged the existence of motions for reconsideration.  But they analogize reconsideration motions to motions to alter a judgment under Rule 59(e), and apply Rule 59(e)'s strict standards to the motion to reconsider.  *Smith v. Hudson*, 600 F.2d 60, 62 (6th Cir. 1979); *Al-Sadoon v. FISI-Madison Financial Corp.*, 188 F.

Supp. 2d 899, 900-902 (M.D. Tenn. 2002); *United States v. Alexander*, 2007 WL 710238 at *2, C.A. No. 1:06-CR-200 (N.D. Ohio March 6, 2007).

Like motions to alter judgments, motions to reconsider earlier rulings should be made only rarely, and should not be used by a party to simply re-argue a ruling it dislikes. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998); *Alexander* at *2. Federal courts, including this one, are presumed to have given thoughtful consideration before they ruled, and the decisions they make should not be routinely saddled with burdensome "think about it again" requests. Thus, a motion to reconsider an earlier ruling should be made only when:

(1) there is an intervening change in controlling law;

(2) new evidence—that was previously unavailable—is discovered; or

(3) there is a need to correct clear error or to prevent manifest injustice.

*Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999)*; Lowery v. Federal Express Corp.*, 2004 WL 2805965 at *1, C.A. No. 02-2056 (W.D. Tenn. June 24, 2004).

Here, there has been no change in the applicable law since the parties briefed and argued the motions that plaintiffs want reconsidered. Nor has any new, previously undiscovered evidence come to light. Rather, plaintiffs argue that the Court committed error and was manifestly unjust in its decision. It is difficult to understand how plaintiffs can claim that the rulings they seek to reverse are the result of a manifest injustice. Before ruling on the motions, the parties submitted hundreds of pages of briefing and exhibits. The Court heard hours of oral argument on the issues. The Court obviously gave careful consideration to the parties' arguments before issuing detailed opinions plaintiffs now seek to have reversed. Understandably, plaintiffs disagree with the Court's rulings, but simply losing a motion cannot

be manifest injustice because there is always a losing side.  And while plaintiffs claim that the Court erred, they do not  plainly state that the Court committed *clear* error, which is the relevant standard.  Clear error will lie only when the reviewing court is left with the definite, firm conviction that a mistake has been made.  The issue is not whether the Court reached the perfect conclusion, but whether the evidence supports the Court's findings.  *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005).  As set forth in detail below, the Court's decisions were not erroneous at all, much less clearly erroneous.

Motions to reconsider "run contrary to notions of finality and repose . . . especially where such motions merely restyle or re-hash the initial issues. . . . Where a party views the law in a light contrary to that of [the court], its proper recourse is not by way of a motion for reconsideration, but appeal to the Sixth Circuit."  *Fisher v. Wellington Exempted Village Schools Board of Education*, 223 F. Supp. 2d 833, 850 (N.D. Ohio 2002) (punctuation and citation omitted).  The same can be said here.  Plaintiffs disagree with the Court's decision and the Court's application of Sixth Circuit case law.  The required course of action, then, is to appeal the Court's rulings to the Sixth Circuit.  There is no basis or need for the parties and the Court to reargue these issues at the trial court level.

**B.      The Court Correctly Ruled that Plaintiffs have not Produced Reliable Evidence of Specific Causation.**

In their briefing on specific causation, plaintiffs do nothing but recycle their previous arguments as to why their experts have met the *Daubert* requirements to opine on specific causation.   For the Court's convenience, defendants have prepared an index of plaintiffs' arguments in their motion to reconsider and have identified the earlier briefing where those same arguments previously have been made.  *See* Exhibit 1.  The specific causation ruling is the only issue the Court need consider.  Even if the Court were to grant plaintiffs' motions and allow Drs.

4

Sawyer and Kramer's opinions, neither of their opinions would satisfy the dose standard required by *Nelson.*

> 1.    **Plaintiffs are required to quantify the dose of chemicals to which they were exposed from the NEC plant.**

Plaintiffs first argue that they are not required to quantify dose in order to satisfy their specific causation burden; rather, they need only put themselves in the zone of defendants' operations.  The case law and scientific theory that plaintiffs invoke in support of this untenable position has been considered and rejected by this and other courts.

Case law

As noted at the outset, *Nelson* is the leading authority in the Sixth Circuit on the burden of proving dose in a toxic tort case.  By ignoring it, plaintiffs essentially concede that they cannot meet its requirements.  Indeed, plaintiffs do not even focus on *Hardyman v. Norfolk & Western Ry. Co.*, 243 F.3d 255 (6th Cir. 2001) which they have previously claimed dilutes *Nelson*'s quantification requirements.  Instead, plaintiffs focus on *Westberry v. Gilslaved Gummi AB*, 178 F.3d 257 (4th Cir. 1999) from the Fourth Circuit, as well as other cases from three other circuits that purportedly have held quantification evidence is not required in toxic tort cases.  Of course, as the Court notes in its opinion, the Fifth, Seventh, Eighth, Tenth and Eleventh Circuits have all held the opposite—that an expert must address the dose-response relationship when offering an opinion on specific causation.  *See* cases cited in Court's order of July 30, 2007, D.E. No. 959 at 7-8.

But this tally-sheet of authority in other circuits is really beside the point in light of *Nelson*, the controlling authority in the Sixth Circuit.  As this Court recognized, *Nelson* requires that an expert must attempt to determine what amount of chemical exposure a plaintiff received from a particular source.  This includes evidence of both the frequency and duration of the

alleged exposure.  Court's order of July 30, 2007, D.E. No. 959 at 9-11.  And there can be no dispute that here, plaintiffs' experts have "failed to perform any objective research on the amount of exposure suffered by the bellwether plaintiffs."  Court's order of July 30, 2007, D.E. No. 959, at 15.  "At most" the evidence shows that "plaintiffs were in an area during a given time frame and that chemicals released by the defendants were in that area during the same general time frame."  Id. at 10.  This type of generalized, non-specific evidence is exactly what the Sixth Circuit rejected in *Nelson*, when it held that evidence showing "PCBs were present in the environment in excess of allowable limits and plaintiffs lived and worked in the area" was insufficient to demonstrate specific causation.  243 F.3d at 252-53.

Like *Nelson*, the *Reference Manual on Scientific Evidence* calls on experts to "offer an opinion as to whether *the dose to which the plaintiff was exposed is sufficient* to cause the disease." REF. MAN. SCI. EVID. at 419 (emphasis added).  Plaintiffs simply cannot escape the rule that quantification through dose-response analysis is the touchstone of specific causation, and without quantification evidence their experts' opinions are deficient.

Scientific Theory

While avoiding any discussion of *Nelson*, plaintiffs argue that science supports their contention that they need not quantify their level of exposure, because many in the scientific community accept the "no-safe-threshold" or "one molecule" theory.  Thus, the argument continues, it is proper for plaintiffs' experts to rely on the theory.  Plaintiffs' motion for reconsideration, D.E. No. 984. at 23, n. 6.  But neither defendants nor the Court assert that the no-safe-threshold theory does not enjoy any scientific support.  Rather, the point is that while the theory is considered by some scientists as an appropriate basis for assessing risk and protecting public health, it is not a basis on which a specific causation opinion can rest.  REF. MAN. SCI.

EVID. at 426 (explaining that while an exposure to a single mutagen might increase the *risk* of cancer, the risk is likely to be very slight "*and not achieve medical probability*") (emphasis added).  Courts have broadly rejected the contention that no-safe-dose opinions are sufficient to prove specific causation:

> Increased risk alone is not actionable.  In toxic tort cases generally, plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure.  The fact the chemicals increased the possibility of sickness in the overall population does not suffice to provide a causal link with plaintiffs' illnesses.

*Whiteley v. Philip Morris, Inc.*, 117 Cal. App. 4th 635, 701 (2004) (emphasis in original); *see also Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1350 (6th Cir. 1992) (causation under no-safe-dose theory is not known and cannot be proved to the requisite degree of medical probability); *Sutera v. Perrier Group of America, Inc.*, 986 F. Supp. 655, 666  (D. Mass. 1997) ("there is no scientific evidence that the linear no-safe-threshold analysis is an acceptable scientific technique used by experts in determining causation in an individual instance").[1]

The no-safe-dose theory, if accepted as a legal standard, would lead to near-universal causation and liability because "[t]he substances which plaintiffs allege caused their illnesses are ubiquitous in the environment."  Court's order of July 30, 2007, D.E. No. 959 at 17.  Even plaintiffs ultimately concede (in their motion to reconsider) that the no-safe-level theory is an unworkable legal standard: "[a]s the Court pointed out, such a position would open a Pandora's

---

[1]      Plaintiffs also invoke the California case of *Rutherford v. Owens-Illinois, Inc.*, 941 P.2d 1203 (Cal. 1997) and its progeny in support of their one-molecule theory.  But *Rutherford* crafts a legal causation rule only for California "asbestos-related cancer cases."  In California, once it is established that asbestos has caused plaintiffs' disease, the plaintiff is not required to show that each defendant was the actual cause of the disease under Restatement 402's "but for" causation test.  Rather, in asbestos cases, California uses a hybrid "but for" test that allows a plaintiff to satisfy legal cause by showing that a particular defendant made a substantial contribution to the aggregate dose which caused the disease.  941 P.2d at 1203.  This, however, is not the rule in Kentucky.  As set forth in the briefing on legal cause, in Kentucky the plaintiff bears the burden of establishing that each alleged cause, *viewed in isolation*, is capable of being a cause-in-fact of his injury.  Applied here, this means that plaintiffs must show that, when considered separately, exposures from the NEC plant must be the "but for" causes of their injuries, even though there might be other causes as well.  *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 91-92 (Ky. 2003). *See* briefing at DE No.  655.  And, in any event, without a dose reconstruction, plaintiffs cannot show that even one molecule of a harmful substance from the NEC plant reached them.

box given the many ways in which the general public is exposed to these chemicals."  Plaintiffs'

motion for reconsideration, D.E. No. 984 at 25.

Faced with the incompatibility of the no-safe-dose theory and specific causation,

plaintiffs next recycle their "non-trivial level of exposure" theory.  Plaintiffs' motion for

reconsideration, D.E. No. 984. at 25.  But this theory—if it is indeed anything more than a phrase

created by plaintiffs' experts for purposes of this litigation—is useless in evaluating specific

causation.  The idea that something is non-trivial clearly calls for a quantification, *i.e.*, a dose

calculation, which is "*the single most important factor* to consider in evaluating whether an

alleged exposure caused a specific adverse effect."  David L. Eaton, *Scientific Judgment and*

*Toxic Torts—A Primer in Toxicology for Judges and Lawyers*, 12 J.L. & Pol'y 5, 30 (2003-2004)

(emphasis added).  But plaintiffs' experts did not even attempt such a dose calculation.   By

invoking the "non-trivial" standard, plaintiffs merely beg the questions that the case law puts to

them: what exposure levels do plaintiffs contend is harmful and have plaintiffs been exposed at

those levels?   To this day, plaintiffs' experts have not answered these questions.

**2.     Plaintiffs have not attempted to perform a quantifiable dose assessment.**

Plaintiffs also complain that it is unfair to put the "onus [i.e., burden of proof] on injured

plaintiffs" to quantify their exposure, because quantification is a difficult task.  D.E. No. 984 at

33.  Statements such as these exemplify the core problem with plaintiffs' experts' approach,

which is wholly detached from which party carries the burden of proof.  In plaintiffs' view,

because defendants *may* have released chemicals that *could* cause injury, then this is sufficient

evidence to hold defendants liable, unless the defendants can show otherwise.

But it is plaintiffs' burden to prove specific causation.  And while plaintiffs complain

they cannot perform an exact dose reconstruction given the passage of time and lack of certain

records, the Court has not said that they are required to analyze dose with mathematical precision.  Rather, they must provide a scientific, objective assessment of plaintiffs' level of exposure.  Court's order of July 30, 2007, D.E. No. 959 at 18.  Plaintiffs repeatedly recognize in their motion to reconsider that they had certain building blocks to consider an evaluation of the dose—water quality data, plaintiffs' water consumption levels, frequency of burning activity at the NEC plant, air modeling, etc.  Yet they just chose not to assess the dose, or even attempt to do so, in any quantified way.  Plaintiffs cannot refuse to do the scientific legwork that *Daubert* demands and then ask the Court to assume that the incomplete scientific analysis would have broken in their favor had it been performed.

### 3.    Plaintiffs cannot establish specific causation through Dr. Sawyer's blood evidence.

Plaintiffs also attack the Court's statement in its specific causation opinion that blood data does not substitute for a *Nelson* dose assessment:

> [T]he mere fact that the plaintiffs' blood levels were allegedly elevated does not excuse the specific causation experts from their well-established duty to base their causation opinions on reliable evidence of exposure and dosage.

D.E. No. 959 at 12-13.  Plaintiffs contend that elevated blood levels can in fact substitute for a dose assessment and serve as complete proof of specific causation, and that the Court was wrong to conclude otherwise.

As an initial matter, this argument hinges entirely on whether the blood levels were in fact abnormally high – a point supported only by the opinion of Dr. Sawyer.  If the blood levels were not abnormally high, then normal blood levels certainly cannot serve as a substitute dose assessment or basis for specific causation, as even plaintiffs appear to concede.  As set forth in Section **C**, the Court has correctly determined that plaintiffs' blood levels are not abnormally high, and thus their specific causation opinion based on elevated blood levels must fail also.

Responding to plaintiffs' argument, as the quoted passage from the Court's opinion recognizes, evidence of *exposure* is not tantamount to evidence of *specific causation*. While proof of exposure is certainly one piece of the specific causation issue, blood results tells us nothing about where the exposure came from. Plaintiffs loudly proclaim the validity of sampling PCBs, dioxins, and furans in the blood; analogizing it to sampling lead and blood-alcohol levels. But these analogies miss the point—neither the Court nor defendants contend that PCBs, dioxins and furans cannot be sampled in the blood. Rather, the question is: what does a measured blood level tell us about the *source* of the chemical in that blood level?

If a child is found with a substantially elevated lead blood level, it would be highly erroneous to conclude, e.g., that minor paint dust on window sills must have caused the condition without conducting a dose assessment first. The child could just as easily been drinking from lead-containing cups his entire life. Likewise, when someone has a .1% blood-alcohol level, it may be fair to conclude that they have consumed alcohol. But the blood-alcohol level tell us nothing about *where* the person consumed the alcohol. And, unlike blood-alcohol—which does indicate recent alcohol consumption—the blood tests of PCBs, dioxins, and furans do not indicate when the exposure occurred because these ubiquitous chemicals have such long half-lives.

As the Court observed, at most, plaintiffs' experts opine that "defendants' chemicals *could have* reached the plaintiffs." Court's order of July 30, 2007, D.E. No. 959 at 10 (emphasis added). The results by themselves could not possibly point to any particular exposure source, because humans are exposed to PCB and dioxin congeners in a host of ways – fish, red meat and other foods, forest fires, campfires or other sources of burning, car emissions, and many sources both natural and human-generated. This is why the NHANES study has found one or more of

these congeners at low levels in nearly every individual tested.  The congeners are too generic and widespread to serve as an exclusive "biomarker" for any particular exposure, as might be the case with radiolabeled tissue or extremely rare chemicals not found in normal populations.

The lack of a direct link is exacerbated here by the extended period between the alleged NEC site exposures – more than twenty years ago – and the recent blood testing.  All sorts of exposures could have occurred, and certainly did occur, in the intervening years.  Which of these exposures produced the current, low-level blood findings is entirely unknown and unprovable by the blood results themselves.

Thus, even elevated results could not suffice alone for specific causation.  To demonstrate which exposures are responsible, particularly the alleged NEC site exposures, a dose and exposure assessment is still required, first, to see whether those exposures could have produced the levels found in plaintiffs today, and second, to determine whether the doses were comparable to the levels of exposure shown to cause disease in epidemiology studies.[2]  Just as critical, the contribution of ordinary exposures – the same ones that produced the NHANES dataset – would have to be ruled out as well, which plaintiffs cannot do from the blood data itself.  *Nelson*'s dose requirement remains critical for this case regardless of whether blood data is elevated.

All the authorities cited by plaintiffs are thus irrelevant.  Those authorities (e.g., the *Reference Manual*, the Cullen text, and the case law) simply recognize that blood measurements are one way to show that an exposure has occurred.  None of them stand for the point that blood levels prove *which* source caused the exposure or that blood levels eliminate any need for a dose

---

[2]     Plaintiffs continue to rely almost exclusively on two studies, De Roos and Lee.  The problems with their reliance on these studies have been briefed and argued extensively.  De Roos in particular is the first study of its kind, and its findings are not consistent with prior epidemiology and have not been replicated.  The vast majority of the epidemiology studies show cancers and other disease occurring (if at all) only at high-level occupational or environmental disaster exposure levels, not the near-background levels found here.

assessment, particularly under the circumstances of this case (long latency, many other sources). Plaintiffs' repeated insistence that blood levels are *admissible* under these authorities in fact misses the point. The Court did not exclude the results themselves, only Dr. Sawyer's opinion that they were abnormally high. The blood levels as presented in Dr. Sawyer's methodology cannot prove a unique and substantial past exposure, and thus cannot provide a dose assessment from a given source that meets plaintiffs' burden of proof under *Nelson*.

Plaintiffs gain nothing by referring to Drs. Rozman and Shields' testimony that they relied on the blood levels to determine that no serious past exposures had occurred. This evidence is not a two-way street. Blood levels are sufficient evidence of a <u>lack</u> of unusual exposure – if the footprints are not there, no one stepped in the sand. Because these congeners remain in blood for so long, normal blood levels can be properly used to eliminate any possibility of a past extensive exposure, as Dr. Shields and Dr. Rozman have stated. Such an exposure would have left its mark behind in substantially elevated congeners, not the routine results seen in these plaintiffs. *See* Rozman Dep. at 271 ("if it were so, then I would see it [elevated blood levels], and you could see it for the rest of their lives") (attached as Exh. 2). Drs. Shields and Rozman are firmly convinced that the blood levels were <u>not</u> elevated and thus proved that no serious past exposure had ever taken place. *See* Rozman Dep. at 270-71 (blood levels were consistent with background and dietary exposures); Shields Rpt., Dec. 1, 2006 at 1 - 3 (submitted by plaintiffs as Ex. 5 to D.E. No. 720).

The *converse* is not true. Elevated blood levels, at most, prove only that a past exposure occurred. The question of which exposure was sufficient to cause an elevation, and whether any exposure was sufficient to cause disease, would remain. The blood levels thus could not be

sufficient to displace a dose assessment aimed at addressing those critical issues.  None of the cited questioning of Drs. Rozman and Shields was directed at this scenario.[3]

Fundamentally, plaintiffs' blood arguments microscopically focus on small pieces of the puzzle while ignoring the overall picture.  The few congeners over which plaintiffs argue do not change the reality that the blood results are entirely normal and comparable to results that would be expected from any group of four individuals living in the United States.  Plaintiffs' arguments are insubstantial and off point and certainly do not reflect the kind of clear error or manifest injustice that would require reversal of any of the Court's rulings.

To determine if the chemicals from the NEC plant reached plaintiffs in an amount sufficient to cause them injury, it was necessary for plaintiffs to perform some level of dose reconstruction.  And it is undisputed that they did not do so.  The Court correctly struck as inadmissible Dr. Sawyer's opinion that plaintiffs' blood levels were abnormal.  But even if it were admissible, his opinion alone cannot complete the link between plaintiffs' blood and operations at the NEC plant.

**C.     The Court Correctly Excluded Dr. Sawyer and Rejected the Blood Evidence as Stand-Alone Proof of NEC Site Exposures Sufficient to Cause Disease.**

Plaintiffs also attack  the exclusion of Dr. Sawyer's opinion that some of plaintiffs' blood levels are in fact elevated.  As previously explained, the Court's decision on Dr. Sawyer is irrelevant (unless, as set forth in Section **B** above, the Court reverses itself and finds that Dr. Sawyer's opinions are sufficient to satisfy the *Nelson* requirement of a dose and exposure

---

[3]     Likewise, plaintiffs' criticism of the Court's use of *Parker* is not well taken.  The *Parker* experts had nothing but anecdotal stories of exposure and broad qualitative characterizations like "substantial" to support their specific causation opinion.  That is exactly the case with Drs. Rodgers, Orris, and Miller.  Supposedly elevated blood levels do not prove what the source of the exposure was or whether, as *Parker* requires, the dose was sufficient to cause the disease.

assessment).  In any event, the Court already correctly held that Dr. Sawyer's opinions are not admissible.

1.      **Dr. Rodgers' New Methodology Does Not Save Dr. Sawyer's Flawed Assessment of "Half-Above, Half-Below" as an Abnormal Result.**

Plaintiffs begin their attack on the Court's Sawyer ruling by criticizing only one of several reasons the Court gave for rejecting Dr. Sawyer's testimony as unscientific. The opposition is directed at the Court's "half-above, half-below" analysis of Dr. Sawyer's charts, which, as the Court recognized, demonstrates nothing outside of a normal range of results for these plaintiffs.  The opposition largely ignores multiple other Court findings supporting its decision that Dr. Sawyer did not apply a scientific process, including, e.g., his flawed pattern analysis, his cherry-picking of results from the combustion studies, and most critically, the misinterpretation of the mean (and the confidence interval around it) as the measure of normalcy. Plaintiffs thus do not even attempt to resuscitate the key to Dr. Sawyer's entire opinion, the "mean as the definition of normal" approach rejected by *Allgood* and this Court.  Their failure to address any of these multiple grounds for excluding Dr. Sawyer's testimony is by itself sufficient ground for denying their motion for reconsideration.

Instead of addressing Dr. Sawyer's central errors, plaintiffs chose to address only the last of the Court's findings, at the very end of the Court's discussion of Dr. Sawyer, contending that the "half-above, half-below" analysis is flawed.  Plaintiffs' only basis for criticizing the Court's analysis is an entirely new affidavit and methodology from Dr. Rodgers (not from Dr. Sawyer, whose opinion is at issue).  Dr. Rodgers contends that if the analysis is narrowed only to the six congeners for which NHANES reported a geographic mean, and to the 24 results associated with

those congeners, then 20 of the 24 are above average. There are multiple reasons to reject this latest effort both for its untimeliness and on its merits, including the following:

(1) *Dr. Rodgers' methodology and opinion is new and untimely.*  Dr. Rodgers has provided seven different expert reports, been deposed twice for a total of fourteen hours, and produced an affidavit in opposition to defendants' *Daubert* motions.  Nowhere in any of this did he provide any opinions on the normalcy of the blood levels independent of Dr. Sawyer's report, much less introduce the new methodology contained in this latest affidavit.  Plaintiffs have had more than adequate opportunity to defend their view of the blood data without a post-ruling expert methodology not subject to any cross-examination and completely inappropriate at this stage of the case.

(2) *It is Dr. Sawyer's methodology that is at issue, not Dr. Rodgers'.*  The only methodology at issue is that of Dr. Sawyer, who did *not* exclude from his analysis the congeners for which NHANES could not identify a geometric mean.  He included them in his approach by arbitrarily assigning a value of half the limit of detection to the congeners and opining that any plaintiff values above that arbitrary number were abnormally high.  *See* Defendant's Sawyer Mem., DE 561 at 8-9.  Dr. Rodgers' new approach was *not* used by Dr. Sawyer and does nothing to save Dr. Sawyer's methodology.  If the Court's analysis contained a "fatal flaw" by including more than the six congeners selected by Dr. Rodgers, as plaintiffs claim, then so did Dr. Sawyer's approach, and the exclusion ruling should stand.

(3) *Dr. Rodgers is wrong to exclude the many results lower than the LOD.*  The congener results that Dr. Carpenter chose to eliminate from his analysis are all extremely low—most are lower than the limit of detection (LOD) of the highly sensitive equipment used by NHANES in

its analysis.[4]  By eliminating these, and focusing only on the higher results associated with the remaining six congeners, Dr. Rodgers presents a highly skewed view of the overall plaintiff data. The Court is correct that roughly half the results, as presented by Dr. Sawyer (who did not use Dr. Rodgers' approach), are below normal and half are above.  Neither plaintiffs' motion for reconsideration nor Dr. Rodgers' analysis contradicts this finding.  The Court's statement similarly remains accurate even under Dr. Rodgers' approach, and more so, because the vast majority of the results are below the LOD and thus completely inconsequential, whereas only a handful (according to Dr. Rodgers, only 20 out of 116 results) are above an NHANES mean.  Dr. Rodgers cannot simply ignore the far larger number of insignificant results to opine that the blood of these plaintiffs has abnormally high amounts of dioxins and PCBs.[5]

*(4) Dr. Rodgers ignored the confidence interval around the mean.*  Defendants do not believe Dr. Rodgers' counting method is appropriate, but in any event he has not even counted properly.  Dr. Sawyer and plaintiffs have previously stood firmly on the appropriateness of utilizing the 95% confidence interval around the mean rather than the mean itself, and in fact used this proposition to try to save Dr. Sawyer's reliance on the mean as the touchpoint of normalcy.  *See* Pltf. Opp. to Motion to Exclude Dr. Sawyer, DE 637.  Yet Dr. Rodgers now ignores this position in identifying 20 of 24 results as above the NHANES mean, for which he

---

[4]     There are 20 congeners on Dr. Sawyer's table that do not have an NHANES mean but do identify an NHANES LOD.  *See* Exh. 10 to Defendants' Sawyer Mem., DE 561 (attached as Exh. 3).  Dr. Rodgers ignored all of these results.  For the 100 plaintiff results associated with these congeners, 80 are below the LOD.  That is likely also a statistically significant figure, if Dr. Rodgers had bothered to analyze it.  Overall, Dr. Rodgers can identify 17 congeners above the NHANES mean (95% CI), but there are five times as many that are below the extremely small detection limit.  This picture is even more skewed toward normalcy than the Court's "half-above, half-below" analysis of Dr. Sawyer's chart.

[5]     The statistical analysis provided by Dr. Rodgers is inconsequential.  He is simply analyzing whether 20 of 24 is a significant number, but the error is in the exclusion of all the results lower than the LOD and the skewing of the overall picture that results from this error.  Moreover, the amount of emphasis he places on the statistical analysis is an attempt to obscure the bigger picture – a large number of inconsequential results, no clear pattern, an overall result consistent with NHANES – with an overdone emphasis on one statistical calculation.  As the old adage says, statistics can be used (or misused) to prove anything.  The larger question is not whether 20 of 24 is significant, but whether Dr. Rodgers ignored the full set of data in isolating only six congeners for his analysis.

used the actual mean and not the confidence interval around it.  *See* Exh. 11 to Rodgers Affidavit ("max" column represents high end of confidence interval in NHANES data).[6]  This point illustrates the willingness of plaintiffs and their experts to bend or ignore their own methodologies to "find" an outcome that supports their case.

At bottom, Dr. Rodgers' analysis is as flawed as Dr. Sawyer's and illustrates yet another attempt to skew data that under any rational view is not unusual at all.  In any event, the Court's analysis rested on many independent and conclusive grounds and did not turn only on its "half above, half below" finding.  Plaintiffs have not provided any reason, much less a compelling one, to reverse the Sawyer ruling.

### 2. Plaintiffs' Congeners are not Unusually Elevated, and the Court did not Err in that Regard in Excluding Dr. Sawyer.

Plaintiffs also submit a flurry of arguments as to why individual congener results were high enough to permit Dr. Sawyer to testify, despite his flawed methodology.  All of these arguments are misdirected – they do not address or correct any of the methodological flaws of Dr. Sawyer, which is the only blood opinion methodology that is the subject of the Court's Sawyer ruling and the motion for reconsideration.  Instead, the arguments are aimed at proving as fact that some congeners are abnormal, which is beyond the province of the *Daubert* motions on which the Court ruled.  The argument that Dr. Sawyer may have stumbled upon a few elevated congeners through an improper methodology does not make his methodology correct or scientific.

In any event, most of these points were presented in the prior briefing and argument and have already been addressed by defendants and the Court.  For instance, the question of whether Ms. Jessie's HpCDF finding of 31.7 is outside the range of the NHANES data was discussed in

---

[6]    Three of the "above average" results fall out if the 95 percent confidence interval is used.  The change would, at a minimum, affect Dr. Rodgers' statistical analysis.

prior briefing.  (*See* Exh. 1).  That figure is within the 95% confidence interval around the 95th percentile (see Rodgers Exh. 11) and is thus still within the NHANES range of normal population outcomes.  *See* Defendants' Sawyer Mem., DE 561 at 11 n. 10.  Plaintiffs cannot rely on the 95 percent confidence interval to justify Dr. Sawyer's methodology and then abandon it to argue that Ms. Jessie's level is abnormal.[7]

Likewise, all of the arguments regarding NHANES providing an "overestimate" and the reasons why the blood results of the four plaintiffs would supposedly be lower today were all covered in detail during prior expert testimony, briefing and oral argument and provide nothing new here.  (*See* Exh. 1).  Dr. Sawyer's conclusions in this regard are speculative and cannot displace the straightforward fact that these plaintiffs' results are no different than those of other U.S. residents.

There are two arguably new points in the motion for reconsideration that are worth brief discussion.  First, Dr. Kramer criticizes the likelihood that Ms. Jessie's HpCDF finding is due to chance.[8]  Her primary ground for doing so actually works against her – if it is true, as Dr. Kramer contends, that these congeners are not independent (and thus cannot be ascribed to chance because they tend to move up and down together with exposure), then one would expect Ms. Jessie to have a *multitude* of results above, and even well above, the NHANES 95th percentile, rather than just one.  If anything, the single result at the high end of the 95th percentile looks even

---

[7]       Plaintiffs for the first time have cited to an older version of the NHANES report, the Second Report, instead of or in addition to their previous citations to the current (Third) report.  *See, e.g.*, Plaintiffs' Opposition at 14, 17; Rodgers Aff. ¶ 10.  The current report is much closer in time to the date of the blood testing (2006) and is the more appropriate comparison.  It is also disingenuous for plaintiffs and their experts to reference the older report for the first time after their experts have been excluded, particularly since they argued only one page earlier in their brief about the importance of using data close to the date of the blood sampling (Plaintiffs' Opp. at 14).

[8]       Dr. Kramer has never to this point in the case offered any opinion at all regarding the blood data.  No such opinions were disclosed in any of her expert reports, affidavits, or testimony.  Dr. Kramer also appears to rely heavily for her views on two undocumented "personal communications" with other experts (Kramer Aff., ¶¶ 42, 55) who were not disclosed in this case, who have produced no reports, and whom defendants have had no opportunity to depose.  One of these experts is widely known to support plaintiffs' litigation elsewhere (Dr. Clapp).  This latest affidavit criticizing the Court's opinion is, like Dr. Rodgers', untimely and inappropriate at this stage of the case.

more like chance by its sheer isolation.  The fact remains that any time so many multiple analyses are run at a confidence level of 95 percent, 5 out of 100 will be "abnormally" high or low due purely to chance.  Here, where the laboratory ran 116 separate analysis, roughly six could be expected to be outside of the 95th percentile range in an entirely normal group of people.[9]  Nothing in Ms. Jessie's single HpCDF congener result is inconsistent with a normal range of multiple analyses, a few of which by chance will appear to be high.  The rest of Dr. Kramer's arguments are entirely circular – she claims that because plaintiffs have diseases caused by these congeners, then the blood result must not be due to chance.  She has simply assumed causation to eliminate chance, therefore the chance result supports causation.  To the contrary, the blood data standing alone has to withstand scrutiny to prove the causation link.

The second point worth comment is the Court's criticism of plaintiffs' experts for reaching their opinions first and then relying on the later-developed blood data to support those opinions.  The Court is correct to levy this criticism, as supported by multiple other decisions around the country rejecting expert opinions formed before reviewing the relevant materials.  *See e.g., Sorensen ex rel. Dunbar v. Shaklee Corp.*, 31 F.3d 638, 649 (8th Cir. 1994); *Claar v. Burlington N. R.R. Co.*, 29 F.3d 499, 502-03 (9th Cir. 1994); *Mitchell v. Gencorp, Inc.*, 968 F. Supp. 592, 600 (D. Kan. 1997), *aff'd*, 165 F.3d 778 (10th Cir. 1999); *Lofgren v. Motorola*, 1998 WL 299925, *4, *18, *27, *35 (Ariz. June 1, 1998).  As these courts recognized, reviewing materials after forming an opinion "is the antithesis of" the scientific method.  *Claar*, 29 F.3d 499, 502-03.  Plaintiffs have also misconstrued the Court's point, which is that the experts reached a causation opinion with no dose information whatsoever, in violation of *Nelson*'s

---

[9]      Dr. Kramer's criticism of the shape of the curve is also irrelevant.  Most of these congeners demonstrate a long "tail" to the right of the distribution reflecting a wide range of results at the higher end.  Nonetheless, the 95th percentile is the 95th percentile, regardless of the shape of the curve.  Five out of 100 results would fall outside this range by chance alone no matter what the shape of the curve is.

requirements.  The experts cannot fix that serious error by construing later-developed blood data to be consistent with their opinions.

Thus, nothing in plaintiffs' briefing even addresses why the Court was in error to reject *Dr. Sawyer's* methodology, which is the only relevant issue.  The misdirected arguments based on Dr. Rodgers' new methodology and the supposed significance of the higher congener results are both erroneous and not a basis for reversing the Court's exclusion of Dr. Sawyer.

**D.      The Court Should not Entertain any Further Argument by Plaintiffs on the Admissibility of Dr. Kramer's Studies.**

Plaintiffs persist in arguments for the admissibility of Dr. Kramer's studies that this Court has heard and rejected many times before.  They offer no new answer to the Court's concerns about the undue prejudice inherent in this evidence; indeed, they do not address the issue of prejudice to defendants at all.   Plaintiffs do not contend that these studies are sufficient proof of dose to require reconsideration of the Court's specific causation ruling.  Nor do plaintiffs explain why their arguments about Dr. Kramer's studies, even if accepted, would warrant denial of defendants' motion for summary judgment.

This Court not only excluded the Kramer studies on defendants' original motion in limine in *Amburgey,* but also:

- denied plaintiffs' motion for reconsideration of that order;[10]

- denied their motion to permit Dr. Kramer to testify in rebuttal about her studies;[11]

- denied their motion to reconsider the rulings in the context of the *Cummins* case;[12]

---

[10]      Order of April 23, 1996, attached as Exhibit B to Defendants' Motion to Exclude Plaintiffs' Studies Regarding Other Plaintiffs and Workers, D.E. No. 451-1.

[11]      Order of October 9, 1996, attached as Exhibit C, *id.*

[12]      Order of September 27, 2001, attached as Exhibit D, *id.*

- granted defendants' motion to exclude the studies from trial in this case;[13]  and

- declined to rule that Dr. Kramer's studies were admissible in response to any reliance by defendants' experts on OSHA PELs or ACGIH TLVs.[14]

Plaintiffs ignore these rulings, apparently believing that if they simply argue the point again and again, the Court will eventually relent.  The Court should summarily reject this portion of Plaintiffs' Response.  It should declare an end, at last, to plaintiffs' arguments about the Kramer studies.[15]

Dr. Kramer's studies have become plaintiffs' all-purpose answer to an ever-changing set of causation issues.  Plaintiffs have variously offered the studies as probative of general causation, emotional distress, dose, and specific  causation.  Even worse, they have contended that defendants open the door to Dr. Kramer's studies by raising even the most basic defenses to allegations of toxic injury, such as the fundamental dose-response principle of toxicology.  The Court has twice ruled, however, that there is only one circumstance in which the door to Dr. Kramer's studies will open:  "if the defendants present any evidence regarding incidence of cancer in the Dayhoit area as compared with state or national incidence rates."[16]  Defendants have scrupulously avoided doing so.  Nothing in defendants' specific causation or summary

---

[13]     Order of December 19, 2006, D.E. No. 510.

[14]     Transcript, hearing of July 26, 2007, at 79, D.E. No. 960.

[15]     Plaintiffs have suggested in the past that they would voluntarily put the Kramer issue to bed.  In opposition to defendants' motion to exclude Dr. Kramer's studies from evidence in this case, plaintiffs stated that they would no longer seek to offer into evidence her 1995 studies.  (Order of December 19, 2006, D.E. No. 510, at 4.)  In their Response In Opposition To Defendants' Motion For Summary Judgment, however, they argue for the admissibility of Dr. Kramer's studies generally, making no distinction between the 1995 and 2006 studies.  Similarly, in response to plaintiffs' motion for an order requiring defendants' consulting expert, Dr. Blot, to destroy his copy of data obtained by Dr. Kramer from the Kentucky Cancer Registry for use in her 2006 cancer incidence study, defendants explained that they could not surrender the data "unless we know this is the end of the Kramer issue, no motion for reconsideration, no proffer at trial, we will never hear about Dr. Kramer's studies again."  (Transcript, hearing of December 21, 2006, at 74-75, D.E. No. 515).  Plaintiffs did not disagree.

[16]     Order of December 19, 2006, D.E. No. 510, at 9; *cf.* Order of February 15, 1996, Exhibit A to Defendants' Motion To Exclude Plaintiffs' Studies Regarding Other Plaintiffs And Workers, D.E. No. 451-1, at 7.

21

judgment motions depends on, or opens the door to, evidence of cancer incidence in the area around the NEC plant.

This time around, plaintiffs also suggest that Dr. Kramer's studies should be admitted because defendants' experts rely on epidemiologic studies in reaching their causation opinions. But this argument wrongly equates Dr. Kramer's studies with the peer-reviewed, published epidemiologic literature.  Dr. Kramer's studies are neither peer-reviewed nor published.  They exist only in the context of her expert opinion in this litigation.  Defendants' reliance on epidemiologic literature goes to the heart of its defense; epidemiology is the gold standard in reaching  causation opinions and is a required part of expert testimony in a toxic tort case.  Such routine reliance on the epidemiologic literature cannot be said to open the door to Dr. Kramer's studies.

Plaintiffs' argument that studies of the population nearest the plant are the most relevant, moreover, ignores the Court's past rulings on this very point.  Beginning with its opinion of February 15, 1996 in the *Amburgey* litigation, the Court has consistently recognized that these studies are of minimal probative value on the causation of the bellwether plaintiffs' injuries.  In that opinion, the Court described the incidence of illness in Dayhoit as having "very little relevance, if any at all."[17]  More recently, in its decision excluding Dr. Kramer's 2006 studies, the Court characterized the studies as "of limited relevance" on the issue of specific causation.[18]  Although plaintiffs' response calls Dr. Kramer's studies "highly relevant," "important," and "one means" of testing their causation hypothesis,[19]   it also concedes that "[t]he studies themselves do

---

[17]    Order of February 15, 1996, Exhibit A to Defendants' Motion To Exclude Plaintiffs' Studies Regarding Other Plaintiffs And Workers, D.E. No. 451-1, at 6-7.

[18]    Order of December 19, 2006, D.E. No. 510, at 6.

[19]    Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment, D.E. No.969, at 34-39.

not prove the cause of any particular illness,[20] and that "[n]either Dr. Rodgers nor Dr. Orris points to the results of the Kramer study as proof of causation."[21]  Nothing in plaintiffs' argument, therefore, adds weight to the "relevance" side of the Rule 403 balancing test.

Nor does their argument support the conclusion that the Court wrongly decided defendants' motion to exclude plaintiffs' expert testimony on specific causation.  If Dr. Kramer's studies "do not prove the cause of any particular illness," they can hardly dictate reconsideration of the Court's ruling on that issue.   Indeed, the Court has correctly recognized that epidemiological studies can never prove the specific causation of any bellwether plaintiff's illness.[22]   Dr. Kramer's studies are not an attempt to quantify the bellwether plaintiffs' exposures.  The results say nothing at all about dose.  Plaintiffs' experts do not contend that Dr. Kramer's studies prove even general causation – her study design precludes any such conclusions – much less the dose at which causation can be inferred.[23]  Finally, while plaintiffs contend that their experts should be permitted to cite the Kramer studies as proof of "substantial exposures to dioxin-like compounds,"[24] they offer no new reason why merely labeling the exposure "substantial" should be held to satisfy *Nelson*.

---

[20]     *Id.* at 36.

[21]     *Id.* at 37.  *The Reference Manual on Scientific Evidence* agrees.  It explains that so-called "ecological" studies "may be useful for identifying associations, but they rarely provide definitive causal answers."  (Federal Judicial Center, *Reference Manual on Scientific Evidence* (2nd ed. 2000) at 344.)  The Manual also points out that the lack of information about each individual's exposure in an ecological study "detracts from the usefulness of the study and can lead to an erroneous inference" about causation.  Thus, an ecological study is considered hypothesis-generating; its primary use is in identifying an area for further research.  (*Id.* at 344-45.)

[22]     Order of December 19, 2006, D.E. No. 510, at 6.

[23]     Thus, plaintiffs' argument that Dr. Kramer's studies show an increased prevalence of cancer in the community "associated with the specific chemicals that were released in large amounts into the community" is one their own experts do not endorse.  As Drs. Orris and Rodgers conceded in their depositions, the most that can be said about Dr. Kramer's studies is that they show an increase in cancer associated with *some factor* affecting the two zip codes she studied.  Her study design does not permit any conclusion about *what* that factor might be.  (Orris deposition transcript at 403-404 (attached as Exh. 4); Rodgers deposition transcript at 351-53 (attached as Exh. 5).)

[24]     Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment, D.E. No. 969, at 36.

Plaintiffs' response also completely ignores the Court's consistent rulings on the "prejudice" scale under Rule 403. Time and again, the Court has recognized that this evidence will create mini-trials about persons and injuries that are not before the Court; that the evidence will unduly prejudice the jury against defendants; that it will create jury sympathy and confusion apart from its actual merits; and that a limiting instruction cannot stop "the jury's race to the conclusion that, where there is so much smoke, there must be fire."[25]  After full briefing and a lengthy oral argument on defendants' newest motion to exclude Dr. Kramer's studies, the Court recently concluded, "These same concerns are present in this case."[26]  Plaintiffs offer no reason the Court should now disregard the prejudice to defendants and overrule its decision under Rule 403.[27]

### III.   CONCLUSION

Accordingly, the Court should deny plaintiffs' motion for reconsideration. The Court correctly found that plaintiffs' experts' opinions on specific causation are inadequate. Nothing about the rulings on Dr. Sawyer's or Dr. Kramer's opinions will change that. Plaintiffs are not left without recourse. They can appeal the Court's decision to the Sixth Circuit. But this Court's decision on specific causation should remain final.

---

[25]   Order of February 15, 1996, Exhibit A to Defendants' Motion To Exclude Plaintiffs' Studies Regarding Other Plaintiffs And Workers, D.E. No. 451-1, at 6-7.

[26]   Order of December 19, 2006, D.E. No. 510, at 7.

[27]   Plaintiffs contend, instead, that the *exclusion* of Dr. Kramer's studies is prejudicial to *them*. This can hardly be the case, given their concession that the studies do not prove causation, their description of the studies as only "one means" of proving causation, and their experts' acknowledgment that the studies cannot be interpreted to associate any increased cancer incidence with the NEC plant in particular.

Dated:  September 14, 2007.

                                                    Respectfully submitted,

Harry K. Herren                                     s/Tracie J. Renfroe
Angela Logan Edwards                                Robert E. Meadows
Woodward, Hobson & Fulton, L.L.P.                   Tracie J. Renfroe
2500 National City Tower                            C. Brannon Robertson
Louisville, Kentucky  40202                         King & Spalding LLP
Tel:  (502) 581-8000                                1100 Louisiana, Suite 4000
Fax:  (502) 581-8111                                Houston, Texas  77002-5213
hherren@whf-law.com                                 Tel:  (713) 751-3214
aedwards@whf-law.com                                Fax:  (713) 751-3290
                                                    rmeadows@kslaw.com
                                                    trenfroe@kslaw.com
and                                                 brobertson@kslaw.com

                                                    and

Clifford J. Zatz                                    Linnea Brown
William L.  Anderson                                Holme Roberts & Owen LLP
April M. Nelson                                     1700 Lincoln Street, Suite 4100
Crowell & Moring LLP                                Denver, Colorado  80203-4541
1001 Pennsylvania Avenue, N.W.                      Tel:  (303) 866-0608
Washington, DC  20004-2595                          Fax:  (303) 866-0200
Tel:  (202) 624-2810                                nea.brown@hro.com
Fax:  (202) 628-5116
czatz@crowell.com
wanderson@crowell.com
anelson@crowell.com

                                                    *Counsel for Defendants, Cooper Industries, Inc.
                                                    and McGraw Edison Company*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served via electronic filing on September 14, 2007 to the following:

Donna Keene Holt
P.O. Box 10307
Knoxville, TN 37939

Nancy Seidler Eichler
Masry & Vititoe
Second Floor
5707 Corsa Avenue
Westlake Village, CA  91362

Charles L. Cunningham, Jr.
Suite G
6010 Brownsboro Park Boulevard
Louisville, KY 40207

Ellen Presby
Laura Baughman
Jory Lange
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX  75219

/s/Tracie J. Renfroe
      Tracie J. Renfroe